# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

### APRIL TERM, 1914.

HARRY TROLL, Administrator in Charge of Estate of MURDOCH & DICKSON, Plaintiff in Error, v. CITY OF ST. LOUIS et al.

*In Banc, May 4, 1914.*

1. QUIETING TITLE: Multifariousness: Bill of Peace. Notwithstanding in a suit in equity to quiet title an objection of multifariousness may be raised, since many persons claiming to own land in severalty, some of whose titles depend on limitations and are separately asserted, are joined as defendants, yet both sides may refuse to object to the omnibus character of the petition, and assume that such common relation exists among defendants, and such common interest and common question are involved, that the equitable doctrine of avoiding a multiplicity of suits so controls the situation as to permit a general bill of peace.

2. ————: Improvements: Laches. Where unimproved land, as the result of a partition suit brought by the assignee of the administrator of a partnership which the title records do not show was the owner, was sold many years ago, and improvements to the amount of many thousands of dollars were made by the purchaser's grantees on the faith of an established title, and the flux of time and laches have been marked, the gran-

(626)

tees' title ought not to be disturbed except for the gravest reasons and only to preserve settled and indisputable principles relating to real property.

3. ————: **Railroad Company as Defendant.** Whether or not Sec. 650, R. S. 1899 (Sec. 2535, R. S. 1909), relating to a remedy for determining and adjudging title to land, applies to a railroad defendant, which has long used the land for its tracks, is not decided in this case, because both sides concede it does apply, and the case was tried on that theory.

4. **FRAUD: Based on Conjecture: Presumption of Honesty.** Where actual fraud is not made out, but its imputation is based on conjecture, speculation, theory and lack of diligence, in matters in which the active participants are all long since dead, including administrators, executors, creditors and purchasers at a partition sale, the presumption of honesty must be kept in view, and fraud held not to be established.

5. **LACHES: Aided by Estoppel.** As estoppel and laches may meet in a faded line and overlap at the edges, existing elements of estoppel *in pais* may serve as an aid to laches.

6. **QUIETING TITLE: Estoppel: Accepting Benefits of Illegal Sale.** Whether or not the acceptance of benefits by the assignee for the benefit of creditors of a partnership estate from the surviving partner as administrator, will be held to estop the subsequent administrator of said partnership from attacking the validity of a partition sale of the land to defendants in a suit brought by such assignee, will not be decided where the decree of the chancellor for defendants was not placed on that ground.

7. **JURISDICTION: Assignment of Partnership Estate: Former Decision: Stare Decisis.** The judgment in a former branch of this case (State ex rel. v. Withrow, 141 Mo. 69), holding that, under the statutes in force in 1873, jurisdiction of a partnership estate could not be transferred from the probate court to the circuit court by means of a voluntary assignment of the surviving partner as administrator to an assignee for benefit of creditors, and hence that the deed of assignment was void, is held to be *stare decisis*.

8. **LACHES: Definition.** The word laches at its root means laxness, negligence, neglect. Laches consists in not doing something which a party might do and might reasonably be expected to do in the vindication of his right. It does not rise to the rounded dignity of estoppel, and yet in its equitable application it borrows from the doctrine of estoppel.

9. ————: **When Available as Defense: Variant Circumstances.** Laches gives rise to an equitable doctrine, free from artificial or fixed rules, having regard to the relation of the parties

to each other and to the subject-matter, to be applied in each case in accordance with its own peculiar circumstances in order to reach substantial justice—for instance, where plaintiff lies by an unreasonable length of time awaiting a rise in land or some future event to determine his course, or where by acquiescence or by sleeping upon his rights he creates the belief in others that those rights are abandoned, whereby he induces them to act on such belief, or where something has intervened whereby he would obtain an unconscionable advantage were the relief he asked granted—under these or like conditions, where there is some natural justice behind his claim, the defense of laches is allowed, independently of limitations.

10. ———: ———: **Lapse of Time Without Action.** Where the surviving partner as administrator of an insolvent partnership, after having made two annual settlements, made an assignment of all the partnership assets for benefit of creditors, including an inventoried interest in land, whose title stood of record in the name of the deceased partner, and said administrator was thereafter removed, and the assignee brought partition suit in the circuit court and had the land sold to a purchaser, who in turn sold it, by parcels, to the various defendants, who have put valuable improvements thereon and paid the taxes, a suit to quiet title brought by an administrator *de bonis non* appointed twenty-two years after said surviving partner was removed and brought on the theory that the circuit court had no jurisdiction of said assignment proceedings or the partition suit and the sale and deed were in consequence void, and brought after all creditors are dead or their claims barred and hence for the benefit of the heirs of the deceased partner who for twenty-five years have been *sui juris*, should be held to be barred by laches on the ground of neglect, unless to so hold would be to contravene some stubborn and controlling principle of law—for instance, that the doctrine of laches has all along been suspended by *lis pendens* or *custodia legis*.

    *Held*, by WOODSON, J., dissenting, with whom BOND, J., concurs, that the assignment was void, and the assignee a mere intermeddler, by whose wrongful acts the property was diverted from its legal channels, and the doctrine of laches cannot be invoked by a wrongdoer against those upon whom the law places no legal duty to move in the matter.

11. **LIMITATIONS: Based on Void Deed.** Though defendant's possession began under a void deed, void because bottomed on a void judgment, yet the actual, uninterrupted, peaceable and adverse possession of the land by him during the period of time prescribed by the statute, under claim of right, gives him the title—unless limitation is suspended by *lis pendens* or *custodia legis*.

12. **LIS PENDENS: Suspension of Laches and Limitations: No Jurisdiction of Subject-Matter.** *Lis pendens* implies that the court had jurisdiction of the subject-matter and parties; it implies a controversy in court. If the court had no jurisdiction *ab initio* of the subject-matter, the property involved was not in *lis pendens*, and the application of the doctrine of laches or the law of limitations was not suspended by the fact that a void sale in partition of the property was never approved by the court.

13. **CUSTODIA LEGIS: Title to Partnership Real Estate: Suspension of Laches and Limitations.** The legal title to an aliquot part of real estate was in Dickson, who died, and his surviving partner, as administrator, inventoried the land as an asset of the partnership, and thereafter sold it, by general assignment for the benefit of creditors, and in pursuance to a void proceeding in partition in the circuit court brought by such assignee (void because the court was without jurisdiction), the property was sold and under a deed by the commissioner defendants entered into possession and have been in possession for many years. *Held*, that neither the land nor its legal or equitable title was in custody of the probate court or the administrator; and hence neither the defense of laches nor of limitations to a subsequent administrator's right to recover the land was suspended by the supposed fact of *custodia legis*. *Custodia legis* involves the actual domination over some objective thing by the court. It is that custody only which an officer has the right to assume over property by virtue of legal process. It does not include the mere controverted right to possession, but it must be the actual possession itself in the officer; and though land purchased by partnership funds be treated in equity as personal property, and where the legal title is vested in a deceased partner, the equitable title is in the surviving partner, yet to obtain the legal title that partner (or his assignee) must enter a court of equity, and not the probate court; and, hence the theory that the property, for a long time in the actual adverse possession of defendants who have improved it, was in the custody of the probate court or the administrator, will not avail to suspend or supplant the defense of laches or of limitations.

    *Held*, by WOODSON, J., dissenting, with whom BOND, J., concurs, that the surviving partner, upon the death of the partner to whom land bought with partnership funds had been conveyed, at once, upon his appointment and qualification as administrator of the partnership estate, acquired the title and possession of said land, and upon his removal the title and the possession (the *res*) thereafter until the appointment of an administrator *de bonis non*, were in *custodia legis* and remained in possession of the probate

court, notwithstanding the illegal attempt, after the general assignment for creditors, to transfer the whole matter of administering the estate to the circuit court; and the title (whether legal or equitable) and the possession (an administration in the probate court being a proceeding *in rem*) being *in custodia legis*, limitations did not begin to run in favor of those who entered into actual adverse possession under the void partition deed until the appointment of the administrator *de bonis non*.

14. **PARTNERSHIP LAND: Personalty or Realty: Limitations and Laches.** Conceding that partnership land, of which the deceased partner held the legal title, was, for liquidation and winding up purposes personal property and constructively in the possession of the probate court's administrator by virtue of that court's jurisdiction, it was still real estate for the purpose of the application of the Statute of Limitations and the doctrines of laches. The administrator's equitable title may be lost by limitations by actual adverse possession or by laches, just as may the legal title. Actual possession is the live element both of limitations and *custodia legis*, and no property can be said to be in *custodia legis* which is in the actual possession of an adverse claimant. [WOODSON and BOND, JJ., dissenting, in an opinion by WOODSON, J.]

Error to St. Louis City Circuit Court.—*Hon. W. M. Kinsey*, Judge.

AFFIRMED.

*John M. Dickson* for plaintiff in error.

(1) Real estate and other property in possession of an administrator is in possession of the court. Cowen v. Mueller, 176 Mo. 98; Bank v. Field, 156 Mo. 310; Brown on Jurisdiction, sec. 54; Byers v. McAuley, 149 U. S. 614; Youley v. Lavender, 88 U. S. 280. No person purchasing land in the custody and control of the court of competent jurisdiction can assert an adverse possession against the court or its officer; and any attempted sale thereof pending the litigation, is wholly destitute of effect on the court's control, possession and jurisdiction. The interest in the realty here was,

before and ever since the deed to Priest, at the time
Harrison conveyed to others and they to successive
grantees, and now is in the custody, control and posses-
sion of the probate court and its officer. That adminis-
tration and winding up proceeding was at all times and
still is pending. 21 Am. & Eng. Ency. Law (2 Ed.),
601; Bennett on *Lis Pendens,* p. 251. No person pur-
chasing *pendente lite* can claim adverse possession to
the parties to the proceeding in which the land is di-
rectly involved, while the suit is in progress and un-
til its complete and final determination; and the pro-
ceeding in the probate court, substituted by statute for
courts of equity in the same behalf, was a proceeding
pending, involving this interest in land, which was
subject to sale and accounting there in precisely the
same manner as would be a winding up proceeding in
a court of equity jurisdiction between living persons
until the final order or decree therein. The pretended
deed of Murdoch to Priest was void and barren of
effect upon the title or jurisdiction. Harrison and his
grantees claim under Priest's void deed. Ibid.; 1 Am.
& Eng. Ency. (2 Ed.), 818; Hanley v. Gore, 4 Dana,
133; Bennett on *Lis Pendens,* p. 212. In support of
the rule that no person purchasing *pendente lite* can
claim adversely to the ultimate decree a court may
make in respect of real estate directly involved in the
proceeding, or to rights as fixed or determined thereby,
see Bailey v. Winn, 113 Mo. 165; O'Reilly v. Nichol-
son, 45 Mo. 166; Turner v. Babb, 60 Mo. 348; Stoddard
v. Myers, 8 Ohio, 203; McIlwrath v. Hollander, 73 Mo.
113; Holloway v. Holloway, 103 Mo. 283; Burnham v.
Smith, 82 Mo. App. 47; 21 Am. & Eng. Ency. (2 Ed.),
647; 27 Am. & Eng. Ency. (2 Ed.), 597; Union Tr.
Co. v. So. Isl. Nav. Co., 130 U. S. 565; Jackson v.
Pearson, 60 Fed. 113; Dodd v. Lea, 57 Mo. App. 171;
Herrington v. Herrington, 27 Mo. 560; Miller v. Hall,
1 Bush (Ky.), 229; Land & Cattle Co. v. Miller, 152
Fed. 21. Neither can a purchaser *pendente lite,* or

while the land is in legal custody—that is, where it is either involved in the determination of any suit and not in legal contemplation *in custodia legis,* or where it is in legal contemplation *in custodia legis,* make any claim adverse to the true owner as fixed by the proceeding or decree, or make any demand for improvements made and taxes paid; since such purchaser cannot claim to be bona-fide. Hoole v. Acty. Gen., 28 Ala. 190; Cable v. Ellis, 120 Ill. 136; Asher v. Mitchell, 9 Ill. App. 335; Henderson v. Pickett, 4 T. B. Mon. (Ky.) 54; Haren v. Adams, 8 Allen (Mass.), 363; Patterson v. Brown, 32 N. Y. 81; Shand v. Harley, 71 N. Y. 319; Harle v. Langdon, 60 Tex. 555; Willie v. Ellis, 28 Tex. Civ. App. 462; Harm v. Keller, 79 Va. 415; McGee v. Johnson, 85 Va. 161. The proceeding in the probate court for the winding up, accounting and settlement of the partnership estate is still in progress, and until finally disposed of by that court no possession adverse to plaintiff here, or to the probate court, can be asserted. (2) Where a court lacks jurisdiction over subject matter, no consent, express or implied, no acquiescence, no delay, no estoppel predicated upon such consent, delay or acquiescence, or from anything else, can give to such unauthorized proceedings any validity whatever, or bind, in any way, any of the parties to such proceeding. Cooley, Const. Lim., pp. 575, 576; Brown on Jurisdiction, pp. 47, 48 and 49; Wells on Jurisdiction, sec. 66; Hawes on Jurisdiction, secs. 10, 11; 11 Cyc. 673; Black on Judgments, sec. 217; Black on Const. Law, p. 426; Bigelow on Estoppel, 206; Fields v. Maloney, 78 Mo. 176; Bk. v. Doak, 75 Mo. App. 336; Ladd v. Forsee, 163 Mo. 506; Freeman on Judgments, sec. 117; Fithian v. Monks, 43 Mo. 521; Russell v. Grant, 122 Mo. 180; 17 Am. & Eng. Ency. (2 Ed.), p. 1046. (3) In every partition suit, whether strictly at law, under the statute, or equitable in its nature, all persons having any interest in the real estate sought to be partitioned, must be made parties plaintiff or de-

fendant, and if not so joined, the proceedings are wholly void as to such interests. Hiles v. Rule, 121 Mo. 228; Shields v. Barrow, 17 How. (U. S.) 130; Barney v. Baltimore, 6 Wall. 284; Freeman on Co-tenancy (2 Ed.), sec. 463; Holloway v. Holloway, 97 Mo. 628; Thompson v. Holden, 117 Mo. 118; Johnson v. Johnson, 170 Mo. 34. (a) The rule that requires advantage to be taken of defect of parties, if such defect appears on the face of the petition, or by an answer or plea, if it does not so appear, has no application to partition suits. Sec. 4375, R. S. 1899. A court can acquire no jurisdiction from the filing of a petition for partition or by the service of summons thereunder, when the plaintiff is a total stranger to the title. And to confer jurisdiction upon the court to entertain such suit, or to make a decree of partition, it must appear from the face of the petition that the plaintiff has a legal or equitable interest in the land and is in possession as a joint tenant, tenant in common or co-parcenary, in fee, for life, for years, or is a tenant by the curtesy or in dower. Sec. 4373, R. S. 1899; Freeman on Co-tenancy, chap. 21. Neither Harrison nor his grantees can claim to be innocent purchasers under the pretended partition proceedings, or to hold adversely to plaintiff as purchasers under the order of sale therein, as they are purchasers *pendente lite* that proceeding, and that proceeding is still pending and no final judicial termination thereof has yet been had. A purchaser *pendente lite* can not claim that he holds possession as purchaser under an interlocutory order of sale. He holds it subject to any orders, amendments or changes in the interlocutory decree the court may make. He is a *pendente lite* purchaser and the court's control of the cause does not cease until the final judgment, which is the approval of the sale and the order of distribution. Collier v. Lead Co., 106 S. W. 978. (b) The record shows that Priest did not by his petition disclose that he had any interest of any kind in the

land. That he was a sham plaintiff. By his petition he did not invest the court with jurisdiction to adjudicate, and under it the court was without power to decree partition. Wonderly v. Lafayette Bk., 150 Mo. 635; Argument in Kingston Case, 20 How. St. Tr. 478; 15 Ency. Pl. and Pr. 468; Att'y-Gen. v. Tel. Co., 30 Beavan, 287; Baxter v. Baxter, 43 N. J. Eq. 82, 44 N. J. L. 298; Life Ins. Co. v. Lanier, 5 Fla. 110, 58 Am. Dec. 448; Dix v. Ins. Co., 22 Ill. 272; Shoemaker v. Grant, 36 Ind. 175; Townsend v. Townsend, 5 Hare, 127; Stoddard v. Mix, 14 Conn. 12; Story, Eq. Pl., sec. 259; Story, Eq., secs. 256, 262; 1 Beach, Eq. 105; Sec. 4373, R. S. 1899; Freeman on Cotenancy, chap. 21; 2 Hughes Proc. 772; Johnson v. Johnson, 170 Mo. 34. (c) The record shows that the interlocutory decree rendered was of date April 9, 1875, before the death of Renick was suggested. It further shows that the court adjudged at that time that Renick had parted with his interest in the land to Oliver D. Filley before suit brought. If it had power to so determine, then it ceased to have jurisdiction to decree partition, as Renick was the only real plaintiff stating an interest in the land, and upon such finding the only power in the court was to dismiss the proceeding. Ibid.; Hiles v. Rule, 49 Mo. App. 628, 121 Mo. 248; Sec. 761, R. S. 1899. (d) If the foregoing propositions are true, then the court's duty in the partition suit yet awaits it, viz., to set aside all orders, judgments and decrees it assumed to enter, either after the date of its finding that Renick, the only real plaintiff stating an interest in his petition, had in fact parted with his interest before suit brought, or after the suggestion of death, showing he died before the submission and interlocutory decree. All such are necessarily void, and after setting them aside the cause is still pending, awaiting dismissal. Windsor v. McVeigh, 93 U. S. 274; Keele v. Keele, 118 Mo. App. 262. (4) Priest was not the legal successor of Murdoch, de-

rived no title or interest in the assets by his deed. By said deed and Priest's qualification thereunder the jurisdiction of the circuit court over the estate and the accounting did not attach. The assignment being void and creating no assignment of which the circuit court could take jurisdiction, and the deed leaving the estate in the probate court with the jurisdiction of that tribunal unimpaired, the whole pretended accounting in the circuit court was void, and no court could consider any pretended accounting there or any single item of any account there for the purpose of changing, modifying or in any way affecting the true accounting already begun in the probate court. Everything done in any proceeding under the assignment in the circuit court was outside of that court's jurisdiction. Hence Priest was in no sense whatever a representative of the estate of Murdoch & Dickson, and whatever he did and whatever transactions he had with others, and whatever the circuit court, in its usurpations attempted to do with reference to this estate, were the acts of strangers to the title and jurisdiction and *res inter alios acta alteri nocere non debet.* The exclusive jurisdiction over the partnership accounting being fixed in the probate court, that court alone can determine what claim presented or what payments made shall be charges against the estate both in respect of any such credits sought by Murdoch in his settlement with his successor, or in respect of any such credits asked by Murdoch's successor in his settlements. These things are involved in the accounting, and are factors in the determination of the final balance chargeable against the estate's proper representative, which is for the probate court alone. The estate must be accounted for there, not here. Richardson v. Withrow, 141 Mo. 69; Ensworth v. Curd, 68 Mo. 285; Caldwell v. Hawkins, 75 Mo. 453; 1 Werner's Am. Law of Adm., sec. 130; Barnes v. Stanley, 95 Mo. App. 688; Bell v. McCoy, 135 Mo. 552; Roberts v. Hendrickson, 75 Mo. App. 484.

*Charles W. Bates* and *Benjamin H. Charles* for the City of St. Louis, defendant in error.

(1) Where a judgment is irregular in form it should be modified on application so as to conform to the judicial intention as expressed in the findings. (a) This may be done at any time by the trial court, but certainly within the term at which the judgment is rendered. 1 Freeman on Judgments (4 Ed.), secs. 69, 70; Neenan v. St. Joseph, 126 Mo. 89. (b) Or, the correction may be made on appeal by the Supreme Court. Pockman v. Meatt, 49 Mo. 345; Weil v. Simmons, 66 Mo. 619; Stotler v. Railroad, 200 Mo. 150; R. S. 1899, secs. 865, 660, 672, 673. (2) Both with respect to the four streets in question and also with respect to the wharf the city clearly established its title by prescription, a fee simple title with respect to the public uses of the street and a fee simple title with respect to the land itself in the tract lying along the river called the Wharf. The trial court so found and intended so to decree. (3) A prescription presupposes a grant. United States v. Chaves, 159 U. S. 452; United States v. Devereux, 90 Fed. 187; 2 Blackstone (Cooley), p. 264, and note 3; Washburn on Easements and Servitudes (4 Ed.), pp. 32, 33, 124, 125. Even at the time of the issuance of the Brazeau or Maguire patent in 1862 the city had a title then perfect by prescription, which will be presumed to have issued regularly from the Government of the United States. That patent related back to the date of the original grant. United States v. Bagnell, 102 C. C. A. 246. That such title actually existed is evidenced by the conduct of the parties through all the Maguire-Tyler litigation both then and subsequently pending. The city was never made a party thereto. (4) No one has ever paid any taxes on these streets or on the wharf, either to the city or to the State. (5) The trustees under Dickson's will are barred by adverse possession. Their *cestuis que trust*

are therefore also barred. Walton v. Ketchum, 147 Mo. 219; Schiffman v. Schmidt, 154 Mo. 213; R. S. 1899, sec. 4262. (6) The title of the city in the streets and the wharf antedates the title of any of the other parties to this suit with respect to any of the property other than the streets and wharf; but even if it did not, the plaintiff and the *cestuis que trust* would be barred by their own laches. Bauserman v. Blunt, 147 U. S. 659; Goodson v. Goodson, 140 Mo. 217; Lenox v. Harrison, 88 Mo. 497; Loomis v. Railroad, 165 Mo. 495. (7) The running of the Statute of Limitations is not suspended by reason of any vacancy in the administratorship. Griesel v. Jones, 123 Mo. App. 45; Schlueter v. Albert, 39 Mo. App. 154; Stanton v. Gibbons, 103 Mo. App. 264. (8) The thirty-year Statute of Limitations also is an absolute bar to the claim of the plaintiff. Laws 1874, pp. 118, 119; R. S. 1899, sec. 4268; Collins v. Pease, 146 Mo. 135; Mansfield v. Pollock, 74 Mo. 185; Fairbanks v. Long, 91 Mo. 628; DeHatne v. Edmonds, 200 Mo. 246; Campbell v. Greer, 209 Mo. 199.

*E. T. Allen, C. B. Allen, Perry P. Taylor, George W. Lubke,* and *Nagel & Kirby* for certain other defendants in error.

(1) The probate court never had any jurisdiction over the equitable interest here in controversy. Easton v. Courtwright, 84 Mo. 27; Crook v. Tull, 111 Mo. 283; Hargadine v. Gibbons, 114 Mo. 561; State ex rel. v. Withrow, 141 Mo. 82; Meriwether v. Railroad, 128 Mo. App. 658. (2) When the Statute of Limitations has begun to run against an administrator, a vacancy in the administration does not suspend its operation; so that, if the original administrator would have been barred, the administrator *de bonis non* is equally barred. Collins v. Bradford, 1 Strobhart (S. C.), 25; Campbell v. Wilson, 13 Dist. of Col. (2 Mackey Sup. Ct.) 497; Hoskins v. Miller, 2 Dev. 360; Ried's Adm'r

v. Minell Co., 30 Ala. 64; Underhill v. Ins. Co., 67 Ala. 451; Manly v. Kidd, 33 Miss. 141; Schlueter v. Albert, 39 Mo. App. 154; Stanton v. Gibbons, 103 Mo. App. 264; Griesel v. Jones, 123 Mo. App. 45. The statute began to run when Priest took possession (Oct. 1873) and he was in possession (Dec. 1st, 1873) when he filed his appraisement. At both of these times Murdoch was still administrator of the partnership estate. (3) It was the duty of Eads and Bates, as trustees under Dickson's will, to protect the legal title which was vested in them. If they became barred by the adverse possession of Edwin Harrison, beginning Aug. 4th, 1875, and ripening into title Aug. 4th, 1885, their *cestuis que trust* were also barred. Walton v. Ketchum, 147 Mo. 219; Schiffman v. Schmidt, 154 Mo. 213; Simpson v. Erisner, 155 Mo. 163. (4) Section 4262, R. S. 1899, not only bars action but confers title. Kirton v. Bull, 168 Mo. 633; Stevens v. Martin, 168 Mo. 407; Scannell v. Am. Soda F. Co., 161 Mo. 618; Quick v. Rufe, 164 Mo. 412; Bank v. Evans, 51 Mo. 347; Franklin v. Cunningham, 187 Mo. 196; Whitaker v. Whitaker, 157 Mo. 343. (5) The judgment and decree based upon the ground of laches, without regard to the defense of adverse possession, are amply sustained by the authorities. Goodson v. Goodson, 140 Mo. 217; Lenox v. Harrison, 88 Mo. 497; Bauserman v. Blunt, 147 U. S. 647; Swan v. Thompson, 36 Mo. App. 155; Weinerth v. Trendley, 39 Mo. App. 333; Gunby v. Brow, 86 Mo. 253; Loomis v. Railroad, 165 Mo. 495; Shelton v. Horrell, 134 S. W. 988. (6) Whether or not Harrison was acting in good faith in taking possession of the "Brazeau" tract, is immaterial. Wilkerson v. Eilers, 114 Mo. 253. (7) The so-called partner's lien is not a specific lien or a direct trust. Hollins v. Coal & Iron Co., 150 U. S. 371. (8) *Lis pendens* only exists where the court in which the *lis* is pending has jurisdiction over both the subject matter of the *lis* and the parties to the *lis*. Herrington v. Herrington, 27 Mo. 562. A

voluntary abandonment or discontinuance of the action destroys the *lis pendens*. Bristow v. Thackston, 187 Mo. 347; Fox v. Reeder, 28 Ohio St. 181. (9) Implications of fraud ought not to be regarded respecting Murdoch, Priest, Eads and Bates and Harrison, after the death of all of them. Hammond v. Hopkins, 143 U. S. 224; Goodson v. Goodson, 140 Mo. 217.

LAMM, C. J.—This suit is under former section 650 (now 2535) to try and determine title to real estate in the city of St. Louis. The pleadings cover seventy-nine pages of print. Absent any question raised on their sufficiency, we shall not reproduce even a summary of them. Presently something more will be said of them. For present purposes it will do to say that they are in scope and object sufficient to raise the propositions discussed by counsel.

Dates are of significance. In 1871 Charles K. Dickson and John J. Murdoch were and for a score or more of years had been partners in St. Louis dealing under the firm name and style of Murdoch & Dickson. Possibly they were general partners as real estate dealers, but the scope of the partnership is not clear. In 1871 Dickson died, and Murdoch, as surviving partner, took upon himself the burden of administering upon the partnership estate under the auspices of the probate court, giving a bond therein in the penal sum of $125,-000. In 1873 Murdoch, having theretofore made two elaborate settlements in that court, as surviving partner made a statutory deed of assignment of the partnership assets to one John G. Priest for the benefit of creditors of Murdoch & Dickson. Subsequently in that same year, failing to obey an order of the court to give an additional bond as surviving partner, he was removed. From the record facts before us, we have no doubt the firm owed in excess of its assets and was insolvent. We take judicial notice of the historical fact that the times were ones of severe financial de-

pression and falling prices. Among the firm's liabilities of over two hundred thousand dollars was a liability of over eighty thousand dollars to Dickson, and one of thirty-four thousand to Eads, and one of about five thousand to Barton Bates, trustee. Dickson died testate, his will nominating Barton Bates and James B. Eads, two of his friends, as executors. It also created a trust in the residue and remainder of his estate and they were nominated trustees of the trust estate. There were excluded from this "residue and remainder" only an annuity to his sister and his mansion house and grounds and personal property in and about the same and appurtenances to that establishment, devised to his wife absolutely. They qualified as executors, and in 1890 settled finally his individual estate and were discharged, the final judgment in that matter showing Dickson's individual estate indebted to them the rise of $46,000. Eads and Bates are both long since dead and so far as we can see never collected aught of that sum. The history of the trust is not disclosed. These same executors were sureties on the bond of John J. Murdoch as surviving partner of the firm of Murdoch & Dickson.

For twenty-two years, to-wit, 1873 to 1895, no steps were taken in the probate court by anyone interested to appoint a successor for Murdoch as administrator of the partnership estate, nor was an entry made by the court. In August of that year, to-wit, 1895, the widow and children of Dickson filed a petition in the probate court "In the matter of Murdoch & Dickson," praying that Richardson, public administrator, take charge of the estate of Murdoch & Dickson. This prayer was granted, and an order was made that Richardson take charge and custody of all the estate of the late firm remaining unadministered. Later in that year said Richardson was appointed administrator *d. b. n. c. t. a.* of the individual estate of Dickson.

Going back to pick up the thread of the assignment, in the meantime Priest as assignee proceeded with his assignment, collecting assets, allowing claims, disbursing moneys, and in 1874, joining with himself one Renick, he sued John Maguire and, say, seventy other defendants in the St. Louis Circuit Court in partition, claiming as assignee a one thirty-second interest in a tract of land known as the Brazeau Reservation located on the west bank of the Mississippi river and of an area of four by four arpents. (Note: This Brazeau Reservation, or rather this one thirty-second part thereof, is the subject-matter of the instant suit.) The defendants in that partition suit were said Eads and Bates as executors and trustees of Dickson, the widow and children of said Dickson, members of such families as the Harrisons, the Clemens, the Harneys, the Valles, the Chouteaus, the Filleys, the Lindells, Judge William B. Napton and many others. In 1875 such steps were taken in that suit as resulted in a partition sale of the Brazeau Reservation, it being divided by order of the court into lots, blocks, streets and alleys prior to the sale. At that sale, made *en masse,* Edwin Harrison purchased the whole tract for about $120,000. The sale was reported, approved and a deed made to him. It seems objections were made to the sale by Priest, assignee, which resulted in his getting from the purchaser the rise of seven thousand dollars for the Murdoch & Dickson interest, instead of the rise of three thousand dollars as a *pro rata* would have given him at the outset. Presently in the same year Harrison entered into possession under that purchase and deed, afterwards from time to time conveying parts of the tract (by lot and block descriptions) to different grantees at sundry times; as we understand it, the parts so conveyed were much the greater part of the whole tract. The grantees under his conveyances severally entered into immediate possession and severally spent

257 Mo. 41

great sums of money, some in tracks and railroad betterments, some in buildings and improvements. From 1875 down to this day, Harrison (during his lifetime) and his several vendees and subvendees (defendants here) have been in actual, open, notorious, continuous, peaceable and adverse possession of the respective parts of the Brazeau Reservation conveyed to them as aforesaid and this possession was taken and has been continued under a claim of exclusive right and title. They have paid all taxes, estimated at a great sum. Neither the Dickson heirs as remote beneficiaries in the Murdoch & Dickson partnership estate, nor the executors or trustees under Dickson's will, holding the legal title thereunder, nor Murdoch, nor his heirs, remote beneficiaries, nor the creditors of Murdoch & Dickson (near beneficiaries), nor anyone standing in their shoes, nor representing them, have been in possession of any part of said Brazeau Reservation since 1875, or ever, on this record, directly complained in court of that partition sale till 1904. Shortly after obtaining his partition deed, Edwin Harrison executed and recorded a declaration of trust showing his purchase to be in his own behalf and in behalf of certain of his co-defendants in the partition suit, and that he held title as trustee. After being sued in the instant case he died, and defendant, St. Louis Trust Company, became his successor in trust and took and held possession of the remaining unsold part of the Brazeau Reservation.

In 1897, two years after his appointment, Richardson sued out of this court a preliminary rule in prohibition (141 Mo. 69) directed against the several judges of the circuit court of the city of St. Louis, citing them to show cause why they were assuming to exercise jurisdiction of the Murdoch & Dickson partnership estate under the Priest assignment. On a return coming in, a peremptory writ issued on the judgment of a divided court holding the deed to Priest void,

forbidding any further exercise of jurisdiction in the circuit court over the assigned estate, on' the ground the probate and not the circuit court had jurisdiction. Harrison and none of those claiming under him (defendants here) were parties to that suit, nor were any of their present defenses within the scope of the pleadings, nor were they directly adjudged. What remained of the estate of Murdoch & Dickson does not appear, but it does appear that Priest took possession of assets valued at $40,000 (141 Mo. 1. c. 72) and that when he applied for his discharge in 1888, he admitted the possession of $2,911 and some cents, which amount was increased on appeal to $9,632, and some cents (*Ibid.,* p. 72. *Vide,* also, *In re* Assignment of Murdoch & Dickson, 129 Mo.488, where the record of a loosely managed estate may be read). It also appears that Richardson, administrator, came into possession of over $600. At a certain time Priest died, whether before or after the prohibition is not clear, but, having reported to the circuit court his proceedings as assignee at delayed intervals, we infer he never paid over the amount found due creditors, though it does appear from this record that he charged himself with and disbursed the rise of $7000, the amount realized for the Murdoch & Dickson estate at the partition sale.

In July, 1904, seven years more having passed, Richardson brought the instant suit against the city of St. Louis (said city claiming title to certain streets and a certain wharf) and against Harrison, and, as said, against an aggregation of individuals and corporations claiming title under conveyances under the Harrison partition title—several of them railroad companies occupying their several portions with their tracks, others manufacturing companies occupying their several portions with their plants. He also made the widow and children of Dickson parties defendant.

After the cause came into this court one of the Dickson children, John M., died, and his widow, Emma,

executrix of his last will, entered her appearance and was substituted in his place. While the case was pending below Richardson was removed as administrator in charge and his successor in office, Harry Troll, was substituted as plaintiff. The Mississippi Valley Trust Company and Wiggins Ferry Company, two of defendants, bought their peace and the cause was dismissed as to them.

The trial court found for defendants and plaintiff sued out a writ of error in this court. For convenience we will refer to Troll as plaintiff instead of plaintiff-in-error and to defendants-in-error as defendants.

There was not a vestige of record title to any part of the Brazeau Reservation in the names of the two members of the partnership of Murdoch & Dickson by any conveyance. To the contrary, on September 20, 1852, by a deed then spread of record, Dickson for a consideration of $3750, acquired a one-twelfth interest of one Maguire's three-fourths interest in that tract, thereby putting a one-sixteenth interest in him. In 1866 Dickson, one Renick and one Peterson and their wives (why Peterson and Renick joined does not appear) conveyed to O. D. Filley (by deed spread of record in February, 1874, and reciting a consideration of $6,000) a one-half interest in the one-sixteenth interest Dickson got from Maguire, thus leaving a one-thirty-second interest remaining in him of record. The deed from Maguire to Dickson in 1852 made no reference to Murdoch or to the firm of Murdoch & Dickson, but put a straight legal title in Dickson as an individual. The first time or place that the firm of Murdoch & Dickson appears in this record as owning Dickson's interest in the Brazeau Reservation is in the inventory of the partnership estate filed by Murdoch in the probate court in 1871. It is there referred to as a one thirty-second part of the John Maguire tract of land in the northern part of St. Louis "being the same premises now in dispute between John Ma-.

guire and Mary Tyler'' (of which more presently). In 1873 Murdoch had it appraised with other real estate and assets and its value was estimated at $10,-000, now swollen by the outlays of others and increase of real estate values to a great sum. The instant case proceeds on the theory on all sides that it actually and in truth was an asset of the partnership of Murdoch & Dickson, although the legal title was in Dickson individually. The Priest partition suit proceeded on the theory that the firm owned the equitable title in that one thirty-second interest in the Brazeau tract and that the legal title passed by Dickson's will to Bates and Eads, executors and trustees under that instrument; and one main object of that suit was to clear up the title and perfect it so that both the legal and equitable title might unite and pass by the partition sale.

In brief, the theory of the petition in the instant case to quiet title is that the equitable partnership interest or equitable right of Murdoch & Dickson became, in the eye of the law, personal property for winding up purposes and by operation of law passed to Richardson as administrator and thence to Troll his successor.

In a nutshell, the separate defenses of the several defendants, *mutatis mutandis*, are limitation, laches, and estoppel. There are side or subsidiary contentions in this answer or that, but the foregoing covers them all for our purposes.

By way of reply to such defenses plaintiff pleaded facts upon which his learned counsel base the contention that the one thirty-second interest in the Brazeau tract was, at all times after Murdoch gave bond as surviving partner, in the custody of the law, within the jurisdiction of the probate court, came within the scope of the doctrine of *lis pendens,* and, hence, neither laches nor any statute of limitation constituted a defense. The replies pleaded other facts avoiding, it is claimed, the application of any estoppel.

The trial court passed the question of estoppel *sub silentio* and found for defendants on limitation and laches, and plaintiff, as said, brought error.

The city of St. Louis, not satisfied with the form of the decree, appealed to correct it. Its appeal is pending as a separate case and will not be further noticed in this opinion.

Any further record facts, deemed by us necessary to a determination of material questions in judgment, will appear in due course in connection with a discussion of those questions.

We will not follow the heads or subheads of the aggregation of briefs, but will put our rulings under heads adopted by ourselves and the propositions there announced will dispose of those contentions we deem vital.

*I. Of a foreword as a foreground (and herein of the pleadings and the history of the Brazeau Reservation) and certain general observations.*

(a) No question of multifariousness was raised below or is raised here by defendants' counsel and none of a misjoinder of parties defendant. Hence if the cause be one in equity we are not called

**Multifariousness.**

upon to say whether the petition was open to attack below for multifariousness. Or, if it be at law, then, by the same token, we are not called upon to say whether it was open to attack below for misjoinder of parties defendant. We say so much to avoid misunderstanding and confusing good practice; for in Peniston v. Press Brick Co., 234 Mo. 698, and Chaput v. Bock, 224 Mo. 73, many defendants claiming to own distinct tracts in severalty (as here) whose titles depended in part at least on limitations (and were separately asserted, as here) objected to the omnibus character of the petitions and their objections were allowed as fatal in suits directed (as here) to clear up and adjudge title under former section 650.

The doctrines of the Peniston and Chaput cases we adhere to; but we shall assume (without deciding) that learned counsel on both sides considered the instant case as one in equity and that there was such common relation between defendants, .and such common interest or common question involved, that the equitable doctrine of avoiding a multiplicity of suits so controlled the situation as to permit a general bill of peace. [*Vide* the Peniston case, supra, p. 712.] That view of it reflects credit on counsel; for it, we *hope*, permits squabbles over the Brazeau Reservation (that in one form or another have been on the carpet in State and Federal jurisdictions for nearly a century) to be finally cut off and set at rest at one judicial stroke. *Debet esse finis litium.* We say one judicial stroke, not unmindful that it has. always been taken for evil that a bad emperor, Caligula, once wished all the necks of Rome made into one for his decapitation by-ends, and is claimed by some jocose persons to be the putative father of the "one stroke" theory. The doctrine of uniting claims of a certain kind against sundry individuals to avoid a multiplicity of suits is a sensible device of equity, applicable here. We use the word "hope" above, not unmindful of the conceit that (maybe) *hope* is not permitted to "spring eternal" in judicial breasts as Pope says it does in others, and that (maybe) if it does so spring it is subject to the same sad limitation, to-wit, that "man never is, but always to be blest."

(b) And this paves the way to fetch a small compass on the remarkable history of the litigation over the Brazeau Reservation, in which counsel such as Ewing, Carlisle, Cushing, Blair, Krum, Hill, Glover, Shepley, Gamble, Geyer, at one time or another, only memories now, appeared at the bar and the judgments fell from such judges as Catron, Taney, Clifford, Napton, Scott and Wagner, all gathered to their fathers.

History of Brazeau Reservation.

When George Washington had yet a lustrum of life left to him, to-wit, in 1794, Don Zenon Trudeau, Spanish lieutenant-governor of Upper Louisiana, "conceded" to Joseph Brazeau out of the "royal domains" a tract of four by twenty arpents on the Mississippi river about two miles from "the town of St. Louis," a tract lying alongside the concession and survey of a "free mulatress," Esther. [84 U. S. l. c. 293.] An arpent is a land measure varying in dimension from eighty-four hundredths of an acre to one acre and four hundredths and to one acre and twenty-eight hundredths, accordingly as the arpent meant is an *arpent de Paris*, an *arpent commun*, or an *arpent d'ordonnance*. In 1798 this same Joseph by deed conveyed to Louis Lebeaume (spelled in more ways than one) the same concession, reserving therefrom to himself four by four arpents in the southern part "to be taken at the foot of the hillock." [84 U. S. l. c. 275.] This four by four arpents is the "Brazeau Reservation" and hence its name. This Lebeaume dug a drainage ditch, not on the south line of his own arpents, but on the south line of those reserved by Brazeau, a ditch known in judicial records as "Lebeaume's Ditch." [Magwire v. Tyler, 25 Mo. l. c. 489.] The location of this ditch confused the south out-boundary of his land and figures much in the litigation, as does a stockade and an earth barn (*"Grange de Terre"*) and the "Big Mound"—all taking the mind back to a dim and almost forgotten past, a past older than the Treaty of Paris, that of San Ildefonso and that of Madrid, whereby good luck came to us, it is said, in heaped-up measure.

Before that, Lebeaume got a Spanish concession of 360 arpents "including that which he acquired from Brazeau." Then he got in 1799 a Spanish survey of the concession made by a surveyor, Don Antonio Soulard, in which Soulard (by slip or design) included the four by four arpents reserved by Brazeau. This added more confusion. Then followed in 1810 a confirmation

in Brazeau by a board of commissioners, acting under United States laws passed to carry out the terms of the Treaty of Paris and the obligations of Napoleon to Spain under the treaties of San Ildefonso and Madrid. The same commissioners confirmed to Lebeaume 356 arpents, four less than in his concession (evidently Brazeau's reserved four). They then issued to Brazeau a "patent certificate" and ordered a survey of both confirmations. Then Brazeau conveyed his four by four arpents to Pierre Chouteau in 1816. Then Brown, United States surveyor, further confused the situation by surveying "two tracts in one," Lebeaume's and Brazeau's. Then conflicting patents issued. Then by conveyances from Chouteau and his vendees, one "John *Magwire*" acquired Brazeau's title to his reservation in January, 1852. This "Magwire" is the John *Maguire* of the present record, who eight months afterwards conveyed a one-twelfth in a three-fourths interest to Mr. Dickson as hereinbefore set forth. Lebeaume's title early passed off to one Chambers in another direction and the claimants under Lebeaume and claimants under Brazeau began "lawing" in the courts as early as 1823 in forcible entry and detainer, ejectment, equity to remove clouds, cancel patents, etc., etc., besides carrying on auxiliary contentions in the government land offices and before the Secretary of the Interior. We need not set forth in detail the vast snarl in surveys, resurveys, patents, certificates of patent, cancellation of patents and certificates, charges of fraud and mistake, and suits that, while, to borrow Milton's phrase, possibly gave rise to "fat fees and flowing contentions," yet spread a blight over this reservation in the twenties, thirties, forties, fifties, sixties and seventies of the last century, all growing out of the location of Lebeaume's Ditch and confusion in description and mistake of fact in surveys, certificates, confirmations and patents. It is sufficient to note that finally title to the Brazeau Reservation was, in 1872

or 1873, say two years after Dickson's death, confirmed in John "Magwire" by a decision of the Supreme Court of the United States in Tyler v. Magwire, 84 U. S. 253, a notable case. Of nine judges on that bench when the opinion was handed down, one did not sit and three dissented; and so vexed was the question, so long drawn out the dispute and so reluctant had been the Supreme Court of Missouri to give full force and effect to a former decision by the Supreme Court of the United States on a writ of error in the same case, that the Supreme Court of the United States did not remand the case with directions, trusting to this court to carry them into full and rounded effect, but entered its own judgment determining the validity of Maguire's title, and through its own marshal, put him in possession.

Peradventure, the student in case law following the lead of a curious and scholarly spirit may find the judicial records of the history of the Brazeau Reservation not so hopelessly uninteresting or dry-as-dust affair as appears on the surface. If the game be worth the candle, then such an one may consult Maguire v. Vice, 20 Mo. 429; Magwire v. Tyler, 25 Mo. 484; Magwire v. Tyler, 30 Mo. 202; Magwire v. Tyler, 40 Mo. 406; Magwire v. Tyler, 47 Mo. 115; West v. Cochran, 17 How. (58 U. S.) 402; Maguire v. Tyler, 1 Black (66 U. S.), 195; Maguire v. Tyler, 8 Wall. (75 U. S.) 650; Tyler v. Magwire, 84 U. S. 253, and other cases referred to in those several reports where one or another question concerning title to the Brazeau Reservation was held in judgment.

There is a German word, *sittlichkeit*, which Lord High Chancellor Haldane, in his noble Montreal address before the American Bar Association, September 1, 1913, in substance defines as the spirit and habit of life, the hidden and uniform ground of action of a people. Maybe a man, too, can have his *sittlichkeit*. Possibly it is too far a cry to say that an inanimate

thing like a title to land or a piece of land, say, four by four arpents, may have its custom, its trend, its *sittlichkeit;* but sure it is this Brazeau Reservation was born to trouble as under an evil star—was as prone to trouble as sparks are to fly upward—and has had it in a turbulent career. Its destiny was cast rough. In chimney-corner phrase, it was always in hot water. In the midway of that career in 1852 Mr. Dickson (with the litigation yet twenty years to run) bought into the lawsuit by buying a one-sixteenth interest, we shall assume for speculative ends. It is charged in briefs of respondents and vehemently denied in appellant's that his children under cover of the name of the public administrator reopened the litigation on another issue and in another form in 1904 and continued it since for the same speculative ends, to press a thorn in their side and compel the present claimants to severally buy their peace. We say neither aye nor nay on those contentions, but we point to the fact that during the former litigation the tract remained unimproved except by an indifferent and humble house or so, now and then occupied; that it mostly, at the earlier periods of the litigation, remained open and unoccupied; that the improvements were not worth while so late as 1875, though it had become part and parcel of a great city and should have borne its proper share in the betterment of the town; that when the land passed to Harrison and from him in great part to those holding under him, then (and for the first time) improvements were made to the amount of hundreds of thousands of dollars on the faith of an established title; and that the effluxion of time and laches have been so marked that their title ought not now to be disturbed except for the gravest reasons and only to preserve settled and indispensable principles relating to real property. If this case is to be ruled justly, it must be ruled in the spirit of those observations and not otherwise.

*II.   Does section 650 relating to a remedy for determining and adjudging title to land apply to railroad parties defendant?*

This is a real estate action to adjudge title as a prerequisite, a forerunner to a recovery of possession and a sale of the land for the purpose of winding up a partnership estate.  Presently, before we dismiss this opinion, we shall have something fur-

**Quieting Title:
Suit Against
Railroad.**

ther to say of this general feature of the case in connection with a contention made by appellant.  For present purposes a question springs, to-wit, the railroad corporations, parties defendant, having many years ago acquired the Harrison title and devoted the land to trackage uses as an integral part and parcel of their railroads, is the remedy against them or either of them, if any, not one for damages instead of for a decree of title heading towards possession and ultimate sale of the land? There is a doctrine of the law to the effect that the true owner of land may be estopped from bringing a possessory action, or what amounts to the same thing, the recovery of the land, where the original entry by the railroad was unlawful (as it is claimed in this case it was) and where he knowingly permits or acquiesces in the placing and use of railroad tracks upon the land as part of a railroad system.   Under such circumstances, where the land itself is permanently appropriated for railroad purposes, a sound public policy requires that such appropriation be left intact as a *fait accompli,* and that the remedy of the land owner be confined to an action for the value of the land by way of damages.  [Alexander v. Railroad, 138 Mo. l. c. 473 et seq., and cases cited; Second St. Imp. Co. v. Railroad, 255 Mo. 519; Rivard v. Railroad, *ante, p.* 135.]

Whether the facts justify the application of that doctrine to this case need not be looked into or decided. No such question is raised by learned counsel.  We may

assume, then, that both sides concede the case well brought under section 650, insofar as the stated and foregoing proposition is concerned. We only allude to the matter now so that it may not hereafter be contended that by overlooking it we inadvertently introduced confusion into the administration of the law. It is trite doctrine that parties can not complain if the court adopt on appeal their common trial theory; though, if the question were here on facts justifying its application, it would be well worth while to look into plaintiff's right to do the following thing (which thing he emphatically seeks to do), to-wit, to have title adjudged to real estate under a statute solely relating to real estate, when in no possible event would he be entitled to the land itself, but his only remedy would be for damages measured by the land's value. Clearly the statute in question was never intended *to clear up a title to mere damages, or to a chose in action.* But we drop the subject with the pronouncement that the question is reserved for some case turning on it.

### III. *Of fraud.*

Running like a marking thread through the several briefs of appellant is a heavy charge of fraud—fraud against the dead in their graves. At places it is boldly made; at others by innuendo and in an undertone as if to hoot away the reputation of those who cannot answer—fraud in

Fraud: Based on Conjecture.

the administration of the partnership assets by Murdoch, surviving partner; fraud and covin in that his sureties, Bates and Eads, aided or acquiesced in that administration; fraud in Murdoch's assignment to Priest; fraud and covin in Bates and Eads taking no steps in the probate court to have an administrator appointed in lieu of Murdoch, removed, so that his bondsmen could be brought to book; fraud in bringing the partition suit; fraud and covin in the conduct of that suit by the attorneys on both sides; fraud and covin in the

parties defendant in that suit not answering, in consenting to a decree whereby the land was sold instead of partitioned in kind; fraud in the circuit court's assumption of jurisdiction and so on and so on. The story is long and details unimportant in the view we presently take of the question. We can not quite make out whether the probate and circuit courts are also tarred with the same stick or whether the creditors of Murdoch & Dickson (who seem, as things stood, to have been the only ones vitally interested in the estate) are also accused of fraud in Murdoch's administration, in the matter of that assignment and in the subsequent partition sale and Priest's dealings with the estates, or not.

That there may be no mistake about the fact that fraud is depended upon by plaintiff as a deciding element in the case—we reproduce the animated conclusion of one of his briefs, thus:

"The relation of the widow and children of Dickson to the estate is sufficiently set forth in the will. Suffice it to say that they had no right, title or interest in this property when Harrison acquired title. They were the remote beneficiaries of a trust estate the title to which was vested absolutely in Eads and Bates. Of all the world they alone were under no obligation to inquire into the estate's affairs. We are not dragging them" (the parties to the fraud) "out of their graves. We point to the ineffaceable records of two courts. We are seeking to uphold the law's majesty. Defendants are seeking to drag it down. They are the beneficiaries of this monstrous fraud on the law and courts.

"Says Pomeroy in his Eq. Jur. (3 Ed.), sec. 918: 'The remedy which equity affords to the defrauded persons is most extensive. It reaches all those who are actually concerned in the fraud, all who knowingly and directly participated in its fruits, and all those who derive title from them voluntarily or with notice.

''A court of equity will wrest property fraudulently acquired, not only from the perpetrators of the fraud, but, to use Lord Cottenham's language, from his children and his children's children, or, as elsewhere said, from any persons amongst whom he may have parcelled out the fruits of his fraud.'' '

''When the frauds are committed through the juggling of jurisdictions and unbridled usurpations, the question is above equity and relates to government itself.''

On the other hand, in some of defendants' briefs is a defense to those charges we will leave unstated for the reason that as to the charge of fraud we rule it falls out of the case and should be put to one side as a deciding factor. This is so, because:

The settlements of Murdoch are elaborate, but are obscure in matters of charge and disbursement, which, as we see it, a single word or so by the responsible actors might have cleared up in life. To some extent the same is true of Priest's. Moreover, as far as we know the creditors of Murdoch & Dickson, if not dead, in person do not now and did not then complain of fraud. No creditor appeared then or appears now to say in person, lo! here it is, or there it is, or to put his finger on a fact proving fraud. With an insolvent partnership estate on Murdoch's hands, observe, the shoe pinched the creditors and no one else; for if the estate was insolvent, as we hold it was, then the widow and children of Dickson or the widow and children of Murdoch, had not a particle of interest in the *corpus* of the estate as remote beneficiaries. If those creditors be dead, then during life, when under a call to speak and act, they murmured not and took no steps to surcharge Murdoch's accounts, or to put themselves in a position to sue on his bond. They did not, so far as this record discloses, pursue the individual estates, but, as to fraud, remained mute and rested satisfied. Look at it. Murdoch is dead. Eads is dead. Bates is dead.

Priest is dead. Harrison is dead. Verily, while the dead tell no tales neither can the dead defend themselves against tales. The lawyers in the partition suit are dead as well as most if not all of the defendants in that case. We have the right to assume the creditors are dead, too, for does not every man of us shortly meet up with death and his scythe? Under such circumstances, with those dead who should have lifted up their voices and cried "fraud," if fraud there was, and those dead who could have defended against the cry, if it had been made, this belated charge of fraud by the public administrator (a new king that arose up over Egypt and knew not Joseph, Ex. 1-8)—a charge based largely on speculation, conjecture and theory—can not now be answered except by conjecture, speculation and theory; for the dead lips of those who knew the facts pro and con can not establish, justify, explain or excuse. Mark, we are not dealing with a case where actual fraud is proved, but with one where inferences of fraud are said to arise, where the facts (unexplained) are said to bear a sinister look and to deserve a sinister twist.

Now the fireside rule, preserved in the wise Latin, is: *De mortuis nil nisi bonum.* Equity and Law are not so deadly cold, withal, as to eschew all sentiment, or turn their faces to the wall and away from all human feeling. Hence, some of their accepted rules are: Fraud is never presumed and may not rest alone on supposition or conjecture. Men are presumed honest. The doctrine of "original sin" is not applied in equity. [Troll v. Spencer, 238 Mo. 1. c. 102.] So, if in the pursuit of fraud, two judicial views are open on the facts, one in favor of honesty, the other *contra,* the law (an invention of men for their welfare) but agrees with human nature in saying we must take the nobler view. So, the maxim is: In cases of doubt the more generous and more benign presumptions are preferred. (*Nobiliores et benignores,* etc.) The rule of the fireside,

quoted above, finds its beautiful prototype or supplement in equity when the fraud is charged against the dead and a pronounced lapse of time has intervened. Says Chief Justice FULLER finely in Hammond v. Hopkins, 143 U. S. 1. c. 274:

"In all cases where actual fraud is not made out, but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence. The hour-glass must supply the ravages of the scythe, and those who have slept upon their rights must be remitted to the repose from which they should not have been aroused."

In charging the jury in a will case, with fraud the gravamen of the action, Mr. Justice GRIER, on the circuit (Turner v. Hand, 3 Wall., Jr. [U. S. C. C. R.], 111 et seq.) let fall some just observations on fraud I am fond of. I esteem them as profoundly acute and apposite. They have worthily found imperishable place in a scholarly treatise (1 Moore on Facts, p. 83 et seq.), to-wit:

"You must remember, that the burthen of proof is on the party who alleges fraud. That fraud, though proved by circumstances, can never be presumed—for fraud is a crime. It is not enough to show suspicious circumstances. Suspicion is not proof. It does not require a great deal of ingenuity to cast suspicion of fraud upon any transaction.

"There is a very great and sometimes grievous error into which not only the public mind, but that of jurors and judges too, are apt to fall; and which leads to false judgments, and sometimes to great oppression. I would, therefore, especially call the attention of the jury to it, and caution them to beware of it. It is this: The law abhors fraud. Every honest mind

hates it, and even those who practice it themselves will
join in the denunciation of it. It makes them feel vir-
tuous for the time, and they are the most ready,
from the arguments of conscience, from judging
of others by themselves, to believe it true, and in-
veigh most loudly against it. When the clamor
of fraud is raised in a community, or when it
is confidently charged by counsel in a court, we are
prone to see all facts through a false medium, which
*magnifies* the importance of every fact from which sus-
picion of fraud may be raised, and ignores the plainest
inference against it. In the midst of our virtuous in-
dignation against fraud, we first assume it has been
committed, and then seek for arguments to confirm,
not our judgments, but our prejudice. 'Trifles, light as
air,' then become 'strong as proofs of holy writ.' Cir-
cumstances which to an unprejudiced mind are just as
compatible with innocence as guilt; which at best could
only raise a suspicion, are set down as conclusive evi-
dence of crime. Those who sit in judgment over men's
rights, whether as courts or jurors, should beware of
this natural weakness to which we are almost all of us
subject. We all fancy ourselves wiser than perhaps
others are willing to give us credit for. This feeling
is gratified by what we believe to be superior sagacity.
Rogues may be cunning, but they can't deceive *us*.
Under this satisfactory belief, we become over-astute,
and often see that which is not to be seen. We suffer
our imaginations to take the rein from our judgments,
and rush headlong in this chase after the fox called
fraud. Circumstances which should avail for the proof
of fraud, are such only as are inconsistent with a con-
trary view of the transaction, and lead irresistibly
to that conclusion.''

Each and every of the premises in mind, admon-
ished by the record facts and the legal propositions
advanced, we take the most benignant view possible
and, hence, put fraud to one side. This leaves us to

confront the two main propositions in the case, laches and limitations. We take them under one head because plaintiff has a common answer to both, *viz.*, *lis pendens* and *custodia legis*.

IV.  Laches and limitations (*and herein of custodia legis, lis pendens, and State ex rel. Richardson, Admr., Dickson et al. v. Withrow et al., Judges, 141 Mo. 69, and of estoppel*).

Of those *seriatim*.

(a)  It is argued on defendants' behalf that the decree can stand on the theory of estoppel. We shall not develop the facts, let alone belabor the point or allow the case to break on it. As estoppel and laches may meet in a faded line or overlap at the edges, those elements of estoppel *in pais* which exist (as they do) may presently serve as a handmaiden to laches. It is in the main argued that the acceptance by the creditors of benefits (by way of disbursements by Priest of the purchase price of the one thirty-second interest of Murdoch & Dickson arising on the partition sale—disbursements made for the benefit of the estate and its creditors it is claimed) raises an estoppel. There is a doctrine arising from the acceptance of benefits or from election, or taking inconsistent positions, which precludes a party, *sui juris,* from objecting to a decree or deed under which he has with knowledge and notice accepted benefits, although the decree or deed be void. That doctrine is denominated *quasi*-estoppel in the books. [Hector v. Mann, 225 Mo. l. c. 245 et seq.] But the trial chancellor did not put his decree on that ground and we lay it to one side on this appeal because of that fact, absent an appeal by the defendants.

*New Ground for Decree.*

(b)  *Ex industria* and with vigor, a thrust is made by defendants at the soundness of the doctrine of State ex rel. v. Withrow, 141 Mo. 69. With the same set

**Stare Decisis.** purpose and vigor that thrust is parried by plaintiff. As already pointed out, the judgment in that case was to the effect that, in the state of our statutes in 1873, jurisdiction of a partnership estate could not be transferred from the probate court to the circuit court by means of a voluntary assignment of the surviving partner under our statute on assignments, hence the deed of assignment was void. We are asked to explode that doctrine and to rule that a surviving partner had the clear legal right in 1873 to make a general assignment of the partnership estate for the benefit of its creditors and thus put the burden of marshaling the assets and administering the estate on the assignee and within the jurisdiction of the circuit court. Counsel leave no stone unturned in their attack and defense of that case. The general law of partnerships on the right of a surviving partner to settle the estate, the early statutes, the evolution of those statutes by amendments making inroads on the general law, precedents, reason—all have been levied upon and brought into play on one side and the other in the glow and ardor of the work. While the discussion has been illuminating and the field an inviting one for exploration, while we have been both informed and interested, yet it boots nothing; for we have not been persuaded to overturn that case. What say the maxims: Obedience is miserable when the law is uncertain. Where the law is uncertain there is no law. There was need of a rule and the case established the rule. No harm or injustice can spring from it. *Stare decisis.*

(c) Laches is a word of rare or obsolete use in ordinary discourse. At root its meaning is laxness, negligence, neglect. The word, however, is in live **Laches.** use as the name of a doctrine, or concept, found useful in the administration of justice— a doctrine forged in the workshop of equity. Laches consists in not doing something which a party might

do and might reasonably be expected to do in the vindication of his right. Laches, as an unreasonable or unexcused delay, is the antonym of vigilance, which latter in turn is a synonym for activity and diligence. Laches does not rise to the rounded dignity of estoppel and yet in its equitable application it borrows from the doctrine of estoppel. While time is an element in it, yet it moves independently of limitations. To lay down a rule for the application of laches to all cases is impossible. The doctrine is not applied mechanically and to every situation where there has been any neglect at all, but each case must stand on its own facts in that regard. Speaking to the doctrine generally it may be said that where a party has some natural justice behind his claim, he may invoke in its protection the equitable doctrine of laches, a doctrine that is "free from artificial or fixed rules, having regard to the relation of the parties to each other and the subject-matter, to be applied to each case in accordance with its own particular circumstances in order to reach substantial justice—for instance, where plaintiff lies by an unreasonable length of time awaiting a rise in land or some future event to determine his course, or where by acquiescence or by sleeping upon his rights he creates the belief in others that those rights are abandoned whereby he influences them to act on such belief, or where something has intervened whereby the party asking relief would obtain an unconscionable advantage if the relief were given." [Rutter v. Carothers, 223 Mo. 1. c. 640.] Laches is "principally a question of the iniquity of permitting the claim to be enforced —an iniquity founded upon some change in the condition or relations of the property or the parties." [Quoted approvingly by GRAVES, J., in Shelton v. Horrell, 232 Mo. 375, from CALDWELL, J., in Lemoine v. Dunklin County, 2 C. C. A. 1. c. 347.] The philosophy of the doctrine of laches is elegantly formulated by Mr. Justice BREWER in a pronouncement our Brother

GRAVES also quotes approvingly in the Shelton-Horrell case (p. 376):

"No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant that he make known his claims. It gives to the actual and longer possessor security, and induces and justifies him in all efforts to improve and make valuable the property he holds. It is a doctrine received with favor, because its proper application works out justice and equity, and often bars the holder of a mere technical right, which he has abandoned for years, from enforcing it when its enforcement will work large injury to many."

The facts in this case in no small tones call out for the application of the doctrine of laches against plaintiff's claim, unless, indeed, there be an insurmountable obstacle in the way (an insistence by plaintiff we will consider presently), for the wit of man could not invent a more typical case of neglect—a case in which the omission to move for many years has caused vast changes to be made in the betterment of the property and in the rise of values—a case in which it would cause a just man instinctively to cry out against holding that defendants, who in good faith invested great sums to improve the property, should now lose part of it on this newly-sprung, newly-asserted stale claim. It seems to us that the fact that a just man would cry out instinctively against it is none the less apparent when it is seen that those persons behind the public administrator (whoever they may be) would thereby reap where they have not sown and gather where they have not strewn; for, observe, it is only by death of creditors and death of their claims that the Dickson heirs reap aught of a harvest.

The creditors of a partnership have the primary right to have their claims against the partnership paid out of the partnership assets. If time be reckoned from the removal of Murdoch as administrator up to the appointment of the predecessor of Troll, twenty-two years went by—if time be reckoned up to the institution of this suit, thirty years went by—while these creditors stood idly by with shut eyes and hands on their mouths until they saw a city built on the land they claim was devoted to the payment of their claims. If the claims of creditors, whether in the form of allowances in the probate court or elsewhere, have long since perished by the flux of time, as we believe to be the fact, and if this valuable property is now to drop like a ripe plum from a judicially shaken plum tree into the lap of Dickson's heirs because those primary claims (with those who owned them) have perished, whereby death brings a windfall to them, then the doctrine of laches applies to those beneficiaries too; for what the creditors saw, they saw; what the creditors did, they did. It was six of one and half a dozen of the other. The record shows they have been *sui juris* for a fourth of a century or more. No conceivable reasonable excuse can be given why they did not move with diligence and vigilance. Observe the theory now advanced by plaintiff's counsel is that the circuit court was without jurisdiction of the assignment and partition, hence Harrison's deed was void. If that be so, what obstacle was in the way of creditors moving at once, or the heirs moving sooner? Equity, it has been said, above all things desires the wronged to have restitution, but it also abhors sloth and favors diligence. A court of conscience does not sit to correct the evils of negligence. When it confronts laches equity remains passive. The maxim is: Gross neglect is equivalent to fraud. *Magna culpa dolus est.* We leave the matter with a question: Should equity, which is a synonym for natural right and justice, whose golden rule

and great commandment is to do to others as we desire them to do to us (as Justinian puts it, Inst. 1, 1, 3: "to live honestly, to harm nobody, to render to every man his due"), refuse to apply the doctrine of laches to plaintiff's ancient claim? We trow not, unless to do so contravenes some stubborn and controlling principle of law yet to be reckoned with.

(d) One of the defenses was limitation. It has always been a main concept of civilized man that long possession was the law of peace. That idea is crystal-lized in our Statute of Limitations and in the general doctrine of prescription. Stat-utes of limitation are no longer in disfavor. The modern doctrine is to look on them as highly salutary. [Dudley v. Clark, 255 Mo. 570.] Plaintiff is the mere representative of the rights of others in the administration of the estate. He has no individual claim. If those others are bound, he is bound—if loosed, he is loosed. There is no sign in this record that back of him in his administration is a live creditor with a live claim or a dead creditor with a live claim. If there be only dead creditors with dead claims (shadows of shades) then the rule is: out of nothing nothing comes. (*Ex nihilo, etc.*) It is significant that no creditors moved in his appointment. It is not of insignificance that the heirs of Dickson alone moved. Nor is it of insignificance that they are made parties defendant only apparently to help swell the refrain of the petition, which they do. But if the fact be conceded to him that there are any such, then the further conceded facts of the case show that one or another statute of limitations has run in favor of defendants as against any claim to the land, whether asserted by him for creditors or asserted by him for the heirs of Dickson under the cloak of an administration; provided, of course, some principle yet to be discussed does not avoid limitations. Every recognized and trite element of limitations is present, to-wit: (1) the presence of a period of time

*Limitations.*

prescribed by the statute, (2) the presence of a claim of right and title, (3) the presence of an actual, uninterrupted, peaceable and adverse possession during the prescribed time, and, we may add, (4) with at least a color of title, as color is defined in the books. That in this jurisdiction limitation is both a sword and a shield, both a bar to an action and a conferring of title to land, is no longer in need of citation or open to debate. The proposition announced is not to be weakened or varied by any lack of jurisdiction or by any irregularities in the partition proceeding in the circuit court, or the badness of the partition deed. Let the partition deed be taken, without discussion, as void as bottomed on a void judgment, and yet it matters not a whit in the face of the conceded facts of this case relating to adverse possession as against the whole world, as we have set them down.

(e) In paragraphs *c* and *d* reference is made to a contention of plaintiff that the doctrines of laches and limitations are suspended or their application prevented in this case because of two things, *lis pendens* and *custodia legis*—a contention in the nature of confession and avoidance. Let us look to that.

(1) *Of lis pendens in the circuit court.*

We may fail to follow all the recondite argument of plaintiff (recondite because the subject-matter is abstruse) but, as we grasp one phase of it, it is that the partition suit is still pending undisposed of in the circuit court. That contention is made to seek root or countenance in the fact that at a certain time by agreement of parties the cause was improperly (it is said) transferred from one division of the St. Louis Circuit Court to another and the approval of the report of the partition sale (then pending on exceptions) was made in the latter division, hence never was made at all in contemplation of law. Hence, too, the matter has been pending from that day to this without a final judgment, and the purchaser

**Lis Pendens.**

at that sale, Harrison, bought *pendente lite* and he and those holding under him take with notice.

The point is without substance, because:

We need not allow it to ride off on the narrow question whether at the time of the pendency of the partition suit jurisdiction of a suit pending in one division of the St. Louis Circuit Court could by agreement be conferred on another division. There is no meat on that bone. It is bare, and gnawing it avails nothing. Mark, plaintiff does not want the judgment reversed in order that the proper division of the circuit court might take back jurisdiction of the partition suit and confirm or reject a report of sale sleeping for forty years in the files. Not at all. *Contra,* plaintiff's whole case stands on the foot that *neither* division of the circuit court had or could ever have a shred of jurisdiction. That from *a* to *izzard* the suit was mummery, nothing, "monstrous usurpation," the decree void, every step leading up to it illegal, and, hence, the deed itself void as a crowning act of a series of invalidities. Plaintiff may not blow hot and blow cold on the vital question of jurisdiction. He may not in one breath deny jurisdiction and have his claim allowed (as here), and in the next assert *lis pendens* which assumes jurisdiction as a postulate. He may not even be lukewarm (Rev. 3:15, 16). If the circuit court was without jurisdiction, *ab initio,* as plaintiff must and does claim, then, where was the *lis pendens* in the circuit court? It is trifling with terms, it seems to us, and putting the matter into a mere limbo of confusion to speak of *lis pendens* in connection with a litigation in a court without jurisdiction of the subject-matter, *ergo* without authority to enter any decree or grant relief. *Lis pendens* means a suit, a controversy in court. It involves the essential and primary concept of *jurisdiction* of the subject-matter of the litigation and of the parties. Hence jurisdiction to enter a decree or make a finding involving the subject-matter and parties is indispensa-

ble to *lis pendens*. We are not dealing with the statute, for the record does not show a record of a notice of *lis pendens,* but we are dealing with the general law. "The policy on which the doctrine of *lis pendens* is founded, is to give full effect to the judgment which might be rendered in a suit depending at the time of the purchase." [Herrington v. Herrington, 27 Mo. l. c. 562.] If, then, no judgment be possible because the court is without power to render any, it is nonsense (or, to use a phrase of the ancients, it is milking a he-goat into a sieve—a double absurdity) to stress *lis pendens,* a mere incident to a judgment, when a judgment was impossible. Incidents, peradventure, come in and go out with the principal thing to which they are incidental. *Incidentia rei tacite sequuntur.* "In order that an action may be *lis pendens* the court must have jurisdiction of the subject-matter as well as of the person of defendant." [25 Cyc. 1461.]

We conclude, then, that plaintiff's case cannot prosper on the theory *lis pendens* in the circuit court avoids either laches or limitations.

(2) *Of custodia legis.* In a brief of marked refinement with subtle distinctions and ramifications (all lending a scholarly charm of industry and research), plaintiff's counsel maintain that the Dickson one thirty-second interest in the Brazeau Reservation was at all times in the custody of the law, by virtue of the jurisdiction of the probate court, as an asset of the partnership estate of Murdoch & Dickson, hence neither limitations or laches apply.

It is a bit difficult to follow the argument of counsel on whether it is meant that the actual property itself, the *res,* or the *title* to it, was in the custody of the law. If mere "title" is meant, then it is

Custodia Legis.

self-evident that the *legal* title was in Dickson individually, and on his death, testate, and under the terms of his will, passed to his executors and trustees, Bates and Eads, who were active trustees

and not immune from either laches or limitations binding them as well as the beneficiaries of the trust. Under no possible view did that legal title come into the custody of the law as an incident to the jurisdiction of the probate court over the partnership estate. It is plain enough that, under the record we are dealing with, such legal title could only be made subservient to or united with the equitable title by the decree of some court having equity jurisdiction or by apt conveyance.

If the equitable title is meant, then we confront two propositions: First, is mere title within the concept of *custodia legis* as that concept is developed and understood in the law? Second, did Murdoch hold the equitable title by virtue of the jurisdiction of the probate court, or in his own right by virtue of the fact that he was surviving partner and had an interest in the property as such, together with the right to conserve and wind up the estate, which right was subject to be taken from him in certain contingencies pointed out by the statute? We reserve the last question because in our opinion a determination of it is not necessary. As to the other we say this: To enlarge the boundary of *custodia legis* to include the mere concept of title as a separate entity and as contradistinguished from actual adverse possession of the thing itself, the physical land (which, possession, in turn, *créates title*), is going further than any case known to us has gone. Take an a-b-c case: Roe has title, legal or equitable. Doe had adverse possession for the statutory period under a claim of right. What becomes of Roe's title in that case? Does not the boot, title, shift to Doe's foot?

*Custodia legis* involves the actual domination over some objective thing by the court. It may be corporeal or incorporeal, but it is not a controversy, a question or an inquiry. [Rothschild v. Hasbrouck, 65 Fed. l. c. 286 et seq.]

*Custodia legis* is defined to be "that custody only which an officer has the right to assume over property by virtue of legal process." [12 Cyc. 1025.] It would include attached property or property actually held by a replevin writ, or property actually held by a receiver as a hand of the court, or property actually held by a general administrator and actually a part of the estate. "When property is lawfully taken, by virtue of legal process, it is in the custody of the law, and not otherwise." [Ib., note 43.] To enlarge the doctrine so as to include the mere controverted right to possession and not the actual fixed possession itself in the officer is a refinement that would lead to unexpected and serious results — a refinement repudiated in set terms in Strode v. Gilpin, 187 Mo. l. c. 392. Take an a-b-c case to illustrate: Jones, administrator of Smith, deceased, has a horse in his possession as part of Smith's estate, which horse is claimed by Brown and is his. If Brown sue Jones in replevin for possession is he to be defeated by the doctrine of *custodia legis?* Or if Jones, administrator, be put in possession of "X," a tract of land, as part of Smith's estate, and Brown, claiming to own the land, sue in ejectment, does the doctrine of *custodia legis* defeat him? Or if Jones, administrator, be ordered to take possession of decedent Smith's real estate and tract "X" be claimed as part of the estate and Brown be in possession and Jones sues, is Brown's defense of ownership cut out by the doctrine of *custodia legis.*

But turn to another view. There is a doctrine of the law that may be stated in this way: "Real estate purchased with partnership funds for partnership uses, though the title be taken in the name of one partner, is in equity treated as personal property so far as is necessary to pay the debts of the partnership and adjust the equities of the partners. For this purpose, in case of the death of such partner, the survivor can sell the real estate; and, though he cannot transfer the

legal title which passes to the heirs or the devisees of the deceased, the sale vests the equitable ownership, and the purchaser can, *in a court of equity,* compel them to convey that title.''

The foregoing syllabi are the sum of the matter in a leading case, Shanks v. Klein, 104 U. S. 18. The foregoing is also the doctrine of this court. [Easton v. Courtwright, 84 Mo. l. c. 37 et seq.] The title thus vested in the purchaser is the equitable title once vested in the surviving partner for winding up purposes. ''It is an equitable right joined with an equitable title, which courts of equity will recognize and protect.'' [Shanks v. Klein, supra; Easton v. Courtwright, supra.] If it is thus an equitable right coming within the jurisdiction of equity, how can it be said to be within the jurisdiction of the probate court and thus be within the doctrine of *custodia legis* by virtue of that court's jurisdiction? Apparently it would lead to a confusion of fundamental ideas to hold as we are asked by plaintiff to do.

The plain common sense of the matter is that neither the legal nor equitable title was in *custodia legis* in the probate court, and if we pass from mere title to the custody of the very thing itself, to-wit, Dickson's one thirty-second interest in the Brazeau Reservation, that custody, ''the actual domination'' over the objective thing, has been in the hands of Harrison and those defendants holding under him for nigh forty years. If Murdoch was entitled to it, he thereby lost it. If plaintiff be the successor of Murdoch, he stands in Murdoch's shoes, and what was lost to one is lost to the other.

Moreover, conceding that in the eye of equity, for liquidation and winding up purposes, Dickson's one thirty-second interest in the Brazeau Reservation was personal property and constructively in the possession of the probate court's administrator by virtue of that court's jurisdiction, yet the law would be inefficient

and lame indeed were it to allow it personalty for *all* purposes. It is still real estate in fact. It is real estate for the purpose of conveyance and under the law of conveyancing. It is real estate within the purview of the revenue and registry laws. Why is it not real estate for the purpose of the application of the Statute of Limitations and the doctrine of laches? The correct answer to that question we think is: it is.

It must be remembered that plaintiff is in a court of equity in a bill seeking relief under a statute relating to real estate, not personalty. He seeks a decree of title to land, not personalty. Under such circumstances, to ignore the settled principles of law relating to real estate, like laches and limitations, and allow this case to break only on the fiction of equity that for winding up purposes the real estate of a firm is personal property in the hands of the surviving partner, and when he is removed, then it is claimed in the probate court, would make posterity think ill of our understanding. It would be a dangerous travesty breeding confusion in unexpected ways. What says the precept? *Via trita est tutissima.*

Four judges of this court who at one or another time heard the instant case argued at our bar, have died. Agreement in division was impossible. The leading attorney for plaintiff died after an argument In Banc, with the hand of mortality even then plainly on him. Changes in the personnel of this bench also caused regrettable delay. With the mention of such sorrowful incidents, we dismiss this opinion by pronouncing the judgment reached by a majority of the court, to-wit: There is no substance in plaintiff's claim of title. Let the judgment, *nisi,* be affirmed. It is so ordered. *Graves, Brown, Walker* and *Faris, JJ.,* concur; *Woodson, J.,* dissents in a separate opinion in which *Bond, J.,* concurs.

## DISSENTING OPINION.

WOODSON, J.—Because of, among other things, the great amount of property involved in this case, conservatively estimated to be worth $2,000,000, I devoted much time and labor, some six weeks, in the careful study, consideration and preparation of the divisional opinion filed herein by me.

After a careful consideration of the majority opinion, which has been written In Banc, I am unable to agree thereto; and am firmly of the opinion that it reaches erroneous and highly unjust conclusions.

I, therefore, dissent from the same for the reasons stated in my divisional opinion, which is hereto attached and made a part hereof, as completely as if copied herein.

The record in this case is unusually voluminous, covering more than one thousand pages, and the pleadings, alone, cover about seventy-five pages; but as there is no question raised as to their sufficiency, no good purpose would be served by incumbering this opinion by inserting them herein. It will suffice to state that they were sufficiently broad and specific to embrace all the facts which will appear in the opinion, which are practically undisputed; but the differences existing between counsel for the various parties to the record are questions of law which govern those facts and which must control this court in its disposition of this case.

They are substantially as follows:

On and for many years prior to January 26, 1871, there existed a co-partnership between John J. Murdoch and Charles K. Dickson, doing business in the city of St. Louis under the style and firm name of Murdoch & Dickson, which was upon that day dissolved by the death of the latter.

Thereafter, on March 31, 1871, Murdoch, the surviving partner, qualified as surviving partner to admin-

ister upon the partnership estate in the probate court
of the city of St. Louis (then county of St. Louis)
and gave bond as such in the sum of $125,000 with
James B. Eads and Barton Bates as securities. Shortly
thereafter he began the administration of said partner-
ship estate—he filed with the probate court an inven-
tory of its assets, and among others was an undivided
one thirty-second part of sixteen arpents of land, to-
gether with certain accretions thereto belonging, sit-
uate in North St. Louis and fronting upon the Missis-
sippi River, making about twenty arpents in all, and
known as the Brazeau Reservation. When Dick-
son died the firm was indebted to him in the sum of
$84,074.96. It was also indebted to Eads personally
in the sum of $34,000, and to Bates as trustee of the
estate of R. M. Dillon in the sum of $5388.22. The total
indebtedness of the firm was about $280,000, but the
total value of all its assets does not appear from this
record. Sometime prior to October 14, 1873, Murdoch
had filed two settlements of his accounts with the pro-
bate court, showing that he had disposed of some of
the assets of the said estate, and by the last of which
he showed a balance in his hands in favor of the estate
of $97,902.75, exclusive of $20,650 in cash and St. Louis
city bonds, being $4650 cash and $16,000 in city bonds,
the proceeds of the sale of certain realty reported by
him and approved by the court. On said 14th day of
October Murdoch, as surviving partner of Murdoch &
Dickson, made and executed a pretended deed of as-
signment, purporting to be under the statutes of Mis-
souri, governing voluntary assignments for the benefit
of creditors, to one John G. Priest as assignee, who
shortly thereafter qualified as such in the circuit court
and took possession of a large amount of real and per-
sonal property, assets of the said partnership estate;
and said circuit court assumed cognizance of same
under said deed. The proceedings thereof having been

257  Mo.  43

protracted from the date of the assignment without
a final disposition to October, 1895, this court in the
case of State ex rel. v. Withrow, 141 Mo. 69, granted
a preliminary rule in prohibition against the circuit
court's further procedure with the cause, which was
made peremptory on July 17, 1897. That case is re-
ferred to and made a part of this statement.

On December 20, 1873, a motion was filed by Hill
& Bowman, attorneys, to revoke Murdoch's authority
as surviving partner unless he should file additional
security, and on the last named date the court made a
rule revoking Murdoch's authority further to act un-
less within ten days he furnished additional security
in the sum of $125,000. He failed to furnish the ad-
ditional security, and on December 30, 1873, under the
terms of the order, his authority stood revoked.

After the revocation of Murdoch's authority by
the probate court, as above stated, nothing further was
done in that court regarding the administration and
settlement of said partnership estate; but it remained
in a state of abeyance until said probate court on Au-
gust 11, 1895, ordered William G. Richardson, the pub-
lic administrator of the city of St. Louis, to take charge
of said partnership estate as administrator *de bonis
non.* Troll, the present plaintiff, is the successor to
said Richardson in said office of public administrator,
and he was duly substituted as party plaintiff herein.

This pretended administration of this partnership
estate by Priest, as assignee in the circuit court, bore
no relation whatever to the administration of the same
estate in the probate court, thereby leaving Murdoch's
accounts with the estate pending in the probate court
wholly unbalanced and unsettled; and seven years
elapsed between the date Priest qualified as such pre-
tended assignee and the date on which he filed his first
account in the circuit court, which was on November
24, 1880. On that account it is impossible to ascertain
with any degree of certainty the condition of this part-

nership estate at the date of its dissolution, or since that time.

Richardson, the public administrator, upon qualifying, took charge of the Murdoch & Dickson partnership estate, and moved the circuit court to dismiss the pretended assignment proceedings wherein Priest was the assignee, for want of jurisdiction on the part of that court to administer upon said partnership estate, for the reason that the probate court had previously assumed jurisdiction over the same, which facts excluded all other courts from assuming jurisdiction over the same. This motion was by the circuit court overruled, and Richardson then applied to this court for a writ of prohibition, with the result as before stated.

Prior, however, to the granting of this writ of prohibition, on March 24, 1874, Priest, as such assignee, in conjunction with one Robert M. Renick, through their attorneys, Hill & Bowman, instituted a suit for the partition of this Brazeau tract, which was styled John G. Priest, assignee of John J. Murdoch, Surviving Partner of Murdoch & Dickson, a Firm Formerly Composed of John J. Murdoch and Charles K. Dickson, and Robert M. Renick, Plaintiffs, v. John Maguire and Many Other Persons, Defendants.

It might be well to state in this connection that said Maguire originally owned three-fourths of all of said Brazeau Reservation, and he conveyed the one thirty-second undivided part thereof to said Dickson, which was for the use and benefit of said copartnership, and also by contract agreed to convey certain other portions thereof to James Harrison, the father of Edwin Harrison, mentioned in said partition suit.

The petition therein claimed in behalf of Priest, assignee, five one-hundred-and-sixty hundredths of the entire tract, and a like amount on behalf of said Renick. It made Edwin Harrison and the other children of James Harrison defendants. John Maguire and numerous others, including James B. Eads and Barton

Bates, trustees under the will of Charles K. Dickson, deceased, and Oliver D. Filley and Charles P. Chouteau, were added as defendants after the original petition was filed.

The petition in that case asked for the specific performance of said contract of sale entered into between said Maguire and James Harrison, deceased. Said petition also contained the following allegations, which were established by the evidence therein: ''That the said land is not capable of division in kind, except so far as the interests of said John Maguire and of the heirs of James Harrison are concerned, and as to their interests the plaintiffs pray they may be set off in kind. And as to all the others' interests plaintiffs aver that they are not susceptible of division in kind. And plaintiffs pray that the remainder of said land, after setting off said portions for said John Maguire and the heirs of James Harrison, may be sold and the proceeds divided between all the other parties according to their respective interests therein. And upon said partition of said interests in kind and the sale of the remainder, plaintiffs pray that the title vested in said Maguire by said decree under said Brazeau Patent of June 10, 1862, be vested in said John Maguire and the heirs of said James Harrison and the purchasers of the remainder of said property that will not be susceptible of division in kind.''

This case was assigned to Division 4 of the St. Louis Circuit Court (then St. Louis County Circuit Court), which court was at that date composed of five divisions. Various writs of summons for the various defendants were issued to the sheriff, made returnable to the June term, 1874, of said court, and because of the failure to serve all of the defendants named alias and pluries writs were issued from time to time, and orders of publication granted against nonresident defendants; and after the return term of the original writs the following persons were added as defendants

in said cause, viz.: Charles P. Chouteau, Oliver D. Filley and Wm. B. Napton, trustee of Helen J. Clemens, the petition to be amended with their names.

The only adult defendant who ever appeared to this suit was John M. Harney, who was served to the return (June) term of the original writ, and who filed his answer within the first four days of that term by his attorney, the Hon. T. T. Gantt.

The defendants John Maguire, Edwin Harrison, Oliver D. Filley, Charles P. Chouteau, the widow and children of Dickson, were among these personally served.

James B. Eads and Barton Bates, trustees, by the returns filed, appear to have been served as James B. Eads, trustee, and Barton Bates in his individual capacity.

The minutes and record further show that all of the defendants named were not brought into court until the February term, 1875. But with the exception stated none of the adult defendants, save John M. Harney, ever entered an appearance, and no answers or pleas or demurrers were filed by any of them at any time, save by Harney, so far as the record of Division 4 shows.

The case was docketed for hearing in Division 4, to which it had been regularly assigned, on the 9th of April, 1875, on which date guardians *ad litem* were appointed for the minor Dickson defendants and the minor Valle defendants, and such guardians respectively signed a written entry of appearance on the day of their appointment, but they neither filed an answer nor was any time given them in which to file one, as the cause was immediately submitted to the court, which promptly on the same day rendered and entered an interlocutory decree in partition.

While, as stated, none of the adult defendants, save John M. Harney, ever appeared or pleaded to the suit, we find on the day the cause was submitted

and the interlocutory decree rendered, a paper called "Petition for Sale" was filed, which was signed by Edwin Harrison, Oliver D. Filley, John Maguire, Charles P. Chouteau and certain other defendants, but not by the trustees or the widow and children of Dickson.

On the 9th day of April, 1875, the day the cause was submitted, the guardians *ad litem* appointed and the last named paper filed, the court entered the interlocutory decree in partition.

The decree is as follows:

Friday, April 9, 1875.

Now at this day come the plaintiffs by their attorneys and also comes the defendant, John M. Harney, and also come Mary Estelle Dickson and James Eads Dickson, by their guardian *ad litem*, Martin T. Dickson, also come Belle Valle, Jules F. Valle. Jesse Valle. Maude Valle, and Paul Barbara Valle, by their guardian *ad litem*, Isabelle H. Valle, the other defendants herein come not but make default. And thereupon the cause coming on to be heard upon the motion of the plaintiffs is submitted to the court upon the evidence and proofs adduced. And the court having heard and being sufficiently advised of and concerning the premises, doth ascertain and determine that the parties hereto are the owners of and interested in the following described premises, to-wit: A certain tract of land known as the Brazeau Reservation, in the city of St. Louis in said county, having a front of four arpents by a depth of four arpents of land, lying in the southeast corner of Labeaume Patent of March 25, 1852, and within the patent of the United States to Joseph Brazeau, dated the 10th of June, 1862, including all the accretions to said reservation on the eastern front, bordering on the Mississippi river, bounded north by the north line of said Brazeau Patent, east by the Mississippi river, south by the south line of said Brazeau Patent, and west by the west line thereof, containing with the accretions about twenty arpents of land. And the court doth further ascertain and determine the respective rights, title and interest of said parties and their shares and proportions in said parcel of land, and doth declare the same to be as follows, to-wit: That the plaintiff John G. Priest is seized of 5-160 parts thereof. The plaintiff, Robert M. Renick, has disposed of his interest to Oliver D. Filley, before suit brought and is not entitled to any part thereof. . . .

The court doth further order, adjudge and decree that partition of said real estate be made among the parties entitled

thereto according to their respective rights and interests therein, as hereinbefore ascertained and determined. And for that purpose the court doth appoint William H. Cozzens, one of the county surveyors of St. Louis county, and Henry B. Belt and Charles Miller, three competent persons, residents of St. Louis county, to be commissioners to make partition of said real estate, according to law. And it is further ordered that said commissioners make report of their proceedings herein according to law.

The next record entry shows that on the 20th day of May, 1875, the commissioners appointed by the decree made report that the land was not susceptible of partition in kind, whereupon on the 28th day of May, 1875, the court approved their report and ordered the land to be sold, appointing the sheriff as special commissioner for such purpose. By the terms of the order of sale, however, the sheriff was directed to first dedicate certain streets, then for the first time dedicated, to lay out an additional street, just west of the land appropriated for use for wharf purposes, and then to subdivide all the land, excepting the so-called wharf land, into lots, and report his action to the court for its approval before proceeding to sell.

Nearly two months after the entry of the interlocutory decree and ten days after the court had directed the sheriff to subdivide the land, etc., and report his action to the court and on June 1, 1875, the following suggestion of the death of plaintiff Renick was made: ''And now come the parties and their attorneys in person and it appearing to the court that Robert M. Renick, named as one of the plaintiffs in this suit, has departed this life in the autumn of 1874, and that said Renick had no title or interest in said suit in partition at the time of his death,'' etc.

Twenty days later on the 21st day of June, 1875, the sheriff made report and filed plat showing subdivision of land in accordance with the terms of the order of sale, which report the court then approved, and on July 6, 1875, filed his report of sale. By this report

it was made to appear that the land was offered in bulk by the sheriff, and Harrison was the highest bidder, and the land knocked down to him at the price of ——.

This ended the proceedings in the case in Division 4, as the next entry in the cause, made on the same day, viz., July 6, 1875, is as follows:

"Sheriff's Report of Sale Filed.

"Transferred by Consent to No. 1."

By the same record of that date. it appears that the court adjourned until Monday morning, September 20, 1875, at 10 a. m.

It appears from the testimony of Henry Denison and by the recital in Priest's accounts offered in evidence by defendant Harrison that at this juncture, Priest, the pretended assignee, was dissatisfied with the price bid by Harrison for the land, and was about to file exceptions to the report of sale based upon the inadequacy of price. To avoid this Harrison agreed to and did on July 6, 1875, the day the case was transferred, give Priest his check for $7645.50 which represented twice the proportional part of the gross sum bid by Harrison, to which, under the decree, Priest would have been entitled, and exempted Priest from any liability for his proportion of costs and attorneys' fees. Having thus induced Priest to refrain from filing exceptions to the report of sale, for some reason not given, the case was transferred to Division 1. We find from the record of the proceedings thereafter had in Division 1, that on July 12, 1875, the report of sale was confirmed. There are several other entries of record in Division 1, the first purporting to amend the interlocutory decree in such a manner as to add the interest claimed by Renick to the share of Oliver D. Filley, and the second correcting some error diminishing the reported bid of Harrison.

While Harrison was the sole ostensible bidder for the property at the pretended sale, it appears from

the evidence that he bid not only in his own behalf but also in behalf of certain other defendants ,in the cause, and upon the alleged confirmation of the sale executed a declaration of trust acknowledging he held the lands for himself and the persons named, in the proportions set opposite the names, namely: James Harrison, .52070; Estate of Oliver D. Filley, .38584; Charles P. Chouteau, .04675; Heirs of Jules Valle, .04672.

The record does not show any distribution of the money by the sheriff, and whether any of it was actually paid to the sheriff or by him paid out to any of the interested parties does not appear by any report or by any receipts filed by said sheriff. Whether Harrison paid any money to the sheriff or made his settlement outside with the parties as he had with Priest, or how much any of them so received does not appear either from the record or from the testimony.

At the time of the institution of this partition suit, James B. Eads and Barton Bates had been since January, 1871, acting as executors under the will of Charles K. Dickson, and during the progress of the same and until they made final settlement in June, 1880. That the deceased Dickson, with the exception of the mansion house, left his entire estate to said James B. Eads and Barton Bates, in fee simple, with power in them to sell, mortgage, convey or otherwise dispose of it; and to manage and dispose of it as they saw fit, and as he might do if living, in trust, however, for his widow and children. It continues: "They shall finally dispose of the property as follows, so soon as it may conveniently be done." One-eighth to the widow, another to Julius Walsh, as trustee for his wife, testator's daughter. "The remaining three-fourths of the estate they shall keep in their hands, and manage and control the same as above provided, until as each one of my remaining children shall reach the age of twenty-four years, when they shall convey to such child or for

its use one-eighth part of the estate.'' After providing for a separate estate for the daughter, Estelle Mary, in the event of her marriage, the will continues, ''and in the case of my sons, the trustees may, in any case, if they shall deem it best, invest his portion or any part thereof without power to dispose of the principal for such time as the trustees may think best.'' Then follows this provision: ''In making the division of my estate above provided for, and conveying to my wife and children their portions thereof, the said trustees shall not be bound to convey to any one portions of each kind of property of which my estate may consist, but in each case they may convey to the person then entitled any kind of property of the estate to be selected by the trustees amounting in value by their estimation to the proportions to which such person may then be entitled.''

There is nothing in the record of the partition suit to show that these trustees had ever conveyed anything to either the widow or any of the children during the pendency of said partition suit. These persons, Eads and Bates, were executors and trustees, and also sureties on Murdoch's bond as surviving partner.

According to agreement with Maguire, Filley, Chouteau and the representatives of the Valle heirs, Harrison bid at the sale on June 30, 1875, and was the successful bidder. The newspaper advertisements for this sale merely gave the description by boundaries as they were given in the petition in the partition suit, and in it no reference was made to the subdivision already made by the sheriff under the court's order of the property, exclusive of the river front, into lots.

In common with the rest of the adult defendants (save John M. Harney) the trustees never appeared to the suit. Soon after the rendition of the prohibition decree in 1897, the plaintiff in the suit below filed in the recorder's office of St. Louis a notice, the purpose of which was to advise all persons dealing with

the real estate assets of the partnership estate of the decision of this court holding the assignment and all proceedings thereunder void and sustaining plaintiff's title to and the probate court's continuing and exclusive jurisdiction thereover.

After several attempts to sell the interest of the partnership estate in this property under orders of sale granted by the probate court, and because it was impossible to procure bidders and purchasers, owing to the claims set up to this interest by grantees of the pretended assignee, the plaintiff on the —— day, 190—, instituted this suit to quiet title under section 650, Revised Statutes 1899.

On August 4, 1875, the day the land was conveyed to Edwin Harrison by the sheriff under the partition sale, he executed a declaration of trust to the effect that he held "the title to said tract of land, known as the Brazeau Reservation, in trust for the uses, benefits and behoof of the persons and for the portions hereafter stated," which was acknowledged March 12, 1875, and duly recorded March 13, 1885.

In accordance with the requirements of the decree and order of sale in the partition proceedings Edwin Harrison paid all the then delinquent taxes of every description, and his successor in the trust, and his grantees have paid all the taxes since assessed against the property.

He entered into and held actual, continuous, notorious and uninterrupted adverse possession of the entire "Brazeau" tract, under claim of title from and after August 4, 1875; received the rents and made sales therefrom from time to time, and divided all the net proceeds of such rentals and sales among the parties named in the declaration of trust above mentioned in the proportions therein stated, up to the day of his death in May, 1905, after the institution of this suit.

The St. Louis Union Trust Company, in June, 1905, was duly appointed as trustee, in place of Harri-

son, under said declaration of trust, as to the portion of the "Brazeau" tract remaining unsold; was permitted to become party defendant in this cause, and to adopt, as it did adopt, the answer theretofore filed by Harrison herein.

The John H. Conrades Chair and Parlor Furniture Company, defendant, acquired City Block 293, a part of said tract, in August, 1883, from John H. Conrades, to whom Edwin Harrison and wife had conveyed the same in April of the same year, and has been in adverse possession thereof under claim of title continuously ever since, having expended $61,574.97 in improvements thereon, made use thereof for a manufacturing plant, and paid all taxes, general and special, assessed against it.

The George A. Diederich Furniture Company, defendant, acquired ten lots of City Block 321, a part of said tract, in March, 1885, from Charlotte Diederich, to whom Edwin Harrison and wife had conveyed the same in April, 1882, for the consideration of $12,000; and has been in continuous adverse possession thereof under claim of title, having expended $10,000 in improvements thereon and made use thereof for a manufacturing plant, and paid all taxes, general and special, assessed against the same.

The defendant Standard Stamping Company acquired all of that portion of City Block 320 which lies within the Brazeau Reservation, said portion being bounded on the north by the north line of the Brazeau Reservation, on the east by Second street, on the south by Chambers street, and on the west by the west line of the said Brazeau Reservation; a part thereof, in April, 1892, by warranty deed from C. D. Comfort, who had acquired it, in 1883, from Edwin Harrison by warranty deed; and the balance thereof, in June, 1892, by warranty deed from Edwin Harrison; in 1892, and shortly after acquiring all of said property, said Standard Stamping Company erected thereon a large brick

factory building, covering practically all of the property, at an expense to that defendant of upwards of $64,000, and, beginning with 1892, and ever since that year, that defendant has continually and exclusively occupied such building for factory purposes, and beginning with the year 1892 and until the date of trial it paid all taxes on said property.

Defendant the F. H. Logeman Chair Manufacturing Company by its answer denied the allegations of the petition and then claimed as owner in fee by written title all of lots 100, 101, 102, and 103 in block 290, being 281 feet on First street by 420 to the Levee; and also averred adverse possession of these lots under this claim of title for more than twenty years and the payment of taxes and making in good faith permanent improvements thereon. And the proof showed that on September 22, 1881, Edwin Harrison and wife by warrant deed conveyed these lots in fee to John H. Conrades and Frederick H. Logeman; that Conrades with his wife, thereafter on January 6, 1883, conveyed to Logeman in fee his one half, and that Logeman and wife on July 23, 1883, conveyed these lots in fee to defendant, the F. H. Logeman Chair Manufacturing Company; and the evidence showed further that at all times after July, 1883, the Chair Company held the exclusive possession of these lots and paid all general and special taxes on them; that they improved these lots by erecting thereon a six-story building used as a warehouse and for offices, and at all times after 1883, and for more than twenty years before the commencement of this suit, this company kept these lots inclosed and in use and at all times asserted absolute title to all parts thereof and of every interest therein.

The defendants Charles Alfred Logeman, Roland H. Logeman and Wilbur G. Logeman, by their joint answer, denied the allegations of the petition and then claimed as owners in fee and by written title all of the lots numbered 47, 48, 49, 50, 51, 52 and 53 in block

294, these lots fronting 142 feet and one inch on Second street by 109 feet and seven inches on Main street, and also averred adverse possession of these lots under such claim of title and the payment of all taxes thereon, general and special, for more than twenty years, and the placing in good faith thereon of permanent and costly improvements. And the proof showed that by warranty deed of March 24, 1882, for $15,000 Edwin Harrison and wife conveyed these lots to Frederick Logeman, who at once took possession of them and inclosed them and erected a casket factory on them, which factory cost nearly $65,000, and has at all times been used since then by the Mound City Coffin Company, a corporation formed by Mr. Logeman in 1882; that Mr. Logeman died in 1894, and that these three defendants, his sons, succeeded him as owners of this property and of the Coffin Company shares under his will, and they have continued to pay, as he did while living, all general and special taxes on it, and have at all times since then continued to assert, as he did while living, the exclusive ownership of all of these lots and of every interest in them.

The defendant Franklin R. Jackes (called in the petition "Frank R. Jacks") is one of those who claim by mesne conveyances under Edwin Harrison. In Jackes's answer he claims to be the owner of a lot 120 feet on Main street, by a depth eastwardly of 200 feet, in City Block 289 and asserts actual, open, uninterrupted and adverse possession in himself and his grantors for more than the period of limitation. The claim of title from Edwin Harrison to Jackes begins with a deed from Edwin Harrison to Vornbrock in 1880—consists of eight different transfers of the property at various dates down to and including the last deed to Jackes, September 6, 1902. When Vornbrock bought the Jackes lot from Edwin Harrison in 1880, there was a small frame building on it, used as a dwelling. Vornbrock paid $8,000 for the lot, and at

·once took possession and improved it with a two-story brick building, to which a third story was afterwards added. The building was one hundred feet by sixty feet, and in connection with the building Vornbrock used the balance of the lot, together with other property which he leased from Harrison for a lumber yard. It was fenced in on all sides. After Vornbrock had occupied it exclusively for three or four years, he incorporated his business and conveyed the property to his corporation, the Vornbrock Furniture Company —after which the company continued in the same manner to use and occupy the Jackes lot until 1896, when the company failed, and the title passed under a foreclosure to the Mullanphy Bank. The bank was in actual possession, collecting rent for a time, and afterwards having a watchman in charge until the property was sold to one one Weil, by the receiver of the bank. The receiver also had a watchman in charge. That part of the lot which was not built upon was, during all the time from Harrison's deed down to the sale to Evans, used as a lumber yard. Weil sold to one Evans, who was a business associate of Jackes and later conveyed the lot to Jackes. Evans and Jackes took possession upon their purchase from Weil in 1899; at that time the three-story brick building erected by Vornbrock was still on the lot, and the rest of the lot was used as a lumber yard. Jackes and Evans built upon that part of the lot formerly used as a lumber yard, expending $30,000 in improvements upon the entire lot. During the period from 1880 down to 1896 while the Vornbrocks were in continuous and exclusive physical possession no one else ever demanded rent from them or disputed their possession in any way.

The Chicago, Burlington & Quincy Railroad Company acquired the property described in its answer exclusive of that used as streets from Harrison by deed more than ten years prior to this suit. They occupied the parts of streets under authority of an ordinance

of said. city, dated the —— day of —— 18—, have paid all taxes from date of deed, made extensive improvements and laid tracks both over the land conveyed by Harrison and the streets occupied under the ordinance.

The city of St. Louis claimed the streets, excluding Front or Wharf street, by prescriptive use, and also by use since 1841; claimed the street known as Front or Wharf since the date of the partition proceedings and in virtue of the laying out of said street by order of the circuit court by the sheriff and the commissioners and. according to the plat attached to defendant St. Louis's answer. Harrison claimed the wharf, accepting the dedication of Front or Wharf street made in the partition proceedings, but claimed the wharf under his deed from Maguire. The city claimed the wharf by prescriptive use, also by reason of expenditures made upon it since 1864, and claimed both streets (other than Front street) running through the reservation by deed of Maguire and others, dated —— day of ——, 1853, a deed made prior to Maguire conveyance to Dickson, which was dated and executed the —— day of ——, 1852. Charles K. Dickson did not join in this deed. The city also claimed wharf under direct deed from Harrison executed on — day of ——, 1884, to the city of St. Louis; and Harrison claimed as lessee under said city in virtue of a lease executed contemporaneously with Harrison's deed to it under special covenants recited in that lease and the ordinance of the city of St. Louis under which it was made.

The Mississippi Valley Trust Company claimed block 288 under mesne conveyances from Harrison; and the Wiggins Ferry Company claimed the wharf as assignee of Harrison's leasehold term. The two last named defendants have purchased the interest of this plaintiff and the writ of error has been dismissed as to them.

Whatever additional facts may be necessary for the proper determination of this case will be stated in the course of the opinion.

The trial court made the following findings of fact, which are stated in the decree, to-wit:

"And the court doth further find that on and prior to the fourteenth day of October, 1873, the equitable title to one undivided thirty-second part of the real estate hereinafter described, subject to the rights of the defendant, the city of St. Louis, in the streets and wharf described in the answer of said defendant, was in John J. Murdoch as surviving partner of the firm of Murdoch & Dickson, the legal title thereto being in James B. Eads and Barton Bates, as trustees under the will of Charles K. Dickson, and that both said equitable title and said legal title, at the date of the institution of this suit, had been extinguished by the actual, continuous, notorious and uninterrupted adverse possession of said real estate by said city of St. Louis, and by Edwin Harrison, individually and as trustee, and by like adverse possession thereof by the grantees of said Edwin Harrison, individually and as trustee; and the court doth further find that plaintiff is barred from any recovery in this suit by the laches of said John J. Murdoch as surviving partner as aforesaid, and by the laches of the creditors of said Murdoch and Dickson, and by the laches of said trustees under the will of said Charles K. Dickson, and of the legal representatives of said Murdoch; and the court having reached the conclusion above stated, makes no finding on the defense of estoppel set out in the answers of some of the defendants."

And thereupon the court found for the defendants, and entered its decree accordingly; and the plaintiff brought the case here upon writ of error.

The errors assigned, by reason whereof it is here claimed the decree of the lower court should be re-

257 Mo. 44

versed and judgment and decree entered here in favor of plaintiff and against the defendants claiming any interest in the partnership interest in the Reservation under Harrison, are set out in full in this plaintiff's motion for new trial, which is here reproduced as the errors complained of for correction.

1. The findings in said cause are against the evidence, against the weight of the evidence, and against the law under the evidence.

2. The decree and judgment is against the evidence, against the weight of the evidence, and against the law under the evidence.

3. The findings, judgment and decree were for the wrong party.

4. The court erred in admitting incompetent, irrelevant and immaterial evidence offered by the defendants.

5. The court erred in rejecting competent, relevant and material evidence offered by the plaintiff.

6. Because the court erred in overruling the plea to the court's jurisdiction and the motion therein for a judgment filed on the 4th day of November, 1905.

7. Because the court erred in overruling the plaintiff's objections to the introduction of any evidence under the answers of the several defendants, after the admission made by the several defendants in such answers, also by the stipulation filed in the cause and also by the admission of all the defendants in open court, that the one thirty-second interest in the land described in plaintiff's petition and in the several answers was partnership property in January, 1871, when Dickson died; on October 14, 1873, and at all prior times to the date of Murdoch's qualification as surviving partner; at all subsequent times including the period during which the circuit court usurped the jurisdiction of the probate court, and while Priest was holding this and other property of the estate; when the partition suit was filed and during all of the proceedings therein to

the date of sale and delivery of the sheriff's deed in said partition; at all times since the delivery of the deed to Harrison and up to the present time.

(a) Because the judgment of proceedings in State ex rel. Richardson v. Withrow, 141 Mo. 69, is *res adjudicata* of plaintiff's right and title and the probate court's custody, control and jurisdiction over these assets.

(b) Because the court erred in overruling the plaintiff's objection to the introduction of any evidence under the plea of adverse possession.

(c) Because during the pendency of the partnership administration in the probate court, under the facts pleaded and admitted by defendants, all partnership property was under the exclusive control, jurisdiction and in the custody of the probate court.

(d) Because the partnership administration was pending in the probate court at all times since March 31, 1871, and is still pending, in the settlement of which this property is and has always been involved; and such proceedings were and still are *lis pendens*.

(e) Because no person came into being and no right of action ever accrued to any one for the recovery of any partnership property until Murdoch's successor was appointed by the probate court in August, 1895, aside from the two grounds "c" and "d" hereunder.

9. Because it erred in sustaining the defendant's plea of adverse possession against the plaintiff's right to the one thirty-second interest in the property described, notwithstanding, and in spite of the fact that the judgment of the Supreme Court rendered in July, 1897, vested the title and right of possession to all assets, real and personal, of the partnership estate seized by Priest under the void deed and held under the unlawful control of this court, in plaintiff as of the date 1873; and the exclusive possession, control,

custody and jurisdiction of and over the same in the probate court as of the same date.

10. The court erred in admitting over the objection of plaintiff any testimony in support of the plea of laches, based upon (1) the delay of the circuit court in ceasing to usurp and to interfere with, and the time elapsing during which it continued to usurp and interfere with the jurisdiction of the probate court; or to (2) the delay of the probate court in appointing a successor to Murdoch to dispute the authority of the usurping court, while the circuit court was usurping, interfering with and claiming the jurisdiction of the probate court; or (3) the delay of the executors of Dickson in failing to qualify or to procure the appointment of Murdoch's successor who might do so, during the time the circuit court was usurping, interfering with and claiming the jurisdiction of the probate court; or (4) of that of the trustees of Dickson during the same time; and (5) that of Murdoch, his heirs or representatives of Murdoch's estate, or of that of the remote beneficiaries under the trust created by the Dickson will, during the same time.

11. The court erred in admitting over the objection of plaintiff any testimony in support of the plea of laches, against the plaintiff herein, based upon the alleged delay of any person whomsoever other than the plaintiff himself; he being, since Murdoch's authority was revoked, the only person authorized or permitted to bring this suit; and the right to sue inuring to him along in August; 1895.

12. Because it sustained the plea of laches against complainant's right to sue, when there was no testimony whatever, or parol or documentary proof of, or one single fact alleged by the defendants in their answers or adduced in court tending to show that complainant was guilty of any delay in the institution of this suit.

13. The court erred in admitting any testimony or evidence in support of any plea of adverse possession, laches, acquiescence, consent or estoppel of any alleged equity.

14. Because the judgment rendered violates the letter and spirit, the word and command of the prohibition judgment, because it invades the control and possession of the probate court and of this plaintiff as the probate court's officer of the property herein confessed to be a part of the partnership property at all times from the date of Dickson's death until the present time.

15. Because it violates the letter and spirit, the word and command of the prohibition judgment and under these specious pleas it frees the circuit court's hands of the prohibition, gives effect to its own void orders and judgment, denounced by the Supreme Court as void, dignifies the trespasser Priest and those trespassing under him, with the name of legal possessors, scorns the probate court's possession, control, custody and jurisdiction, and defeats the title and possession of plaintiff as the duly appointed successor of Murdoch, fixed and adjudged by the Supreme Court.

16. It is violative of the Constitution of the United States, which guarantees to the citizens of every State the immunities and privileges of every other citizen and maintains the right of every citizen to life, liberty and property, which cannot be taken from him without due process of law; and forbids the courts and the States to deny to any citizen the equal protection of the laws—in this, that this judgment defeats the whole law of administration referring to the winding up of partnership estates when dissolved by death, and whereby all sales of partnership property must be made by the surviving partner, or his legal successor, and reported to and accounted for in the probate court; the debts of the partnership estate paid under its direction when ascertained and adjudged by it to be

due; the differences between the surviving partner and the deceased partner adjusted; and the surplus, if any, paid to the executor or administrator of the deceased partner, to the end that all the assets of the deceased partner's estate may come into the hands of the executor or administrator in the probate court; and the heirs or legatees of the intestate or testator may under the probate court's supervision and protection receive the full benefit thereof upon the final settlement of such deceased partner's estate.

17. It is violative of the Constitution of the State of Missouri, for the same reasons in that it deprives the plaintiff and all persons directly or indirectly interested in the estate, of his and their property and rights without due process of law.

18. It violates that provision of the Constitution of Missouri which provides, as a part of our Bill of Rights, that there must be a certain remedy afforded for every injury to person, property and character.

19. It violates the judgment of the Supreme Court of the United States in the case of Maguire v. Tyler, decided in 1872, after Murdoch's qualification in March, 1871, in so far as it recognizes the streets and wharf rights and ownership in the city of St. Louis, and predicates upon the use of any part of said land as streets or the use of any part thereof as wharf property prior to the decision of 1872, any prescription or prescriptive rights; and is violative of the rule and decision of the Supreme Court of Missouri in case of State ex rel. v. Withrow, 141 Mo. 69; and in the respects mentioned in all the previous grounds for new trial, in so far as it bases a prescriptive right to the streets or to the wharf or any right to the wharf, or the new street added and designated on the plat made by the sheriff in the partition suit, or under the deed of Edwin Harrison made after Harrison's alleged purchase under the partition, and pending the administration proceedings.

I.   There can be no question, and in fact it is not denied, that on and prior to January 26, 1871, the beneficial interest in and to the land involved in this suit belonged to the partnership of Murdoch & Dickson, and that during said time the legal title thereto stood in the name of Dickson, one of the partners.

Partnership Realty: Death of Partner: Location of Title: Custodia Legis.

The controversy seems to arise as to what became of the legal and equitable title thereto and the possession thereof upon the death of Dickson, which occurred on said 26th day of January, and which fact it is conceded operated as a dissolution of the partnership.

Upon the correct determination of those questions largely depends the proper determination of this case.

It is the contention of counsel for plaintiff that the title to the partnership realty upon the death of one of the parties is converted by operation of law into personalty, and that the equitable title thereto, which courts of equity will recognize and protect, passes to and becomes vested in the surviving partner, with all the incidents of title, including the right to the exclusive possession of the property.

And if that contention is sound, then it is further contended by said counsel that upon the death of Dickson the equitable title to and possession of this land passed by operation of law to Murdoch, as surviving partner, whose duty it was to administer upon it through the probate court of the city (then county) of St. Louis, and that when he qualified as such surviving partner that fact coupled with his possession and inventory thereof filed by him in the probate court, placed the partnership estate, including this land, *in custodia legis,* which fact, it is contended, prevents the running of the Statute of Limitations so long as the estate remains in the custody of the law.

Upon the other hand, if I correctly understand the contention of the counsel for the various defendants, it is substantially this: That during the life of Dickson he held the legal title to the land in controversy in trust for his firm, Murdoch & Dickson; that upon the death of Dickson all of his property passed to and vested under his will in Eads and Bates as executors, and then by the terms thereof they were to hold and manage the same as trustees for the widow and his children; and that by operation of law the full equitable title to the land passed to and vested in Murdoch, the surviving partner; in trust, however: first, for the payment of firm debts; and, second, one-half of what remained to Eads and Bates as trustees of Dickson, and the other half to Murdoch. Consequently, they contend that Murdoch was never in possession of this land, and that when the probate court revoked his authority to further administer the partnership estate as surviving partner, on December 30, 1873, and there having been no one else appointed to succeed him as administrator of said estate until August, 1895, when the appellant was appointed as such, then the Statute of Limitations would and did run during that twenty-odd years and barred this cause of action, for the reason that from December, 1873, to August, 1895, Eads and Bates were *sui juris* in possession of the land, and represented the interests of the six minor children of Dickson; Mrs. Walsh, the other child, was represented by her husband, her trustee, who, of course, was *sui juris;* Mrs. Dickson, the widow, was *sui juris;* that all of the creditors of Murdoch & Dickson were of necessity so, as was Murdoch, the surviving partner. Hence, at the time of Harrison's entry, August 4, 1875, not a single outstanding interest, legal or equitable, was in existence that was not either in person, or by trustee, vested in an adult under no disabilities, who at any time could have moved

for the appointment of a successor to Murdoch or a successor to Priest, according to his fancy, or have taken any other step that he deemed necessary to pro-tect the interest of creditors or the ultimate owners of the property; that all of them stood by with folded hands until Richardson, the public administrator, was ordered to take charge of the assets of Murdoch & Dickson, on August 13, 1895, twenty years after Harrison had entered into possession; and even then when Richardson had so taken charge, this suit was not instituted until the December term, 1903, eight years after his appointment, and six years after July 17, 1897, the date when the writ of prohibition *in re* Withrow was made final.

These contentions of counsel for the respective parties sharply present the legal propositions involved in this litigation; and in order to properly understand those questions we must ascertain the nature of this partnership realty, the character of the title thereto, and to whom it and the possession thereof passed upon the death of Dickson.

These questions have been before the courts of this and other states repeatedly, and have received at the hands of those courts careful consideration.

This court in discussing this question in Bell v. McCoy, 136 Mo. l. c. 561, said: "Until there is a liquidation of the partnership estate, the realty of the firm may be dealt with and managed by the administrator of the partnership estate just as any other asset of the firm. Plaintiff, Mrs. Bell, as administratrix of that estate in this case, is entitled to the possession and control of the leasehold, and it is not material whether it is regarded as real or personal in nature so far as concerns the present controversy."

And in Easton v. Courtwright, 84 Mo. l. c. 36, the court remarks: "The application to the probate court by the surviving partner was for the sale of certain

partnership real estate, and for that portion situated in Hannibal, the legal title to which was in the name of all the partners.  Being partnership property, in contemplation of equity, it was to be treated as assets in the hands of the surviving partner administering as such for the payment of partnership debts."

And Justice MILLER in Shanks v. Klein, 104 U. S. l. c. 22, says: "It is not necessary here to decide that it is not a lien in the strict sense of that word, for if it be a lien in any sense, it is also something more. It is an equitable right accompanied by an equitable title.  It is an interest in the property which courts of chancery will recognize and support.  What is that right?  Not only that the court will, when necessary, see that the real estate so situated is appropriated to the satisfaction of the partnership debts, but that for that purpose and to that extent, it shall be treated as personal property of the partnership and like other personal property pass under the control of the surviving partner.  This control extends to the right to sell it, or so much of it as may be necessary to pay the partnership debts or to satisfy the just claims of the surviving partner."

In this case the court quotes approvingly from Dupuy v. Leavenworth, 17 Cal. 262, the very language quoted in Easton v. Courtwright, which so satisfactorily explains the nature of the title of the surviving partner, as follows: "In the view of equity it is immaterial in whose name the legal title of the property stands—whether in the individual name of one co-partner, or in the joint names of all; it is first subject to the payment of partnership debts, and is then to be distributed among the co-partners according to their respective rights.  The possessor of the legal title in such case holds the estate in trust for the purposes of the co-partnership.  Each partner has an equitable interest in the property until such purposes are accomplished.  Upon dissolution of the

co-partnership by the death of one of its members, the surviving partner who is charged with the duty of paying the debts, can dispose of this equitable interest, and the purchaser can compel the heirs at law of the deceased partner to perfect the purchase by conveyance of the legal title.''

In George on Partnership, p. 126, it is said: ''A partnership may own or even deal in real estate, but it cannot take or hold the legal title in its own name. A partnership, as we know, is not a person, certain, natural or artificial, and, hence, no legal title to real estate can vest in it.''

Even where all the members of the firm are named as grantees, they hold the legal title as tenants in common without survivorship, but the equitable title with survivorship is in the firm. [Riddle v. Whitehill, 135 U. S. 621; Harris v. Harris, 153 Mass. 439; Paige v. Paige, 71 Iowa, 318.] The author last quoted again says: ''When in the deed the firm style only is used in describing the grantee, which firm style contains the name of an actual partner at the time, such partner takes, under the deed, a trust for the benefit of all members of the firm. But if the firm style only is used in the deed, in expressing the grantee, and the firm style so used contains no name of an actual, existing partner, the deed fails to pass a legal estate to anyone, and such legal estate is, thereafter, in the grantor, although he holds in trust for the firm.'' [George on Partnership, p. 127.] In Woodward-Holmes Co. v. Nudd, 58 Minn. l. c. 239, it is said: ''It is now held with practical unanimity by the American courts that if partnership capital be invested in land for the benefit of the company, all the incidents attach to it which belong to any other stock, so far as consistent with the Statute of Frauds and the technical rules of conveyancing, and that it will be treated as personal estate until it has performed all its functions to the partnership and thereby ceases to be any

longer partnership property; and until then it· is not
subject to dower or inheritance. . . . The part-
ners have the power of disposition over it for the pur-
poses of the dissolution of the partnership, the pay-
ment of its debts, and the distribution or division of
the capital among themselves. For until that is done
the property has not fulfilled its functions as person-
alty or ceased to be partnership property."

The case of Holton v. Guinn, 65 Fed. 450 (Circuit
Court, W. D. Missouri W. D.), decided by Judge PHIL-
IPS, who wrote the opinion in Easton v. Courtwright,
is in point. The suit was for partition instituted by
the widow and children of Elijah Lloyd, the deceased
partner of a co-partnership known as Guinn & Lloyd,
against the surviving partner Guinn, who had given
bond in the probate court; the partnership estate was
then in course of administration. The court said: "The
question, therefore, is . . . are the complainants
entitled to proceed in partition of the lands, and for
an accounting of the rents and profits thereof against
the respondent? If the lands were partnership prop-
erty, on the death of Lloyd, one of the partners, the
right of possession, dominion and management there-
of devolved upon respondent as such surviving partner,.
for the purpose of administering and winding up the
partnership affairs. In contemplation of law, the
realty for this purpose is personal property and part-
nership assets. Its primary liability in his hands is
for the debts of the copartnership. To this end re-
spondent ' is entitled to the usufruct thereof, for the
purpose of paying off partnership debts; and he may
sell and dispose of such real estate, if necessary, to
such end. . . . Until such administration is closed
by discharge of the partnership debts, the possession
of the partnership realty by the surviving partner
is adverse to and exclusive of the heir at law, and
hence, suit in partition will not lie. [Holmes v. Mc-
Gee, 27 Mo. 597; Priest v. Chouteau, 85 Mo. 407; 2

Bates Partn., 971 et seq.; 1 Woerner's Adm., sec. 126.]"

In the case of Priest v. Chouteau, 85 Mo. l. c. 407, this court quoted with approval the following language from the Supreme Court of Indiana in the case of Rossum v. Sinker, reported in 12 Central Law Journal, 202:

" 'The rule unquestionably is, that the heirs of a deceased partner have no interest in the real estate owned by the firm until all the partnership debts have been paid. Until all debts have been paid, the surviving partner has the real, substantive interest . . . Certain it is, however, that the land of a partnership is, in many very essential respects, radically and materially different from land owned by an individual. It is also certain that the surviving partner has the substantive interest in such property, and, unquestionably, the right to own, hold and sell it for the purpose of settling up firm affairs and paying firm debts.' [Burnside v. Merrick, 4 Metc. 537; Dyer v. Clark, 5 Metc. 562.] In Jones v. Parsons, 25 Cal. 104, it is said: 'The same result would accrue in case of the sale under execution of the legal interest of a partner, in the partnership real estate, as in the personal property. The partners are regarded at law as tenants in common, but in equity the property is treated as vesting in them in their partnership capacity, the beneficial interest being held by them in trust until the partnership account is settled and the partnership debts are paid.' "

It being conceded, and as the undisputed evidence shows, that during Dickson's life he held the legal title and possession of this land for the use and benefit of the firm, then according to the universal holdings of all the courts, upon his death, the law transferred the title and possession thereof to Murdoch, as surviving partner for the benefit, primarily, of the partnership creditors, and, secondarily, to the execu-

tors of Dickson, for the uses and purposes stated in his will. As soon as Murdoch acquired the possession, the law converted the realty into personalty, and by operation of law the legal title vested in him, as much so as land would vest in the heir at law by the death of the ancestor; and once the surviving partner acquired the title and possession it was a good legal title and possession against the world. [Collins v. Bankhead, 1 Strobhart's L. (S. C.) l. c. 27; Bell v. McCoy, 136 Mo. l. c. 561.]

And according to the principle laid down by all of the authorities, when Murdoch, as such surviving partner, became possessed of this undivided one thirty-second interest in the Brazeau Reservation, he became a tenant in common with Maguire and those claiming under him; and, consequently, he retained that possession up to the date of his removal from office, since his pretended assignment was absolutely null and void, as was held by this court in the case of State ex rel. v. Withrow, supra, and did not therefore have the legal effect of depriving him of the possession of the partnership property. Under this view of the case we must logically and necessarily hold that neither the legal title nor the possession of this real estate ever vested in Eads and Bates as executors under Dickson's will, for the obvious reason that under the law, the estate of a deceased member of a copartnership has no interest whatever in the partnership assets until the firm debts are paid; and, if any surplus remains after the payment of the firm debts, then that surplus passes to and becomes the assets of the estate of the individual member, and not before. Consequently, the heirs, executors or administrators of the deceased partner can in no manner interfere or intermeddle with the title or possession of partnership assets until all of its debts are paid.

By way of diversion and for the purpose of throwing a side light upon the question of the Statute of

Limitations, which will be considered in a subsequent paragraph of this opinion, I wish to here state that, since we have reached the conclusion that during the time Murdoch was acting as surviving partner he was in possession of this land as a co-tenant with Maguire and others, and that being true, it is perfectly clear that there was no necessity for Murdoch, as such surviving partner, to sue the devisees of Dickson or their trustees for the recovery of this land, for the reason that he already held the title and possession thereof, and they were not disputing that title or his right of possession thereto.

We are, therefore, of the opinion that the Statute of Limitations had not begun to run up to the date of Murdoch's removal, which was December 30, 1873. And this brings us to the consideration of the question, and we must ascertain and determine where the title and possession of this property was from and after that date down to the time the plaintiff was ordered to take possession of the partnership estate, which was on August 11, 1895.

It is clearly deducible from all of the authorities, including our statutes governing the administration of partnership estates, that neither the title nor possession of this land remained in Murdoch after his removal from office by the probate court on December 20, 1878.

Plaintiff contends that the administration of a partnership estate is a proceeding *in rem* and that when Murdoch qualified as surviving partner of this estate in the probate court and took charge thereof, then the assets thereof were thereby placed *in custodia legis*, his possession being the possession of the court, and that upon the revocation of his authority to further administer upon the estate, the legal title and possession thereof remained vested in the court, until the appointment and qualification of plaintiff as ad-

ministrator *de bonis non* of said estate, and that he then took possession of same as an officer of the court.

Upon the other hand counsel for respondent contend that the possession of this property was never in the hands of the probate court, or *in custodia legis,* yet they do not point out with clearness where, in, their judgment, the possession rested during that period, but contend in a general way, if we correctly understand them, that it rested with Eads and Bates, the executors and trustees under the will of Dickson.

These contentions call for an examination of the question as to the nature and extent of the jurisdiction of the probate court over the administration of partnership estates.

Sections 52 and 54 of article 1 of chapter 2 of Wagner's Statutes of 1872 were in force and governed the jurisdiction of probate courts over partnership estates at the time Murdoch qualified as surviving partner to administer upon this estate; and sections 52 and 54 thereof read as follows:

"Sec. 52. In case of the death of a member of a copartnership, any surviving partner, resident of this State, shall have the right to give the bond hereinafter required, to take an inventory of the partnership effects in the presence of witnesses, appointed as provided by law, to cause the same to be duly appraised, and to do all other things touching the administration of the partnership effects, in the manner provided by this law; but when the surviving partner administers, his administration shall be had in the county in which the partnership business was conducted."

"Sec. 54. If the surviving partner shall not have administered on the partnership estate, at the time the executor or administrator of the estate of the deceased partner shall proceed to take his inventory, it shall be the duty of such executor or administrator to include in the inventory, which he is required by law

to return to the court, the whole of the partnership estate, goods and chattels, rights and credits, appraised at their true value, as in other cases; but the appraisers shall carry out in the footing an amount equal only to the deceased's proportional part of the copartnership interest.''

From reading those two sections of the statute it will be seen that the surviving partner is given the preference to administer upon the partnership estate, but if he fails to do so, it is then made the duty of the administrator of the estate of the deceased partner to administer upon the same, but one or the other must do so and neither can administer upon the estate independent of the statute (See Ensworth v. Curd, 68 Mo. 282), for the reason that those sections provide whichever administers upon the estate shall take an inventory of the partnership assets in the presence of witnesses, as provided by law, to cause the same to be duly appraised and to do all other things touching the administration of the partnership effects, *in the manner provided by this law.* And section 56 thereof requires the surviving partner, where he administers upon the estate, to file a bond with the court conditioned that he will "use due diligence and fidelity in closing the affairs of the late copartnership, apply the property thereof towards the payment of the partnership debts, *render an account, annually, upon oath, to the court, of all the partnership affairs,* including the property owned by the late firm, and the debts due thereto, as well as what may have been paid by the survivor towards the partnership debts, and what· may still be due and owing therefor, and pay over within two years, unless a longer time be allowed by the court, to the executor or administrator, the excess, if any there be, beyond satisfying the partnership debts and costs, and expenses in closing the affairs of the

copartnership, then the above bond to be void; otherwise to remain in full force."

And section 58 provides that the "court shall have the same authority *to cite such survivor to account, to adjudicate upon such account, to order payments of demands allowed, and to require additional bonds, as in the case of an ordinary administrator, and the parties interested shall have the like remedies as may be had against administrators.*"

According to those sections, the surviving partner must qualify as such in the probate court, inventory and appraise the partnership property and file them in that court, and administer the assets thereof under its jurisdiction and "in the manner provided by this [that] law."

Clearly, when these things are done as provided by that article of the statutes, the partnership assets are placed *in custodia legis.* It would be hard to conceive language that would be more expressive of that idea than that employed in the sections before mentioned; and those following in the same article are confirmatory of that same idea.

The foregoing observations are in perfect accord with the judicial expressions of this and other courts of the country where the same question has been presented for determination.

In the case of St. Louis National Bank v. Field, 156 Mo. l. c. 310, this court said: "There is nothing shown by the record in this case to authorize the appointment of a receiver. The property was already in custody of the law and in the immediate care of a competent officer. Under our law, upon the death of an intestate his whole estate, real as well as personal, is liable to come into the hands of his administrator for the payment of his debts. The administrator is not authorized to take possession of the real estate until ordered to do so by the probate court, and when he takes possession under such order, the land is *in cus-*

*todia legis.* . . . The fact that the estate is insolvent and unable to redeem the mortgage, or that the mortgaged property is insufficient for that purpose, is a subject to influence the probate court in determining what orders it will make in reference to the mortgaged property, but it does not affect the jurisdiction of the court over the subject.''

The case of Byers v. McAuley, 149 U. S. 608, is strictly in line with the views of Judge VALLIANT in the foregoing case. Justice BREWER said on page 614: ''In order to pave the way to a clear understanding of this question, it may be well to state some general propositions which have become fully settled by the decisions of this court; and, first, it is a rule of general application that where property is in the actual possession of one court of competent jurisdiction, such possession cannot be disturbed by process out of another court. The doctrine has been affirmed again and again by this court. [Citing numerous cases.] Secondly, an administrator appointed by a State court is an officer of that court; his possession of the decedent's property is a possession taken in obedience to the orders of that court; it is the possession of the court, and it is a possession which cannot be disturbed by any other court,'' quoting in support of the proposition, Williams v. Benedict, 8 How. 107, 112; Yonley v. Lavender, 21 Wall. 276.

From the latter case the court quotes as follows: ''The administration laws of Arkansas are not merely rules of practice for the courts, but laws limiting the rights of parties, and will be observed by the Federal courts in the enforcement of individual rights. These laws, on the death of DuBose and the appointment of his administrator, withdrew the estate from the operation of the execution laws of the State and placed it in the hands of a trustee for the benefit of creditors and distributees. It was thereafter in contemplation of law in the custody of the probate court, of which the

administrator was an officer, and during the progress of the administration was not subject to seizure and sale by anyone."

And in line with the same view, the court in Yonley v. Lavender, continued, saying: "The recovery of judgment gave no prior lien on the property, but simply fixed the status of the party and compelled the administrator to recognize it in the payment of debts. It would be out of his power to perform the duties with which he was charged by law if the property entrusted to him by a court of competent jurisdiction could be taken from him and appropriated to the payment of a single creditor, to the injury of all others. How can he account for the assets of the estate to the court from which he derived his authority if another court can interfere and take them out of his hands."

"There is nothing," continues the court in Byers v. McAuley, after quoting the above, "in any decision of this court controverting the proposition thus stated, that the administrator is the officer of the State court appointing him, and the property placed in his possession by order of that court is in the custody of the court."

To the same effect is the case of State ex rel. v. Reynolds, 209 Mo. 161.

And as is well said by counsel for appellant in his reply brief:

"It is hardly necessary to argue that what a court cannot do with the whole estate it cannot do with a part of it. *Omne majus in se minus continet.* If the partnership estate was under the exclusive jurisdiction of the probate court, it is inconceivable how one of its confessed assets could be withdrawn from that jurisdiction. No court in this State has ever held that it could be so withdrawn by process of another court. If any asset in the possession of the surviving partner could be seized on execution either under a judgment

against him as one of the partners or against the estate of the partnership, or could be taken from him by a court of equity and placed in the hands of its receiver, and administered in such proceeding, or could be assigned to an assignee for the benefit of alleged partnership creditors, then it could be withdrawn from the probate court's jurisdiction and control, but not otherwise.

"It seems superfluous to add further authorities showing that these proceedings are *in rem* and the estate is the thing (*res*) proceeded against. But the proposition that the estate of the partnership is the thing indebted is incontrovertible, wholly regardless of the power of the surviving partner to sell without an order of the probate court. [See Brown on Jurisdiction, sec. 64.]

"This asset then was in the possession of the surviving partner when he made the pretended assignment, he held the equitable title to it, he could not by his pretended deed affect that title or possession, nor could he thereby affect or impair the probate court's jurisdiction over it. Hence, in legal contemplation, notwithstanding he placed Priest in possession and attempted to pass to him his title, the jurisdiction of the probate court over it remained unimpaired."

It is equally clear that neither the death of Murdoch nor the revocation of his authority to further act could affect or impair the jurisdiction of the probate court over the assets of this estate. That same principle came before this court In Banc in the case of State ex rel. v. Reynolds, supra, and on page 174 the court used this language:

"The legal custody of the property was not disturbed or changed by the order of the court made at a subsequent term removing Tillman as such receiver and appointing Watkins in his stead. [Very v. Watkins, 23 How. (U. S.) 469; Shields v. Coleman, 157

U. S. 178-179.] That order of the court was but the removal of one receiver and the appointment of another in his stead, which the court had a perfect legal right to do. [High on Receivers (3 Ed.), sec. 821.]

And continuing on pages 179 to 181 this court said:

"Having thus shown and decided that the property and assets of the Home Cooperative Company are still *in gremio legis,* it now devolves upon us to determine whether or not the circuit court of the city of St. Louis has the authority and jurisdiction to restrain and enjoin the receiver appointed by the circuit court of St. Louis county from interfering with the property of the company and from performing other functions as such and to appoint another receiver to take charge of and administer the same assets under its own orders and directions.

"This is no novel question to the jurisprudence of this State and country.

"Mr. High, in his excellent work on Receivers, in the discussion of this question, says: 'Indeed, when a court of competent jurisdiction has appointed a receiver, who is in possession of and administering the property under its orders, another court of co-ordinate jurisdiction will not entertain a bill to administer the same property, and to take it from the possession of the former receiver, and to appoint its own receiver. In such a case the parties aggrieved should seek relief in the court which is already in possession of the property through its receiver. So the prior jurisdiction of a court of equity powers over the subject-matter of the appointment of a receiver, and the pendency of a motion for an injunction and a receiver in such court, exclude the interference of that court in a subsequent suit for the same relief. And the appointment of a receiver in the suit thus subsequently begun will be held inoperative as against the appointment made in the former cause. So, if the court first

appointing a receiver has jurisdiction, its receiver will not be dispossessed of the property at the suit of a receiver subsequently appointed by a court of co-ordinate jurisdiction; and this is true, regardless of whether the original appointment was or was not erroneous. And a receiver being an officer of court, and being bound to account to the court appointing him for all funds which he receives in his official capacity, he cannot be compelled by an order of another court to pay over money in his hands as receiver in satisfaction of an execution issued upon a judgment of such other court, since such a procedure would necessarily have the effect of producing a conflict of jurisdiction, and would prevent the receiver from compliance with the obligations of his bond given to the court appointing him.' [High on Receivers (3 Ed.), sec. 48.]

"This seems to be the universal holding of the State and the United States courts upon that subject. [Young v. Railroad, 2 Woods, 606; Young v. Rollins, 85 N. C. 485; Bonner v. Hearne, 75 Tex. 242; Nelson v. Conner, 6 Rob. (La.) 339; Metzner v. Graham, 57 Mo. 404; Heath v. Railroad, 83 Mo. 617; Colburn v. Yantis, 176 Mo. 670; Mishawaka Mfg. Co. v. Powell, 98 Mo. App. 530; Keegan v. King, 96 Fed. 758; Freeman v. Howe, 24 How. 450; Buck v. Colbath, 3 Wall. 334; White v. Schloerb, 178 U. S. 542; Chicago Union Bank v. Bank of K. C., 136 U. S. 223-236; Railroad v. Humphreys, 143 U. S. 97.]

"The difficulty with which the courts meet is not what is the law upon the question, but what is the proper remedy to be applied to such cases when they arise. All the authorities sustain the proposition that when a court of equity acquires jurisdiction of a cause, and appoints a receiver to take charge of the property involved, then no other court of co-ordinate jurisdiction has any power or authority to interfere or meddle with the property in the hands of the receiver, but must

leave the court appointing the receiver untrammeled in its administration of the same, as the law directs.''

The same principle applies to property in the custody of and under the jurisdiction of the probate court; and especially is that true where, as in this case, that court is by express statute authorized and empowered to remove the surviving partner and to appoint an administrator in his stead to administer upon the partnership estate. [State ex rel. v. Williams, 221 Mo. 227; Wehrs v. Sullivan, 217 Mo. 167.]

It was upon this principle that this court in the case of State ex rel. v. Withrow, 141 Mo. 69, held that Murdoch had no power to assign the assets of the partnership estate to Priest for the benefit of the partnership creditors, and that the jurisdiction of the probate court over these assets could not be ousted by any such assignment, and for that reason held that the pretended assignment made by Murdoch was void *ab initio,* and in doing so used this language:

''If the surviving partner is without power to make an assignment of partnership effects the case is altogether different. The deed to Priest shows on its face that Murdoch executed it as the surviving member of his firm. If the statutes denied him the right to so dispose of his firm's estate, then the instrument was void from its inception, not on account of matters *in pais* peculiar to it, but because every attempt of the kind, whatever the surrounding circumstances, violates the policy of the law. . . .

''If the foregoing views are correct, then Murdoch's deed to Priest, in so far as it attempted to convey the partnership property, was void from the first and on its face. It created no assignment of which the circuit court could take jurisdiction and left the estate in the probate court with the jurisdiction of that tribunal unimpaired.

''It results that all the proceedings of the circuit court, with reference to partnership property which

Priest assumed to take under the pretended assignment, were outside of its jurisdiction.''

To the same effect is the case of Bell v. McCoy, 136 Mo. 552.

But counsel for defendants with great earnestness insist that the principle above enunciated is not in harmony with the views of this court as expressed in the following cases: Easton v. Courtwright, 84 Mo. 27; Crook v. Tull, 111 Mo. 283; Hargadine v. Gibbons, 114 Mo. 561; State ex rel. v. Withrow, 141 Mo. l. c. 82; Meriwether v. Railroad, 128 Mo. App. 647, l. c. 658-659. No such question as the one here presented was involved in any of those cases.

In Easton v. Courtwright, there were three propositions passed upon—first, it was held that under section 63 of said article the surviving partner must have refused to allow a demand against the partnership estate before the probate court could allow it; second, that the probate court had no right under statute to order the surviving partner to pay out of the proceeds of the sale of partnership real estate demands allowed by it in preference to demands presented only to the surviving partner; and, third, that the surviving partner had the right to sell partnership realty when it became necessary, after exhausting the personal assets proper, to raise funds to pay the firm debts, and that he might so sell without applying to the probate court for an order to do so.

In the case of Crook v. Tull, the question was whether or not the surviving partner alone could proceed to administer the partnership assets where the administrator of the deceased partner had not qualified; and this court held that he could do so under the statute.

In Hargadine v. Gibbons, it was simply held that the common law rule by which a judgment in favor of a partnership survives on the death of a firm member, the surviving partner has not been abrogated by

statute; and that while the firm may be dissolved by limitation contained in the copartnership agreement as to all new business, yet it may continue to exist for the collection of assets and the payment of debts.

Clearly, the case of State ex rel. v. Withrow is not an authority in support of respondents' claim, for in express terms that case holds that in the absence of statute the common law authority of the surviving partner to dispose of the firm assets, even by assignment for the benefit of creditors, would still exist in this State had it not been revoked by statute, but that he no longer possessed that authority, for the reason that it had been taken from him by legislative enactments.

And in the case of Meriwether v. Railroad, the Court of Appeals announced and followed the same rule announced by this court in the case of Crook v. Tull, supra.

The reason why the surviving partner can do the things mentioned in those cases is because under the rules of the common law he could do all of those things and more too, and when the administrative statutes were enacted the Legislature, in subjecting partnership assets to the jurisdiction of probate courts, did not see proper to shear the surviving partner of those powers, believing, and wisely, I think, that his knowledge of the firm's affairs and his interest therein and his liability for its obligations would greatly facilitate settlement of the estate and better enable him to look after those matters, and wind up its business in a better and more satisfactory manner than it could be done by order of the probate court, who, presumably, has no knowledge whatever of the firm's affairs. But while that might be sufficient reason for the Legislature's failure to deprive the surviving partner of some of his common law powers in the settlement of partnership estates, yet it would be no reason whatever for exempting such estates wholly from the jurisdic-

tion of probate courts, where an inventory must be filed, an appraisement made and accounts kept and filed, showing the nature, character and amount of the estate, as well as the disposition of the same by annual and final settlements. Otherwise, in many cases there would be no means by which the heirs and legal representatives of a deceased partner could ascertain the status of the firm's business, or what right or interest they may have in the same, and would be subjected many times to the mercy of the surviving partner, some of whom, experience has taught us, have but little mercy and less common honesty. But whatever may have been the reason which moved the Legislature to action in the premises, the fact remains that it did enact statutes subjecting partnership estates to the jurisdiction of the probate courts in the same manner and to the same extent that it subjected all other estates of deceased persons to the jurisdiction of that court, reserving, however, to the surviving partner the right to administer upon the partnership estate and to exercise certain common law powers possessed by him in the settling and winding up of such estates.

We are, therefore, fully satisfied upon both principle and authority that the probate courts of this State have jurisdiction over the administration and settlement of partnership estates; and that the assets of the co-partnership of Murdoch & Dickson upon the qualification of the former and inventory of the firm's assets, were thereby subjected to the jurisdiction of that court, and placed completely within the custody of the law with power in the surviving partner to release therefrom such property as he might sell from time to time for the purpose of paying partnership debts), but said court retained jurisdiction over the proceeds of such sale.

II. This brings us to the consideration of the four principal grounds relied upon by counsel for defend-

ants for an affirmance of the judgment of the circuit court, which was in their favor, namely: first, the sale and transfer of the land in question to Edwin Harrison, under and by virtue of the decree of partition rendered April 9, 1875, in the case of John G. Priest, assignee, and Robert M. Renick v. John Maguire and others, which vested the title to the property in said Harrison; second, the Statute of Limitations; third, estoppel; and fourth, laches on the part of plaintiff and all other persons who represent the interest of Dickson in the assets of the firm of Murdoch & Dickson.

We will dispose of those questions in the order above stated.

Having reached the conclusion, in paragraph one hereof, as this court In Banc did when the case was previously here, that Murdoch, the surviving partner, had no authority to make the assignment dated September 14, 1873, of the assets of the copartnership to Priest as assignee for the benefit of the firm's creditors, it must necessarily follow, therefrom, that Priest acquired no right, title or interest in or to any of those assets by virtue of said assignment; and, consequently, he as such assignee, had no legal standing or right to institute or maintain the partition suit begun March 24, 1874, which resulted in a judgment of partition and the sale of the land involved in this case to Edwin Harrison, one of the defendants herein, and through whom all of the other defendants claim title, excepting, however, the claim of the city of St. Louis to the right to certain streets mentioned in its answer, which are claimed by it independent of Harrison.

This record also discloses the fact that Robert M. Renick, Priest's co-plaintiff in said partition suit, had no legal right, title or interest in or to the subject-matter of that suit, for the reason that the court found and the decree rendered therein states that "the plain-

*Partition Suit: Brought by Intermeddlers.*

tiff, Robert M. Renick, has disposed of his interest to Oliver D. Filley before suit brought, and is not entitled to any part thereof," etc., and the decree also stated that said "Robert M. Renick, named as one of the plaintiffs in this suit, has departed this life in the autumn of 1874, and that said Renick had no title or interest in said suit in partition at the time of his death," etc.

It conclusively appears from this record that neither Priest nor Renick, the only plaintiffs in said partition suit, had any interest whatever in the subject-matter thereof at the time of or subsequent to its institution, and that the court found that the latter was dead at the date of the rendition of the decree therein.

Section 4373, Revised Statutes 1899, which is the same as section 1 of chapter 152 of General Statutes 1865, which was in force at the time that suit was instituted, reads as follows: , .

"In all cases where lands, tenements or hereditaments are held in joint tenancy, tenancy in common, or coparcenary, including estates in fee, for life, or for years, tenancy by the curtesy and in dower, it shall be lawful for any one or more of the parties interested therein, whether adults or minors, to file a petition in the circuit court of the proper county, asking for the admeasurement and setting off of any dower interest therein, if any, and for the partition of the remainder, if the same can be done without great prejudice to the parties in interest; and if not, then for a sale of the premises, and a division of the proceeds thereof among all of the parties, according to their respective rights and interests."

That section only authorizes "parties interested" in the real estate sought to be partitioned "to file a petition" asking for a partition of the same, and it must logically follow therefrom that when the very decree entered in the cause shows that neither of the plaintiffs had any interest in the subject-matter of that

suit, the circuit court, in which the petition was filed and the cause was tried, acquired no jurisdiction over the subject-matter thereof, which was the land involved in this case, and the judgment so rendered was absolutely null and void and of no force or effect whatever.

In other words, this record discloses the fact that both Priest and Renick were sham plaintiffs or mere intermeddlers and had no interest whatever in the subject-matter of the suit, all of which appears from the face of that record, and they had no authority to ask the judgment of the court upon matters in which they had no interest or which did not concern them.

In discussing this question the Supreme Court of New Jersey in the case of Baxter v. Baxter, 43 N. J. Eq. l. c. 86, used this language:

"It is clear, that at the time this bill was filed, the complainants were, both as a matter of law and as matter of fact, without the least right to or power of control over these lands. They were the property, absolutely, of the defendants. The duty of making partition of them was not imposed by the will upon the complainants, nor is it claimed or pretended that the condition of the personal estate was such, that it could not be divided among the persons entitled to it, according to the will, unless the whole or a part of the lands were brought into the division. The complainants, it would seem, therefore, are, in respect to the action they ask the court to take concerning the lands, mere intermeddlers. They are seeking judicial aid in respect to a matter in which they have no interest, either personal or fiduciary. The rule, I think, must be regarded as fundamental, that no person can maintain an action respecting a subject-matter, in respect to which he has no interest, right or duty, either personal or fiduciary."

Upon the same question the Supreme Court of Florida in the case of So. Life Ins. Co. v. Lanier, 5 Fla.

l. c. 147, said: "It would seem scarcely necessary to refer to the manifest distinction between the case before us and the cases of the King of Spain v. Machado, 4 Russ. 225; Cuff v. Platell, *ibid.*, 242, and other authorities to the same effect. In these cases, the entire want of interest on the part of some of the complainants appeared on the face of the bill, and the demurrer was of course sustained by the court. In the case of Makepeace v. Haythorne, 4 Russ. 244, the objection did not appear on the face of the bill, but was raised by plea. In these cases the court, in affirmation of the well settled doctrine on this subject, says that if a party has no interest in the suit, the bill is demurrable, if that fact appears on the bill; but if the fact does not appear on the bill, but is brought forward by plea, it is a good defense to the suit."

In the case of Dix v. Mercantile Ins. Co., 22 Ill. l. c. 275-276, the Supreme Court used this language: "We do not well see how this action can be maintained and at the same time preserve an important principle which lies at the very foundation of suits at law. That principle is, that an action on a contract must be brought in the name of the party in whom the legal interest in the contract is vested. A party suing, who, by his own showing, by the averments in his declaration, has no interest whatever in the cause of action, never can be permitted to recover in an action at law. We think a case cannot be found decided in a court of law, where a person having no legal interest in the subject-matter of the action has been allowed to maintain an action at law alone or with others. It is impossible that he can, since, by his own showing he has nothing for which to sue..

In Shoemaker v. Board of Commissioners, 36 Ind. l. c. 181, the Supreme Court of Indiana said: "The second error assigned is, that the plaintiffs below, upon their own showing, have no cause of action. We think that this position is abundantly sustained by the facts

in this case, and is supported by the well settled principles of law. No one can maintain an action in our courts unless he has some interest in the matter in controversy. Under our code of practice, the action must be brought in the name of the real party in interest, except that an executor, administrator, a trustee of an express trust, or a person expressly authorized by statute, may sue, without joining with him the person for whose benefit the action is brought.''

This court in the case of State to use v. Railroad, 32 Mo. l. c. 498, said: ''There is nothing in the petition which shows or pretends to show that the State of Missouri has any interest, legal or equitable, in the subject-matter of the controversy; and the suit was therefore improperly brought, and cannot be maintained in the name of the State.''

And the rule is thus stated in 15 Ency. Pl. & Pr. 468 and 469: ''No one can be a party to an action if he has no interest therein. A plaintiff cannot properly sue for wrongs that do not affect him, and on the other hand, a person is not properly made a defendant to a suit upon a cause of action in which he has no interest and as to which no relief is sought against him. The plaintiff's interest must exist at the time when the action is brought.''

The pretended sale of this land under said decree of partition to Edwin Harrison and his associates was absolutely void, and conveyed no interest whatever to him or them, for the reason that the circuit court had no more power or authority to decree partition of this real estate after its record disclosed the fact that neither of the plaintiffs was interested therein than it would have had over a case where the record showed affirmatively that none of the defendants was served with summons to appear and defend the suit; and especially is that true in this case, where none of the heirs, executors or administrators of Dickson appeared or defended that suit. The law did not require them

to appear and defend a suit instituted by persons who had no right to bring it, or interest in the subject-matter thereof. Otherwise, we would have the anomaly presented of a suit having been brought by a person who had no interest whatever in the subject-matter thereof with that fact affirmatively appearing upon the face of the record, and a judgment rendered in his favor, notwithstanding that disclosure.

The same view of this question was taken by the St. Louis Court of Appeals in the case of Hiles v. Rule, 49 Mo. App. 628, and the court on page 630, in speaking through ROMBAUER, P. J., used this language: ''It is not assigned for error by the appellants that there is a defect of parties in this case, nor that D. A. Ball is a necessary party to a complete determination of the action. The answer of the defendant Rule denies that the plaintiff had any title or interest in the land, and claims that such interest has passed to Ball; but does not ask that Ball be made a party defendant. On what theory Mrs. Hiles was permitted to intervene as a defendant does not clearly appear. If Ball's ownership of the land were conceded, the judgment would have to be reversed, as every party who has an interest in the premises must be made a party to a petition in partition. [R. S. 1889, sec. 7135; Dameron v. Jameson, 71 Mo. 97.] If, on the other hand, the plaintiff's equity of redemption, or whatever other title he had, was closed out in the sale to Ball, the petition would have to be dismissed; because one who has no interest in land cannot maintain an action for its partition.''

That case was transferred to this court, and the opinion is reported in the 121 Mo. 248. The same view was taken of the case by this court.

The same general doctrine is announced by this court in the case of State ex rel. v. Riley, 219 Mo. 667.

And in the case of Windsor v. McVeigh, 93 U. S. l. c. 282, Mr. Justice FIELD, in speaking for the Su-

.preme Court of the United States, in the discussion
of this same question, said:

"The doctrine invoked by counsel, that, where a
.court has once acquired jurisdiction, it has a right to
decide every question which arises in the cause, and
its judgment, however, erroneous, cannot be collater-
ally assailed, is undoubtedly correct as a general prop-
osition, but like all general propositions, is subject to
many qualifications in its application. All courts, even
the highest, are more or less limited in their jurisdic-
tion; they are limited to particular classes of actions,
such as civil or criminal; or to particular modes of
administering relief, such as legal or equitable; or to
transactions of a special character, such as arise on
navigable waters, or relate to the testamentary dis-
position of estates; or to the use of particular process
in the enforcement of their judgments. Though the
court may possess jurisdiction of a cause, of the sub-
ject-matter, and of the parties, it is still limited in its
modes of procedure, and in the extent and character
of its judgments. It must act judicially in all things,
and cannot then transcend the power conferred by the
law. If, for instance, the action be upon a money de-
mand, the court, notwithstanding its complete juris-
diction over the subject and parties, has no power to
pass judgment of imprisonment in the penitentiary up-
on the defendant. If the action be for a libel or per-
sonal tort, the court cannot order in the case a specific
performance of a contract. If the action be for the
possession of real property, the court is powerless to
admit in the case the probate of a will. Instances of
this kind show that the general doctrine stated by coun-
sel is subject to many qualifications. The judgments
mentioned, given in the cases supposed, would not be
merely erroneous; they would be absolutely void; be-
cause the court in rendering them would transcend the
limits of its authority in those cases. [See the lan-
guage of Mr. Justice MILLER, to the same purport, in

the case of Ex parte Lange, 18 Wall. 163.]   So it was
held by this court in Bigelow v. Forrest, 9 Id. 351, that
a judgment in a confiscation case, condemning the fee
of the property, was void for the remainder, after the
termination of the life estate of the owner.   To the
objection that the decree was conclusive that the en-
tire fee was confiscated, Mr. Justice STRONG, speaking
the unanimous opinion of the court, replied: 'Doubt-
less a decree of a court, having jurisdiction to make
the decree, cannot be impeached collaterally; but, under
the act of Congress, the district court had no power to
order a sale which should confer upon the purchaser
rights outlasting the life of French Forrest (the own-
er).   Had it done so, it would have transcended its ju-
risdiction.'   [Id. 350.]

"So a departure from established modes of pro-
cedure will often render the judgment void; thus, the
sentence of a person charged with felony, upon convic-
tion by the court, without the intervention of a jury,
would be invalid for any purpose.   The decree of a
court of equity upon oral allegations, without written
pleadings, would be an idle act, of no force beyond that
of an advisory proceeding of the chancellor.   And the
reason is, that the courts are not authorized to exert
their power in that way.

"The doctrine stated by counsel is only correct
when the court proceeds, after acquiring jurisdiction
of the cause, according to the established modes gov-
erning the class to which the case belongs, and does
not transcend, in the extent or character of its judg-
ment, the law which is applicable to it.   The statement
of the doctrine by Mr. Justice SWAYNE, in the case of
Cornett v. Williams, reported in the 20th of Wallace,
is more accurate.   'The jurisdiction,' says the justice,
'having attached in the case, everything done within
the power of that jurisdiction, when collaterally ques-
tioned, is held conclusive of the rights of the parties,
unless impeached for fraud.'   [20 Wall. 250.]

"It was not within the power of the jurisdiction of the district court to proceed with the case, so as to affect the rights of the owner after his appearance had been stricken out, and the benefit of the citation to him thus denied. For jurisdiction is the right to hear and determine; not to determine without hearing. And where, as in that case, no appearance was allowed, there could be no hearing or opportunity of being heard, and, therefore, could be no exercise of jurisdiction. By the act of the court, the respondent was excluded from its jurisdiction."

And the same was true in the partition suit of Priest et al. v. Maguire et al. It was not within the power of the jurisdiction of the circuit court to proceed with that case so as to affect the rights of the defendants therein after it affirmatively appeared from the face of the record thereof that neither of the plaintiffs was interested in the subject-matter of the suit. For jurisdiction is the right to determine according to the facts found by the court and not against them.

And where, as in that case, the record disclosed in the first instance the fact that Priest, one of the plaintiffs, never had any interest in the subject-matter of the suit, and the subsequent finding of the trial court that Renick, the only other plaintiff, had disposed of his entire interest therein prior to bringing the suit, there could be no determination or opportunity for determining their rights, or the rights of those for whom they or either of them pretended to act, and, therefore, there could be no exercise of jurisdiction. Such a judgment, according to all of the authorities, can be assailed collaterally. [State ex rel. v. Withrow, supra; Windsor v. McVeigh, supra, and cases cited; Caffery v. Choctaw Coal Co., 95 Mo. App. 174; Jewett v. Boardman, 181 Mo. 647. See also Lilly v. Menke, 126 Mo. l. c. 218, near top of page.]

But independent of the conclusions above stated, the decree of partition rendered in that case was ab-

solutely void upon the face of the record, for another reason. The record therein discloses that the trial was had and that the interlocutory decree was entered April 9, 1875, and that subsequently thereto, to-wit, on July 6, 1875, and before the final decree had been made, the cause was transferred to Division No. 1 of that court by the following order, entered of record: "Transferred by consent to No. 1."

Whatever may have been the power of one division to transfer a cause to another before it was submitted to the court or jury, clearly, after submission, such division would be powerless to transfer the cause to another division, nor would any other division after such submission had been made have the authority or jurisdiction to proceed in the cause even though it should be transferred to another division by consent. This precise question has been before this court several times, and in the case of Haehl v. The Wabash Ry. Co., 119 Mo. l. c. 336-338, this language was used:

"The St. Louis Circuit Court is composed of five judges, by the Constitution, article 6, section 27. It is provided that each of the judges of said circuit court 'shall sit separately for the trial of causes and the transaction of business in special term. The judges of said circuit court may sit in general term, for the purpose of making rules of court, and for the transaction of such other business as may be provided by law, at such time as they may determine, but shall have no power to review any order, decision or proceeding of the court in special term.' The statute carrying into execution this provision of the Constitution, after defining what is a general term, providing for the organization of the court in such term and for its making all necessary rules of court in such term to be uniform for the government of the court at special term to be held by each of the judges, further provides that said court 'may classify, arrange and distribute the business thereof among the several judges, as the ma-

jority of them may deem expedient, and each judge shall attend to the business of the court in conformity with the arrangement thereof made by the majority, and when not occupied with the business assigned to him, shall, as far as practicable, aid the other judges, to which end cases may be sent from one judge to another at special term, as the individual judges may agree and direct.' [R. S. 1889, p. 2147, sec. 12.]

"It will be observed from the foregoing provisions, that all causes in the St. Louis Circuit Court are triable by a single judge, sitting in special term; that they become triable before such judge after they have been assigned to him by a majority of his associates; that after a case has thus been assigned to a judge for trial in special term, the jurisdiction to try the same and to transact such other business as is incident to the trial thereof, is vested solely in such judge, and cannot be exercised by any of his associates, unless the case itself be sent to such associate in the manner provided by law. In the trial of such assigned cases, each judge holds the same distinct relation to the others as do the several judges of the other circuit courts of the State to each other in cases brought in their several courts; in other words, each judge after the classification and assignment of cases, holds the St. Louis Circuit court for the trial of such cases as are assigned to him as separately and distinctly from the circuit court held by any of his brother judges of the city, as he does from the circuit court held by his brother judges in any other city or county of the State. [Voullaire v. Voullaire, 45 Mo. 602.]

"This exclusive jurisdiction in the trial of a cause must necessarily extend to the selection of a jury for such trial and such other matters as may rest in the breast of the judge who tries the case and be the subject of exception, and which may be embraced in a general bill of exceptions at the termination thereof. Otherwise, we have the strange anomaly presented in

this case of a defeated party seeking to overthrow the judgment of the judge of the court who tried the case for no error committed by him or in the trial before him, or of which he was advised, but for an error in a proceeding remaining in the breast of another judge who did not try, and was not present at the trial, and which continued to so remain until after the trial, and the record thereof was completed by the judge who did try it. This cannot be permitted."

The same conclusion was reached in the case of Voullaire v. Voullaire, 45 Mo. 602.

It would be just as reasonable to contend that one jury could hear the evidence in a cause and that another could legally find and return a verdict thereon.

This court has held that where a case was tried before the court and jury, and after the cause had been submitted to the jury, a special judge called in to try another case had no authority to receive the verdict of the jury in the former case. Much stronger is the reason for preventing one court from making and entering a decree in a case tried before another than from simply receiving and entering a verdict of a jury in a case not tried before him.

We must, therefore, hold that all the proceedings had in the cause in Division No. 1 of that court, including the rendition of the final decree, on September 20, 1874, whether transferred and submitted to Division No. 1 by consent of parties or otherwise, were totally void acts, and were *coram non judice;* and notwithstanding the order of Division No. 4 transferring the cause to Division No. 1, the cause is still pending in the former division and undisposed of, no final decree ever having been rendered or having been otherwise disposed of.

We are, therefore, clearly of the opinion that the sheriff's deed made in pursuance to the decree of partition, purporting to convey this land to Harrison was of no force or effect, and did not convey to him or to

his associates any right, title or interest whatever in and to the land in question.

These views are sustained by the case of State ex rel. v. Withrow, supra.

The foregoing observations also render it unnecessary for us to pass upon the question of fraud presented regarding the partition and sale of this land to Harrison.

III. This brings us to the consideration of the second proposition presented in the order before stated, which, in my judgment, is the most important question involved in this case, and that is—has plaintiff's cause of action been barred by the Statutes of Limitation?

Limitations: Property in Custodia Legis.

Counsel for defendants contend with great earnestness that it has been, while counsel for plaintiff with equal seriousness negatives that contention.

It is the contention of counsel for defendants that even though it be conceded that the sale and deed made by the sheriff to Edwin Harrison, under the decree of partition, was absolutely void, still it constituted color of title, and that when he and those claiming through him entered into the possession of the land thereunder, which was dated August 4, 1875, the Statutes of Limitation began to run against appellant and his predecessor; and that their continued, exclusive, adverse and hostile possession from that date to the date of the institution of this suit, about twenty-one years, not only barred appellant's cause of action but transferred the legal and equitable title to the land in controversy to them in fee.

This contention of respondents is not seriously controverted by counsel for appellant, without the latter's contention of the law is true; and that is, that when Murdoch, the surviving partner, qualified as such, took an inventory of the partnership assets, and filed it, and the appraisement in the probate court of

St. Louis county, he thereby placed those assets *in custodia legis,* and that they have remained there ever since, which is unquestionably true, as before decided in paragraph one hereof; and that in consequence thereof he contends that the statute can only run against the owner of property when he is in possession of, or has the right to the possession and control thereof in his individual capacity as distinguished from a receiver or other officer of court, and that it could not and did not run against the possession of Murdoch, who was an officer of the probate court of St. Louis county, and which court under the law held the possession of said assets through Murdoch during his incumbency; and from and after his removal to the date of the appointment of plaintiff as his successor the possession thereof remained in the probate court as such, and since the latter date plaintiff has held the possession thereof as an officer of that court. In other words, the probate court has been in the possession of this property, either as a court, within the contemplation of the law, or through Murdoch and plaintiff, from the time the former qualified as surviving partner to this time.

In support of defendant's theory of the question of the Statute of Limitations, their counsel rely upon the authorities cited below, which in effect hold that the Statute of Limitations has begun to run against an administrator, a vacancy in the administration does not suspend its operation; so that, if the original administrator would have been barred, the administrator *de bonis non* is equally barred: Collins v. Bankhead, 1 Strobhart's L. (S. C.) 25; Campbell v. Wilson, 13 D. C. (2 Mackey Sup. Ct.) 497; Hoskins v. Miller, 2 Dev. (N. C.) 360; Reed's Admr. v. Minell & Co., 30 Ala. l. c. 64; Underhill v. Mobile Fire Department Ins. Co., 67 Ala. 45; Manly v. Kidd, Admr., 33 Miss. 141; Schlueter v. Albert, 39 Mo. App. 154; Stanton v. Gib-

bins, 103 Mo. App. 264; Griesel v. Jones, 123 Mo. App. 45; Jones v. Thomas, 124 Mo. 586.

The principle of law announced by those authorities is elementary and can be disputed by no one; but that rule is not applicable to nor does it cover the facts of this case, for the reason that this record does not show, nor can it be seriously contended, that anyone was in the possession of or claimed any right, title or interest in and to this land, adverse to the interest and possession of Murdoch as surviving partner during his incumbency, who was the first or prior administrator referred to by defendants. The first evidence of adverse claim to this land did not appear until after the pretended sale and conveyance made to Harrison in pursuance to said partition proceeding, on August 4, 1875; but, upon the contrary, this record conclusively shows, without contradiction, that Harrison and all of the other respondents, excepting Eads's and Bates's representatives, and as to certain claims made by the city of St. Louis as to certain streets, claim under and through said void deed and not in opposition thereto. The claim of the city of St. Louis will receive further consideration later, in a separate paragraph; and as to Eads and Bates and those claiming through them and under the will of Dickson, it is sufficient to state that this record is perfectly barren of all evidence tending to show in the remotest degree that they or any of them ever set up or made any claim whatever against the interest or possession of Murdoch, as such surviving partner, from the day he qualified and took charge of the estate down to this date; but, upon the contrary, their interests and claims have always been confirmatory of and in harmony with his and their interests in and to said estate, and they are still asserting that their interests are subordinate to and in harmony with those of Murdoch; and, consequently, they have no occasion to assert any claim in conflict with his interests as such surviving partner.

And as regards the contention of counsel for defendants, that it was the duty of Eads and Bates, as trustees under Dickson's will, to protect the legal and equitable title to this property, we wish to reiterate that they, as such trustees, had no right, power or authority to interfere with or in any manner to intermeddle with this partnership estate while it was in the hands of the surviving partner and within the custody of the law until after the final settlement of the partnership estate, which has not yet been made, and until then they had no right to demand the possession of or to sue for the recovery of this land. [Dyer v. Wittler, 89 Mo. 1. c. 87 to 98.] If upon final settlement anything remains of that estate belonging to the heirs of Dickson, then the probate court will order the administrator thereof to turn it over to the trustees under Dickson's will, but until that order is made the Statutes of Limitations will not run against them. [Sec. 159, G. S. 1865, then in force, and Sec. 59, Revised Statutes 1899; Goodson v. Goodson, 140 Mo. 206; State ex rel. v. Blackwell, 20 Mo. 97; Tapley, Admr., v. McPike, 50 Mo. 589; Nelson v. Barnett, 123 Mo. 1. c. 572.]

Eads and Bates would have no more right to sue for or recover the possession of this land before the partnership debts are paid than would a remainderman have the right to sue for and recover the possession of the life estate from an intruder and trespasser claiming title by adverse possession. The remainderman cannot recover the possession until the life estate expires, and during its existence the statutes will not run against the remainderman, however long the adverse possession may continue. [Dyer v. Wittler, 89 Mo. 81, 1. c. 87 to 98; Carr v. Dings, 54 Mo. 95; Dyer v. Brannock, 66 Mo. 391; Shumate v. Snyder, 140 Mo. 77; Reed v. Lowe, 163 Mo. 519.]

Much stronger is the reason why the statute should not run against the heirs, executors and administrators of the deceased partner as long as the partner-

ship estate remains in the *sole and exclusive* hands of the surviving partner, or in the hands of an administrator *de bonis non,* his successor in office, for the reason that they not only have no right to the possession and enjoyment of the partnership estate prior to the time the debts are paid, but for the additional reason that no one can ascertain or know that there will remain any part of the partnership assets which will ever belong to or vest in those who represent the interest in the individual estate.

We must, therefore, hold that the Statute of Limitations did not begin to run, if at all, during the incumbency of Murdoch, which terminated by removal December 30, 1873; consequently, if plaintiff's cause of action is barred, the statute must have begun to run after August 4, 1875, the date of the deed from the sheriff to Harrison.

This brings us to another legal proposition which governs this case, and that is, did the statute run during the period that existed from December 30, 1873, the date of Murdoch's removal, and down to the 11th day of August, 1895, the date of the appointment of Richardson as administrator *de bonis non,* which was something over twenty years?

Counsel for defendants insist that the statute ran during said period, and not only completely barred plaintiff's cause of action, but that it also divested from him and from those whom he represents all right, title and interest in and to the land and invested the same in Edwin Harrison and those claiming through him; and the basis of their claim is this, that even conceding the sheriff's deed to Harrison was a nullity in so far as conveying to him the title to the land is concerned, yet they insist that the deed was color of title and that the entry into the possession thereof by Harrison on August 4, 1875, claiming title to the land under said deed, and the adverse holding thereof by him and those claiming through him during said pe-

riod barred plaintiff's cause of action and transferred the title of the land to respondents.

Counsel for plaintiff contends, upon the contrary, that the statute did not run during said period, for the reasons that the land was in the custody of the probate court, or was in *custodia legis,* and that there was no administrator or other person in charge of the estate who had authority to sue for the recovery of the land. If that reason is unsound, then, clearly, under the evidence in this case plaintiff is barred, but if valid, then it is not barred. We will now consider that question.

In paragraph one hereof we decided, after an extensive review of the authorities, that the assets of this partnership estate were *in custodia legis* from and after Murdoch qualified and filed an inventory thereof with the probate court, and no additional light could be shed thereon by further discussion, but I will cite in support of the conclusions there reached the case of Cowan v. Mueller, 176 Mo. 192.

It is not necessary for us to determine whether or not that custody alone was sufficient to prevent the running of the statute, as contended for by counsel for appellant, for the reason that we have coupled with that fact the other fact, namely, that there was no administrator in charge of said estate during those twenty years, who could have sued for this land.

As before pointed out Harrison's possession under the sheriff's void deed did not begin until August 4, 1875, about seven months after the revocation of Murdoch's authority to further act as surviving partner, consequently the Statute of Limitations did not begin to run against him, for the obvious reason that none of the respondents were at that time in possession or claiming adversely to him. The cause of action must have accrued before the statute runs. [Rabsuhl v. Lack, 35 Mo. 316; Weber v. Manning, 4 Mo. 229.]

Or, as was held in the case of Gray v. Givens, 26 Mo. 291, the statute begins to run from the time a cause of action accrues and a suit may be maintained thereon.

And according to all of the authorities it does not run where there is no one who has the right and capacity to sue. [Underhill, Receiver, v. Mobile Fire Ins. Co., 67 Ala. 45; Dillon v. Bates, 39 Mo. 292; Schlueter v. Albert, 39 Mo. App. 154; Wood on Lim., sec. 117.]

Under the rule above announced neither could Richardson, the administrator *de bonis non*, have sued Harrison or his grantees during that period for the possession of the land, for the reason he had not been appointed at that time, and, consequently, he had no capacity to sue; and I take it for granted that it will not be even suggested that the probate court itself should have instituted this suit during that twenty years; and the period existing between the latter date and the date of the institution of this suit is less than ten years, so it is manifest the statute did not bar this cause during that period; and, of course, the institution of this suit stopped its running, even if it started to run on that date, August 11, 1895, the date Richardson was appointed administrator *de bonis non*.

So, if we view this record from any of the standpoints suggested and apply thereto the well-known rule of statutory limitations, it is clearly to be seen that this cause of action is not barred by the Statute of Limitations; and we so hold.

IV. We will now consider the third defense mentioned, interposed by respondents, and that is the defense of estoppel pleaded by them.

Estoppel.

In support of this defense counsel for respondents insist that the payment of the $7,646.60, the purchase price of this land, by Harrison to Priest, as assignee, and the latter's payment of the same in liquidation of partnership demands, estops appellant and all persons

he represents, even though the circuit court had no jurisdiction to decree partition of this land, or to order its sale, for the reason that it would be unjust and inequitable to permit them to retain that money and recover the property for which the money was paid.

In support of that insistence counsel cite and rely upon the following authorities: Thistle, Trustee of Thistle, v. Buford, 50 Mo. 278; Austin v. Loring, 63 Mo. 22, and cases cited; Barnett v. Smart, 158 Mo. 167; Fischer v. Siekmann, 125 Mo. 180; McClanahan v. West, 100 Mo. 1. c. 323, 324; Clyburn v. McLaughlin, 106 Mo. 521; Lanier v. McIntosh, 117 Mo. 1. c. 519; Cochran v. Thomas, 131 Mo. 1. c. 277; Purse v. Estes, 165 Mo. 1. c. 58; Nalle v. Thompson, 173 Mo. 1. c. 615; Nalle v. Parks, 173 Mo. 1. c. 627; Manning v. Coal Co., 181 Mo. 1. c. 376. See Freeman on Void Judicial Sales (4 Ed.), at pp. 176 and following.

The above authorities proceed upon the principle that when a party in person, or by trustee, or other legal representative, stands by and knowingly permits his property to be sold under a void or voidable proceeding, and sees the proceeds thereof paid to the creditor, and receives the balance of the proceeds, if any, he cannot repudiate the sale and recover the property so sold. A quotation from a few of those cases will suffice to show the principle announced in all of them.

It was held in Thistle, Trustee of Thistle, v. Buford, 50 Mo. 278, that "where the owner of land would be estopped, by reason of his own acts and conduct, from setting up title thereto, those in privity with him, unless purchasers for value without notice, labor under a similar disability." In that case, it was declared that because the trustee was estopped, the *cestui que trust*, a married woman, and having no special equity, being in privity, was also estopped.

WAGNER, J., said in Austin v. Loring, 63 Mo. 22: "'When a sale of land is made no person can be permitted to receive both the money and the land. And it has been held, in the application of this principle, that it makes no difference whether the proceeding under which the sale occurs is voidable, or wholly void in consequence of the want of jurisdiction. In 21 Smith's Lead. Cas. (5 Am. Ed.), p. 662, the author says that when those who are entitled to avoid a sale adopt and ratify it, by receiving the whole or any part of the purchase money, equity will preclude them from setting it aside subsequently, for reasons that are too plain for statement. [Stroble v. Smith, 8 Watts, 280; Commonwealth v. Shuman's Admrs., 6 Har. (Pa. St.) 343; Smith v. Warden, 19 Pa. St. 424.] 'When a sale is made of land,' said LEWIS, J., in Smith v. Warden, 'no one can be permitted to receive both the money and the land. Even if the vendor possessed no title whatever at the time of the sale, the estoppel would operate upon a title subsequently acquired. It was held by this court, in Commonwealth v. Shuman's Admrs., that equitable estoppels of this character apply to infants as well as adults, to insolvent trustees and guardians as well as to persons acting for themselves, and have place as well when the proceeds arise for a sale by authority of law as when they spring from the act of the party. A party will not be allowed to indulge in bad faith and make innocent purchasers the sport of his tricks. When a sale is void the reception of the purchase money renders it valid. [Adlum v. Yard, 1 Rawle, 171; Furness v. Ewing, 2 Barr, 479.] These principles are founded on elevated morals, common honesty and pure good faith, and are co-extensive with the principles of the mischief which they are designed to counteract. Where a party has taken the fruits of a judicial proceeding, he should not afterwards be heard to question it. Though an estoppel may debar the truth in a particular case, yet, as was

said by the Supreme Court of the United States in
Van Rensselaer v. Kearney, 11 How. 326, it imposes
silence on the party only when in conscience and hon-
esty he should not be allowed to speak.' "

The third syllabus of the case of Barnett v. Smart,
158 Mo. 167, is as follows: "Parties cannot, either
at law or in equity, share in the proceeds of a sale
of land and then recover the property from the vendee.
Land was conveyed to a trustee, for the sole and sep-
arate use of a widow during her life, and after her
death and the coming of age of her youngest child,
to be sold by the trustee and the proceeds divided
equally between her eight children.  She and six chil-
dren joined with the trustee in selling the land for
$3150, and $2000 of the money was invested in city
property, and afterwards this property was sold and
she and all her children joined in the deed. *Held*, that
the two children who did not join in the deed to the
land could not after the death of the mother recover
in ejectment one-eighth interest each therein, for they
had shared in the proceeds of the sale of the city prop-
erty."

It was held in Fischer v. Siekmann, 125 Mo. 180,
that "in equity the plaintiff ought not, and cannot,
have the land after having received the value thereof
through the partition proceeding, though the same
was as to him utterly void."

We quote from McClanahan v. West, 100 Mo. l. c.
323-324, as follows: "Besides, the record itself shows
that George W. Buchanan was appointed guardian
*ad litem* for the four minors, and that he filed answers
for them.  From which statement it will be presumed
that the proper service was had upon the minors, and
that the court, cognizant of this fact, thereupon ap-
pointed the guardian *ad litem;* and it will be presumed
also, that the attorney then appointed guardian *ad
litem* would not have filed an answer for minors who

257 Mo. 47

had not been personally served, as required by law. And then there are the receipts given by the minors, and by the plaintiff herself, after she attained her majority, when acting in the presence, and under the advice, of her counsel, for her share of the proceeds of the sale in partition. If she knew from what source these proceeds came, and still receipted for them, and there is good reason to believe she did know, she certainly would not be allowed to repudiate the transaction now, even if the partition proceeding were, in fact, void. She certainly could not have both the money and the land. [Austin v. Loring, 63 Mo. 19, and cases cited.] It is charged in the petition that the partition proceedings are void on their face. If this is true, the plaintiffs have stated themselves out of court; for in such case the remedy at law by action of ejectment would be adequate and ample. But we have discovered nothing in the proceedings which varies from the requirements of the law as then in force. The order of sale was properly made, the rights of the parties being therein determined and adjusted; and if the judgment was rendered at the first term of the court after service had, this was but an irregularity, not going to the jurisdiction. And the sale of the property was duly made; the deed of the sheriff executed and acknowledged, and the sheriff who conducted the sale made proper report thereof to the court which was approved by the court, and this was all that was necessary in such cases. If the sale of the land was valid, of course this ends the matter of the plaintiff's claim for relief on that point; but looking over this whole record, we find nothing to induce the belief that the plaintiff Nancy has been defrauded in the slightest particular, or that any fraud, whatever, was practiced upon her. No one can read this record with any degree of attention without being impressed with the idea that this litigation originated in the fact that the land in question sold in the parti-

tion suit in 1855 for a small sum, but was worth when this proceeding was instituted some nine hundred dollars per acre; this appears to be all the fraud there is in the case. And it is to be distinctly understood that this court views with disfavor proceedings like the present, instituted nearly the life of a generation after the transactions on which they are supposed to be based occurred, and which, if successful, to paraphrase the strong language of Judge Scott on one occasion, would 'make the dead sin in their graves.' "

In answer to the foregoing position of respondents, counsel for plaintiff contends, first, that Priest was not in law or in fact a trustee for him or for any of the parties he represents, either directly or indirectly, and that, consequently, whatever money Harrison may have paid to him was none of their concern, as he was a perfect stranger to him and them; second, that this record does not show that Priest ever paid the sum of money mentioned by counsel for respondents, or any part thereof, to him or to any persons whom he represents.

As to the first contention, there can be no question but what it is well taken. The only pretense of authority Priest had for selling the land to Harrison was by virtue of the assignment of the partnership assets of the estate of Murdoch & Dickson, executed by the former on October 14, 1873, which resulted in the pretended partition and the sale of this land thereunder to Harrison on August 4, 1875, for which he paid Priest the said sum of $7646.50. But this court in the case of State ex rel. v. Withrow, supra, and in paragraphs one and two hereof, held that said assignment, partition and sale were absolutely null and void on their face from the beginning to the end; and in the former case we issued a peremptory writ of prohibition, prohibiting the circuit court from proceeding further with that case, holding that said circuit court had no jurisdiction whatever over the sub-

ject-matter thereof. That being true, we must hold here, as we did there, that all of those proceedings are void and that Priest was in law a sham assignee and an intermeddler in the affairs of the partnership of Murdoch & Dickson. That being true, it will not be contended by respondents that plaintiff or any of those who claim through the copartnership would be estopped by the sale of the land by Priest to Harrison, and the payment of the purchase price thereof by the latter to the former without he had used the same in the payment of liquidation of claims which existed against the partnership estate.

This brings us to the consideration of the second contention of plaintiff before suggested, which is to the effect that the evidence does not show that Priest paid any of the $7646.50 he received from Harrison, the purchase price of the land, in liquidation of partnership debts.

On December 2, 1873, Priest, as such pretended assignee of the partnership estate, filed in the circuit court the following partial appraisement of the assets of said estate, assigned to him by Murdoch as surviving partner, of which the following is a copy:

### ESTATE OF MURDOCH & DICKSON

#### Real Estate.

Olive Street Hotel. An undivided one-half interest as follows: Corner lot 81' 8" on Olive street by 96' on Second street; Second street lot 26' 6" on Second street by 106' 6" deep. Private alley 12 on Second street, over incumbrances.....$ 2,400.00

Sharpe Lot. 25' 2" on Olive street by 90' 8" deep. Not worth over encumbrances.

Dyer Lot. Leasehold three-fourths value of building on expiration of lease ..................$ 3,000.00

Eleventh street property. An undivided one-half interest in a certain lot on the east side of Eleventh street, between Market street and Clark avenue, being on Eleventh street, 20' front by 152' 6" deep, one-half interest....$ 2,500.00

Wilkinson Add. An undivided one-half interest in block No. 3 excepting lot No. 5, being 225' on Third street by 310' on Second street. Not worth encumbrance.

St. Mary's Suburb. Being an irregular shaped
  lot, rear Pacific Railroad west of Fourteenth
  street in part, 361' 1-1.2" by 150' and 303 by
  88'. Over encumbrance ....................$ 7,000.00
Sulphur Springs Tract. Being the north half of
  Lot 5, containing five acres, more or less....$ 1,000.00
          Carried forward ......................$15,900.00
          Brot. forward ........................$15,000.00
Maguire Purchase. Being one thirty-second inter-
  est in the claim of Jno. Maguire, located in
  northern part of the city ..................$10,000.00
Dillon Addition. All the interest of Jas. B. Eads
  and wife in a certain lot in Dillon's Addition
  in Block 480, being 25' on Park avenue by
  107', more or less .........................$   450.00
Mount Pleasant Addition. Deed of trust from
  Chas. L. Tucker of lots 33, 34, 35, 36, 37, 38
  in Mount Pleasant Addition, the same being
  150' on Gibbons street and running east-
  wardly to the west line of the Iron Moun-
  tain Railroad track. Given to secure Mur-
  doch & Dickson in the sum of $10,000 and
  Isaac Walker in the sum of $5000 on notes
  dated October 26, 1867, payable three years
  after date with interest at eight per cent per
  annum two-thirds interest ..................$ 2,500.00
Gamble Addition. An undivided one-half of a cer-
  tain lot in Gamble Addition, acquired from
  Jas. H. Comfort, trustee of Chas. L. Hunt,
  being 64' on Adolph street by 150' on Poplar..$   650.00
St. Mary's Suburb. Two-thirds of lot of twenty-
  five feet front on Gratiot street by 142 feet
  deep in block No. ——, St. Mary's Suburbs on
  which is now situate a small frame house,
  one-half owned by Frank J. Bowman.......$   350.00

                                            $29,850.00
          Brought forward ...................$29,850.00

### NOTES OF SAID ESTATE OF MURDOCH & DICKSON.

1866, Dec. 11, Homer, Rex & Tracy, 60 days....$ 4,788.29
1866, Dec. 24, Homer, Rex & Tracy, 60 days....$ 4,247.99
1867, Jan. 5, Homer, Rex & Tracy, 60 Days..... 3,180 00
1866, Nov. 13, Joe Rex & C. F. Tracy, 4 months..$ 6,761.25

                                            $18,977.53

Received on above from C. H. Krum, assignee,
  Aug. 14, 1867 ..............................$ 3,415.95
  Jan. 4, 1868 ...............................$ 1,018.75
  Dec. 27, 1870 .............................$   569.35 $5,004.05

                                            $13,973.48

### WORTHLESS.

1867, June 3, Chas. F. Tracy, balance on note...$ 2,629.13
                    Worthless.
1867, Oct. 28, Chas L. Tucker, 2 notes, 8 years.
                    Worthless.
1864, Feby. 22, Jno. Maguire, ordinance.........$   175.00 $ 175.00

Troll v. St. Louis.

1869, Jany. 12, Jno. Maguire, 4 mos. ............$    250.00 $   250.00
   The following appear as Bills Receivable:
Charles L. Tucker, 12 notes ..................$ 6,444.63
                Worthless.
Sophia M. Tracy, 4 notes, each $1,380.00........$ 5,520.00
                Worthless.
Tracy ......................................$ 1,466.29
                Worthless.
Jno. Maguire, secured by deed of trust........$ 1,896.25
                Stocks.
West Virginia Land Ass'n Certificate, 90 shares.
                Worthless.
St. L. & West Virginia Oil Co. Certificates, 180 shares.
                Worthless.
Missouri Wrecking Co. Certificate, 232 shares.
                Worthless.
St. Louis and People's R. R. Co., 237 shares, over
   incumbrance ............................$ 2,203.00
Tower Grove and Lafayette R. R. Certificates,
   293 shares, over incumbrance ..............$   729.00
St. Louis Merchants Bank Certificate, 15 shares..$   270.00

                                $35,373.25

Counsel for defendants then offered in evidence the first statement of the account of John G. Priest as assignee of Murdoch & Dickson, which was filed in the circuit court over seven years after the assignment was made to him by Murdoch. It is as follows as shown by the abstract of the record.

"Mr. Allen: The first line on page 61, says, 'amount bro't. for'd.' Reference to the preceding page, shows that this amount brought forward in the left hand column was the amount of money which Priest had paid on account of the assigned estate, $20,447.60. The column next to that on the right hand side of the page is the aggregate of the amounts of money which he had received as assignee from the estate of Murdoch & Dickson, $17,634.74.

"Mr. Dickson: Is he offering the account? He can't offer the items.

"Mr. Allen: I have offered the account.

"Mr. Allen: I think I have the right of calling your Honor's attention to the effect of the heading of this page, to show that at that date John G. Priest had paid out some $2800 more money than he had received

from the estate. The estate was in debt to him some $2800."

The next item of this account is as follows:

Tract in north St. Louis sold in partition by
  Sheriff of St. Louis county, June 30, 1875.
  This amount as agreed upon by said assignee
  and Edwin Harrison in order to have consent
  of J. G. Priest, assignee of Murdoch & Dickson,
  and the sale confirmed by Circuit Court No. 1.
  See agreement of sale and purchase filed,
  dated July 6, 1875 .......................$ 7,646.50

He then offered items of account and vouchers on page 61.

Voucher 80. Being Receipt for Insurance on
  Olive street Hotel, paid May 14, 1875........$     75.00
Voucher 87.  Being ground rent receipt to Priest
  on part of ground of Olive street Hotel, paid
  July 3, 1875 .....................$    337.00
Voucher 89.  Interest Note $12.00 on D. T. of
  $30,000 Olive street Hotel, paid July 12th,
  note dated January 9, 1872 ..............$ 1,200.00

Mr. Allen claimed this as one of the interest notes on the $30,000 loan, the proceeds of which went into Murdoch's accounts in the probate court.

Voucher 101.  Receipt for Insurance on Olive
  street Hotel, paid September 20, 1875......$    100.00
Voucher 102.  Ground rent receipt, Olive street
  Hotel, paid October 11, 1875 ...........·...$    337.50
Voucher 107.  Insurance receipt Olive street Hotel,
  paid October 16, 1875 ....................$     25.00
Voucher 114.  Ground rent receipt, Olive street
  Hotel, paid January 4, 1876 ...............$    337.50
Voucher 115.  Tax receipt for $3,221.43 on Olive
  street Hotel and lot in block 205 of which
  there was paid by Priest a part, by Eads. a
  part.  Priest paid as per his accounts and
  the tax receipts .......................·.....$ 1,610.51
Voucher 116.  Tax receipt for $932.22 on part of
  Olive street Hotel property of which there
  was paid by Eads a part and by Priest......$    466.11
Voucher 117.  Tax receipt for property in block
  449 and block 480, paid by Priest ..........$     86.32
Voucher 117a.  Taxes of 1875, five acres St. Louis
  Co., paid by Priest ......................$     14.14

"Mr. Allen:  Now I proceed to show the payment of similar amounts which were made by Priest after receiving the $7600, that out of the $7600 Priest had

the right to take his $2800, he had overpaid for the estate at that date, which undoubtedly he did. That left some $4000, between $4000 and $5000, which he had to account for that belonged to the assigned estate. Now, this is what he did with it, as we claim.

Voucher 118.  First note J. J. Murdoch, at 48 months, dated January 19, 1872, to Connecticut Mutual Life Ins. Co., paid February 1, 1876 .......................................$ 1,200.00
Voucher 119.  Interest compounded on the same..$     5.66
Voucher 121.  Bill of Sterling & Webster, abstracters for searching St. Louis County records to ascertain what real estate was owned by Murdoch & Dickson, $550, paid February 4, 1876 .....................................$   200.00
Voucher 124.  Tax Bill upon which for the estate Priest paid February 12, 1876 ..............$   132.04
Voucher 123.  Assessment to Home Mutual Fire Ins. Co., paid February 17, 1876 ...........$    22.50
Voucher 131.  Gr. Rt. receipt Olive street Hotel property, paid April 5, 1876 ................$   337.50
Voucher 143.  Insurance receipt Olive street Hotel, paid May 12, 1876 ...................$    75.00
Voucher 144.  Ground rent Olive street Hotel property, paid July 5, 1876 ...............$   337.50."

The foregoing is substantially all of the evidence tending to show Priest used the $7646.50 paid by Harrison for this land in liquidation of the debts of Murdoch & Dickson.

Counsel for plaintiff challenges the sufficiency of the evidence to establish that fact, the burden being upon defendants. This calls for an analysis and a careful consideration of the testimony upon that question.

In the first place, the fact should be considered that Priest was in law, if not in fact, an intermeddler in the affairs of said partnership, and was not acting for or on behalf of the administrator of the partnership or individual estate of Dickson, or any of the persons interested in either. The record also shows that if Priest ever filed a complete inventory of the partnership assets, it was not introduced in evidence, only a partial one appearing therein; and the fact that he never filed or exhibited his accounts as such pretended assignee to the circuit court, under whose juris-

diction he was pretending to act, until seven years after he took charge of the assets assigned to him by Murdoch, should not be overlooked. This record also shows that his pretended administration of this estate was independent of and not a continuation of the administration begun and had in the probate court, nor does it show that he as such assignee ever had a settlement wiᴛn Murdoch, as surviving partner; consequently it fails to show Murdoch turned over to him all of the partnership assets mentioned in the inventory filed by him in the probate court; that he properly administered and applied those assets while they were in his hands, or that he did not receive other assets of said estate subsequent to the filing of said inventory, and prior to the date of the assignment made to Priest. Priest owed a greater duty to the partnership estate and to those who were interested in Dickson's individual estate than merely to accept of Murdoch just such assets as he might deem proper to turn over to him. Priest should have had a settlement with him, and he should have ascertained whether or not the assets turned over were all that Murdoch had received or that belonged to the partnership estate and not accounted for; and if by such settlement it should have been disclosed that they were other assets not turned over to him, he, as such pretended assignee, should have taken proper legal steps to have recovered them.

In fact, the record shows that by stipulation of parties, "that on June 21, 1873, Murdoch, as surviving partner, reported to the probate court the sale of property at the corner of Third and Vine streets (the same ᴊot being a part of the property described in the petition herein) for the sum of $20,650, which sale was approved, and Murdoch was authorized by order of court to accept in payment therefor $4650 in cash and $16,000 of St. Louis city bonds; that neither said Murdoch, in the probate court, nor his assignee, John G. Priest,

in the circuit court, ever accounts for the cash or bonds above mentioned.''

Not only did the records of the probate court show the sale of this property by Murdoch, which it was the duty of Priest to examine, but this record also shows conclusively that Priest knew of the fact that Murdoch had received said cash and bonds, for the reason that the record shows Priest, as such assignee, allowed two of those ''City Bonds, each $500, cash $200 allowed to Barton Bates at $1200.'' If he received those two bonds and allowed them on Bates's claim, the conclusion must necessarily follow that he had sufficient notice to put him upon inquiry as to when, where and the circumstances under which Murdoch received them; and if that information had been properly followed up, as it was his duty to do, then the entire transaction would have been made known to him.

In the absence of evidence to the contrary, the law will presume that Priest followed up that notice, ascertained the circumstances under which Murdoch received said cash and bonds, and that he received not only the two bonds that he allowed on Bates's claim, but that he also received all of the cash and all of the bonds mentioned. [State ex rel. v. King, 136 Mo. 309.]

This record also shows that there were at least two pieces of real estate included in Murdoch's inventory not included in Priest's inventory, appraisement or account stated in the circuit court. Nor does this record clearly or satisfactorily show just what became of all of the $97,902.75, the balance with which Murdoch charged himself, as surviving partner, in his second and last settlement filed by him in the probate court.

Under the foregoing state of the record, counsel for defendants contend that on and prior to the reception of this $7646.50 from Harrison, Priest, as such assignee, had paid out and expended on behalf of the

partnership estate $20,447.60, and had received from
the estate only $17,634.74, leaving a balance due him of
$2812.86. Counsel also contend that after Priest re-
ceived this $7646.50 from Harrison he then undoubtedly
reimbursed himself out of that money the $2812.86,
the sum he had expended for the estate over and above
what he had received, and that he then paid the bal-
ance thereof out for interest on a mortgage existing
against the Olive street hotel, for ground rent on a
portion of the land upon which said hotel was located,
for insurance on the same property, and for divers
other partnership debts, all of which was necessary to
pay in order to protect the partnership assets in the
hands of Priest. There was no direct or positive tes-
timony introduced tending to show that such payments
were made out of said $7646.50, or what disposition
was made of it, but the mode adopted to prove that
fact was by taking as a basis the amount due Priest,
as shown by his first account filed with the circuit court,
which was $2812.85, and by adding to that the aggre-
gate of the sums he claims he paid out thereafter on
account of the partnership property, which exceeded
in amount, as he claims, the said sum of $7646.50. But
by an inspection of Priests's accounts, if I correctly
understand them, not only was this $2812.85 due him
at the time of the reception of that $7646.50 from Har-
rison, but the great majority of all of the other pay-
ments he claims to have made on behalf of the partner-
ship property were made from three to nine months
before he received that money from Harrison, which
was on January 29, 1876. That being true, he simply
reimbursed himself for money which he paid out with-
out legal authority, and which, in fact, did not go to
pay partnership claims, but did go into his own pocket.

But waiving that point, the trouble with that
method of deduction is the extremely unsatisfactory
nature of the testimony relied upon to prove his ac-
counts were properly kept, or that any of said items

were paid out of that $7646.50. No fair-minded, disinterested court can read this record without coming to the conclusion that the affairs of this estate have been very poorly managed and administered, if not fraudulently, and especially by Priest. That is shown by his dereliction of duty and dilatory methods, taken in connection with his poor and extremely unsatisfactory system of bookkeeping, if we may so dignify it by calling it bookkeeping, and his failure to collect and charge himself with all of the partnership assets, which the record discloses he had knowledge of, or was possessed of the means by which he could have known of their existence, and could have collected and charged himself with had he discharged his duty in following up that information and knowledge. Under that state of facts no court would be justified in depriving anyone of his property on the faith of any such testimony.

But beyond and independent of that, this record shows as strong if not a stronger reason why we should decline to concur in the contention of counsel for defendants to the effect that Priest paid this $7646.50 out on behalf of the partnership property, and that is, if we adopt precisely the same course of argument (which at best is weak and unsatisfactory) adopted by said counsel to show that it was so applied, then that same argument would point just as strongly to and indicate that he paid those sums out of the $20,650 in cash and bonds he received from Murdoch.

We are, therefore, strongly of the opinion that the evidence as disclosed by this record fails to show that Priest paid the money he received from Harrison in satisfaction of demands owing by the partnership of Murdoch & Dickson. But we will not decide that question. Upon another trial, in a proper proceeding, it is to be hoped the evidence will be more satisfactory upon that question than it is here.

But suppose Priest did receive said $7646.50 from Harrison as the purchase price of this land, and that he paid partnership debts with it, which, however, he did not do, as will appear later, still those facts should not and will not estop or bar plaintiff's right to have the title to this land ascertained and determined, for the obvious reason that neither the plaintiff nor any of those whom he represents was responsible for the assignment of the partnership assets to Priest, nor for the partition and sale of this land to Harrison by him. Priest was an intruder, pure and simple, and was not acting in any representative capacity, legal, moral, or otherwise for plaintiff, or for any of those whom he represents. Nor did the circuit court have any authority or jurisdiction to decree the partition and sale of this land, as before determined. So it must be perfectly apparent to every one that Priest's action in the premises had no more binding force and effect upon the rights of plaintiff and of the heirs and devisees of Dickson than if the assignment had never been made, or that the partition and sale had never occurred.

His pretended sale under the void partition proceeding was no more valid than if he had intermeddled in the matter and sold the land as an individual without the color of said void legal proceedings; and the facts that Harrison paid his money to this intermeddler, and the latter's payment of the same in satisfaction of partnership debts, if he did so pay it, would no more estop or bar plaintiff's right to prosecute this action than if Priest had by force taken charge of the partnership property, sold the same and applied the proceeds thereof in payment of partnership debts. No intruder or intermeddler without legal sanction can of his own volition seize upon the assets of a partnership estate, sell the same, apply the proceeds thereof in satisfaction of the partnership demands, and thereby estop the representatives of the individual and part-

nership estates from suing for and receiving back those assets; and that is true regardless of the motives of the intermeddler. The law will tolerate no such conduct; and to permit that to be done would clearly sanction the taking of one's property without due process of law. That can only be done by a legally constituted tribunal, not by an individual, after a hearing and determination of the matters according to the laws of the land, and not according to the views of an individual, however wise he may be, pure or honest his motives may be. All such acts are absolutely null and void, and have no force or effect whatever upon the rights of those who own property and are entitled to the possession there, as was substantially held by this court in the case of State ex rel. v. Withrow, 141 Mo. 69.

While it is true a court of equity might, and doubtless would, in a proper proceeding and under a proper showing, protect the interest of all persons who had in good faith parted with their money upon the strength of such void legal proceedings; but that cannot be done in this case, for the reason that under section 650, Revised Statutes 1899, the section under which this suit was brought, the courts can only "ascertain and determine the estate, title and interest" of the respective parties to the proceeding, and have no power or authority to ascertain and determine the equities existing between them—that must be done in another proceeding, as has been held by this court in a number of cases. [Powell v. Crow, 204 Mo. 481, and cases cited.]

There is nothing in what we have here said which is in conflict in the least with the rulings of this court as stated in the cases before cited and relied upon by counsel for defendants, which, in effect, hold that where a defendant in an execution stands by at a sale and not only permits his land to be sold in satisfaction of his debt but receives the surplus of the proceeds there-

of, he will thereby be estopped from claiming the land. But that is not this case—neither the plaintiff nor his predecessor in office was a party to the so-called partition proceeding. While the widow and children of Dickson, and Eads and Bates, and the executors under the will of Dickson, were made parties defendants to said void partition proceeding, yet they did not appear nor were they under any legal or moral obligation to appear and defend said suit, nor could they have done so had they so desired, as their rights to manage, control and enjoy the estate will not attach to the surplus thereof, if any remains, until after paying the partnership debts, which has not been done yet, and until that is done the plaintiff alone can sue for and recover the partnership assets. Nor did plaintiff, or the children of Dickson, or Eads and Bates, the executors under Dickson's will, ever receive one cent from the proceeds of the sale of this land, which was made under said void partition decree, and they are not bound thereby. [Bone v. Tyrrell, 113 Mo. 175.]

In fact, it is not contended here by counsel for defendants that they did receive any portion thereof. The extent of their claim is, that those proceeds were paid by Priest to protect certain partnership property from sale and sacrifice under a mortgage, etc., but it is not shown that he thereby protected said property from sacrifice; if so, he never inventoried the same as an asset of the estate, or accounted for the proceeds thereof if he sold it. Nor is it claimed that any one who had the legal or moral authority to represent plaintiff or any of the other persons who were interested in the affairs of the partnership, or in the individual estate of Dickson, made said payments to protect said property from sale. Mr. Priest, without legal right, made the sale and paid the money out, and neither the plaintiff nor those whom he represents should be made to suffer for the former's unauthorized conduct.

View this case from whatever standpoint you may, there is no legal obstruction whatever in the nature of an estoppel which can bar plaintiff's right to have his rights in and to this land ascertained and determined in this action, as prayed; and, consequently, we hold that he is not estopped.

V. We now come to the consideration of the fourth and last ground assigned by counsel for defendants, why plaintiff should not be permitted to maintain this action, namely, because of the laches on the part of plaintiff and on the part of those whom he represents.

**Laches.**

In the consideration of this question the fact should be constantly borne in mind, that this estate has been pending in the courts of this State ever since the death of Dickson, which occurred January 26, 1871, and that it has been the subject of almost constant litigation ever since, not only in the circuit and probate courts of the city of St. Louis but in this court also, this being the third time, if not the fourth time, it has found its way here by one means or another. It is not therefore to be likened unto a case which has rested dormant out of court during all of these years. This record discloses the fact that some phase of it has been the subject of active litigation all of that time. We must, therefore, view the conduct of all of the parties who are interested in this estate in the light of those facts.

It is first insisted by counsel for defendants as regards this defense, that plaintiff should not be permitted to maintain this action, regardless of their legal and equitable rights to this property, for the reason that he and those whom he represents did not move earlier in assailing the conveyance of this land to Harrison under the void partition proceeding had in the circuit court of the city of St. Louis. That since then this land has become very valuable, and in consequence

of this long delay, they have constructed vast and valuable improvements thereon, which would be lost to them should plaintiff be permitted to maintain this action.

Upon the other hand counsel for plaintiff contend that he and those whom he represents should not be denied their right to this property on account of delay in bringing this suit, for the reason that defendants and those through whom they claim caused all of this litigation and delay in winding up and settling this matter, and have thereby wrongfully detained this property from its rightful owners during all of these years, and that they are in no position to complain of plaintiff's laches, even though they were guilty of such, which, however, they most earnestly deny.

Let us look at this case as it is and consider the relations the parties hereto bear to it, and their respective interests in and to this estate, and the rights and duties each have and owe to the other in that regard.

In the first instance, this property belonged to the partnership estate of Murdoch & Dickson, and under the laws of this State it was made the duty of Murdoch, the surviving partner, to administer upon it, and, first, to pay therefrom all partnership demands, together with the costs and expenses of winding up the partnership business; and, in the second place, the law made it his duty to turn over the remaining one-half thereof, if any, to Eads and Bates, the executors under the will of Dickson, to be by them held as provided by said will. How did Murdoch discharge that duty? This court has answered that question in the negative by its decision in the case of State ex rel. v. Withrow, supra. Whose fault was it that Murdoch violated his duty in that regard? Clearly, it was not the fault of the children of Dickson, or the executors under his will, who are the real instigators of this ac-

257 Mo.—48

tion, as counsel for defendants concede and contend
are responsible for its institution and prosecution.
Their rights to the possession and enjoyment of this
estate have not yet attached, and for that reason, as
before stated, they have at no time had an opportunity
to sue for, in their own names or in their own right,
or to recover the possession of this property. The rep-
resentatives of the partnership estate alone have that
right. While it is true, the children of Dickson are
responsible for the instigation and prosecution of this
suit, yet it is not done in their names, nor in the first
instance for their benefit, but is prosecuted in the name
of the administrator of the partnership estate, and,
primarily, for the benefit of the partnership creditors;
and, if perchance anything remains of this partnership
estate after paying all of those demands, then and not
until then will it become the property of the individual
estate of Dickson, and not until then will his children
be entitled to the possession and enjoyment of any
part of it. That being unquestionably true, then let
us see who are the most guilty of laches in not mov-
ing earlier for the appointment of an administrator
de bonis non of this partnership estate to succeed Mur-
doch, the surviving partner, who was removed by the
probate court, and for the delay in its administration.
In the light of this record, can it be said that greater
laches lie at the feet of those children than are those
which have rested all of these years at the feet of
these defendants, all of whom were full grown men
and possessed vast business knowledge and experience?
We think not. Clearly, the former had nothing to do
with the assignment made by Murdoch to Priest, nor
his removal from office. Harrison and those claim-
ing with and through him were tenants in common with
Maguire, and he was directly interested in having this
land partitioned, while these heirs were only indirectly
or more remotely interested in that regard; and they
had nothing whatever to do with its partition and sale,

nor did they contribute in the remotest degree to bring it about. They were not even represented therein. There was no administrator of the partnership estate in existence at that time whose duty it was, primarily, to represent the partnership estate; and, secondarily, the individual estate of Dickson; consequently, these children were not represented in that suit either through the administrator of the partnership, even in an incidental manner, nor by Eads and Bates, the executors of Dickson's will. Neither the latter nor said children were under legal or moral duty to appear and defend said void proceedings, conceding they had the legal right to do so. But so much cannot be said of Mr. Harrison and those owning with and claiming this land through him. He and his cotenants were the active agencies in bringing about these void proceedings, consequently they knew all about what had been done, which resulted in the pretended sale of this land to him and them; and he actually paid double the amount of his bid for the land in order to prevent the filing of exceptions to the confirmation of the sale which was made to him. So far, clearly, neither these children nor any one who represents them have been guilty of laches or wrongdoing, but we have seen that this entire trouble and litigation was brought on by the wrongful conduct of Harrison and his associates; and they are now interposing the doctrine of laches against the children of Dickson for the purpose of preventing their recovery of that which he and they wrongfully took from and now detain from them, and which is still theirs, if anything remains thereof after the paying of the partnership debts.

The defendants, after their wrongful taking and wrongful use and enjoyment of this valuable property for thirty-five years, free of rent, now insist that plaintiff should not be permitted to maintain this action, because the creditors and said children did not instigate the bringing of this suit earlier for the purpose of

undoing defendants' wrongs and restoring this property to its rightful owners.

What a contrast there is between the conduct of the plaintiff and those whom he represents and the conduct of defendants regarding this property! The most that counsel for defendants have or can urge is the former's inactivity, or, more properly speaking, delay in not making an earlier move looking to the restitution of this property back to the hands of the probate court for the purposes of administration, which, confessedly, had been unlawfully diverted in fact, but not in law, from its control and from the proper channels of administration through the wrongful assistance of the circuit court, a court of superior jurisdiction and control over the probate court, which completely stifled and paralyzed the power of the latter to act in the premises, with no administrator or other person to represent it or the partnership estate (the surviving partner having been removed from office December 30, 1873) to move the dismissal of the assignment proceeding in the circuit court. Nor do defendants criticise the inactivity of the plaintiff personally for the reason that he was not appointed administrator *de bonis non* until August 11, 1895; and since that time he has been very lively in the prosecution of various phases of this case in the various courts of the State, this being the second time he has been in this court with it, to say nothing regarding his contests in the circuit and probate courts of the city of St. Louis. But the shaft of their criticism is directed to the inaction of Eads and Bates, the executors of the will of Dickson, and at the latter's children. Counsel for defendants say that these latter parties were guilty of laches for not having gone into probate court at an earlier date and moved the appointment of an administrator *de bonis non,* in order that he might rip up and undo their unlawful acts, which he is now trying to do. Would they not have opposed him just

as bitterly then as now? Did not Harrison pay twice
as much as he said by his bid the land was worth in
order to consummate this wrong? Should Dickson's
children be deprived of their land on account of laches,
pure and simple, when under the will of their father
they could not act in their own names until the young-
est thereof arrived at the age of twenty-four years,
and when Eads and Bates, the executors of the will,
had no legal right to sue for or to recover the posses-
sion of this property until all of the partnership debts
were paid, which has not yet been done; and in addi-
tion thereto when there was no administrator in exist-
ence to represent the partnership estate, and inciden-
tally the individual estate of Dickson?

Counsel for defendants answer this question in the
affirmative, and assign as their reason therefor that
Eads and Bates and these children while they could
not sue for and recover this property in their own
names, yet they could have appeared in the probate
court on account of their contingent interest in this
property, and have suggested to the court that it should
have appointed an administrator *de bonis non* who
could have sued for and recovered this property placed
back in its proper channels, namely, primarily, for the
purpose of paying the partnership debts, and, sec-
ondarily, to be turned over by him to the executors
of Dickson's will, and, ultimately, by the latter to
the children of Dickson according to the terms of his
will.

It seems to me when we view this entire case in
the light of this record, with the legal disabilities of
the interested parties, and the wrongful diversion of
this property from its proper channels, and the illegal
obstructions thrown in the way of its recovery by
the defendants, or by those through whom they claim,
with notice, that the plea of laches, to say the very
least of it, comes of exceedingly poor grace; and in
my opinion no court of justice should permit that plea

to defeat this action, or prevent the recovery of this property, which in law and good conscience belongs to the parties before indicated, and which has been wrongfully taken and detained from them by defendants, who have no legal or moral right thereto, except, perchance, some of whom, as before suggested, may have some equities therein, which can be adjusted and determined in a proper case.

The doctrine of laches should not be applied to a case of this character, otherwise a court of equity would be lending its assistance to one to enable him to take advantage of his own wrong to the detriment of the injured party, which should never be done.

So far we have discussed this case upon the theory that Harrison and all of the other defendants stand upon the same footing, and have held them responsible for his wrongdoing; and the reason for our so doing is because all of his acts and connections with this property were matters of public record which formed links in the chain of title thereto, and through which they claim their respective titles thereto. Consequently, they had notice of the fact that Harrison had no title to this land when they purchased it from him; and it is no excuse for those defendants to say Harrison had colorable title, and that they should be excused for not discovering the fact that he had no title. If they should be excused for not discovering the fact that Harrison's deed to this land was void when they deraign title through him, and presumably after an investigation of the title to this property, then by what process of reasoning should a court of equity apply the doctrine of laches to these children for not discovering the same fact, when, primarily, that duty rested upon the administrator of the partnership estate, and not upon them, as before stated?

In addition to the foregoing observations, the records of the probate and circuit courts of the city of

St. Louis show that at the time those defendants pur-
chased from Harrison, this property was in the custody
of the law and under the exclusive jurisdiction and
control of the probate court, which fact prevented
Priest and all others, except the proper representative
of the partnership estate of Murdoch & Dickson, from
selling it to any one.

In addition to that, not only did the record in the
partition suit of Priest et al. v. Maguire et al., before
mentioned, show upon its face that the circuit court
had no jurisdiction of the case, as held in State ex rel.
v. Withrow, supra, but it also shows that there was
never a final decree rendered therein, for the reason
that said Division had no authority or jurisdiction
to render said pretended final decree which was en-
tered by it, even though it be conceded Division One
which rendered the interlocutory decree had jurisdic-
tion and authority to do so. [State ex rel. v. Riley,
219 Mo. 667; Collier v. Lead Co., 208 Mo. 246.] Ac-
cording to these authorities that suit is still pending
with no jurisdiction in either of said divisions to try
and determine the same, and for that reason it should
be dismissed, that court having jurisdiction to make
that entry only.

So, it is seen that the decree under which this land
was sold and through which all of the defendants de-
rive title was doubly void, if I may so use that term,
all of which was apparent on the face of the record,
and which imparted notice to them; and as they pur-
chased with their eyes open, they and not the legal
owners of the property should suffer—especially
should that be true when the former brought about
those void proceedings without the connivance or as-
sistance of the latter. And doubtless those illegal pro-
ceedings greatly hampered and impeded the probate
court and the lawful owners of this property from ad-
ministering it according to law, which should go a

long way toward excusing them for not acting sooner, even though it be conceded they were guilty of laches.

It must, therefore, follow that the defendants who claim through Harrison have no greater right to rely upon the void partition proceedings had in the circuit court than he himself had.

The doctrine of *lis pendens* should be especially applied to the administration of estates of deceased persons in the probate courts, for the reason that such

**Lis Pendens.** a proceeding is one *in rem,* the owner thereof being dead; and if it were not for the application of that rule it would often be difficult, if not impossible, for such courts to administer the law, as their orders and judgments operate upon the *res* and not upon the person. And along this same line this court In Banc recently held in the case of Jarboe v. Jarboe, 227 Mo. 59, that in the administration of a partnership estate, where the partnership was dissolved by death, the probate court possesses and exercises the same powers courts of equity formerly exercised in such cases.

In discussing the doctrine of *lis pendens* Judge RICHARDSON in the case of Herrington v. Herrington, 27 Mo. 560, said: "The policy on which the doctrine of *lis pendens* is founded, is to give full effect to the judgment which might be rendered in the suit depending at the time of the purchase." [Turner v. Babb, 60 Mo. 348.] "It is simply the power or force of the jurisdiction of the court. It is of itself simply the power of the court taking effect upon the subject-matter of the litigation so as to preserve the *status quo* —hold it within the grasp of the court for the execution of the final decree or judgment." [Burnham v. Smith, 82 Mo. App. 48.]

Bennett on *Lis Pendens,* p. 251, states the doctrine as follows: "Where a suit is either in whole or in part, in the nature of a proceeding *in rem* to recover, enforce a lien upon or subject to decree specific prop-

erty, a sale of the subject-matter of the litigation after *lis pendens* has commenced, even to one who had no notice of the suit, will not change the rights of the parties to the litigation or the power of the court over the subject of the action. Such an one is a *pendente lite* purchaser. He is not a necessary party to the suit, and takes *cum onere*. Although this is said with reference to a proceeding *in rem,* the principle should not be applied in any narrow sense. In any case where by the commencement of a suit a lien is created or asserted, and the court acquires jurisdiction over and the power to administer the property involved, it may be said that the suit is a proceeding *in rem.*"

The rule is stated in a slightly different form in 21 Am. & Eng. Ency. Law (2 Ed.), 601: "The law of *lis pendens* has also been placed upon the ground that actions and suits affecting specific property are actions *in rem,* or substantially so, and they are frequently said to be notice to all the world, which is true of actions *in rem* strictly so-called. But no jurisdiction is acquired to proceed *in rem* without a seizure of the property, which of itself prevents effective transfers, and there may be no personal defendants; whereas *lis pendens* subjects to the judgment or decree interests acquired *pendente lite* from parties to the suit, in property not in the possession of the court by seizure or otherwise."

The Statute of Limitations has no operation upon the subject of litigation, and hence, does not run in favor of the purchaser *pendente lite,* who cannot be regarded as holding adversely to the parties to the suit during the continuance of the litigation. [1 Am. & Eng. Ency. Law, 218; 27 Am. & Eng. Ency. Law, 653; Henly v. Gore, 4 Dana, 133; Blake v. Heyward, Bailey's Eq. (S. C.) 208.]

This view of the case renders it unnecessary for us to review all of the authorities cited by counsel for defendants bearing upon the question of laches. Ac-

cording to the foregoing authorities those codefendants of and who claim through Harrison occupy a no more favorable position in this case than the one occupied by him.

We must, therefore, rule that the doctrine of laches will not bar plaintiff's right to maintain this action.

V. Having disposed of all of the questions presented which were common to all of the defendants, we will now consider those which apply to the city of St. Louis alone.

The uncontradicted evidence for the city showed that the streets and the wharf located upon and over this land were and always have been, **Streets:** "from a time whereof the memory of **Prescription:** **Limitations.** man runneth not to the contrary," public streets and highways, used, recognized and considered as such by the public in general, including the plaintiff, all persons whom he represents, and had never at any time been used for any other purpose; that the streets had been used and treated as such for more than a half century, and the wharf ever since 1864; that the city had had the possession and control of them, claiming the fee simple title to the property embraced thereby, during all of said time, and that such control and possession had been actual, continuous, open, notorious, uninterrupted and adverse to all persons; that said streets and wharf were at divers and sundry times improved and graded by ordinance, and their names publicly designated and changed.

Upon that evidence the trial court found for the city, and rendered the following decree, to-wit:

"And the court doth further order, adjudge and decree that defendant the city of St. Louis is entitled by prescription to hold, use, occupy and possess all the streets within the limits of the real estate hereinabove mentioned and the accretions thereto, as public

highways, and is also entitled to both by prescription and by deed from Edwin Harrison to hold in fee simple so much of the wharf along the Mississippi River as lies within the limits of the real estate hereinabove mentioned and the accretions thereto, subject to the terms of the lease and the assignment hereof hereinafter mentioned.''

This decree in favor of the city is supported by the greatest abundance of testimony and should not be disturbed, for the reason that the evidence conclusively shows that said streets and wharf had been in the exclusive, continuous and adverse possession and control of the city under claim of ownership for many years prior to the death of Dickson. That being true, the Statute of Limitations, if it had not then run, began to run against Murdoch & Dickson while they were the owners of this property, and had completed its course long before this suit was begun. The law is well settled that where the statute once begins to run during the life of the owner of the land, or against the administrator, then his death or a vacancy in the administration will not suspend its operation. [Landes v. Perkins, 12 Mo. 238; Gordon v. Lewis, 88 Mo. 378; Pim v. City of St. Louis, 122 Mo. 654; Wilkinson v. St. Louis Dock Co., 102 Mo. 130, l. c. 141, 142]

So, under the evidence and the law in this case, plaintiff's cause of action is barred as to the city, for the reason that the statute had begun to run, if it had not completely run, during the lives of Murdoch & Dickson, the owners of the land.

In fact, we do not understand counsel for plaintiff to deny the correctness of the conclusions above reached as regards the city without its rights to said streets and wharf were determined adversely to it by the Supreme Court of the United States in the case of Tyler v. Magwire, 84 U. S. 253. The city was no party to that suit, nor was the question as to the rights of the city to those streets and said wharf in-

volved in that case, consequently that case in no manner arrested the running of the statute in favor of the city.

We, therefore, hold that the findings and decree of the trial court in so far as the city is concerned were proper.

VII.    The Standard Stamping Company and the Chicago, Burlington & Quincy Railway Company have filed separate a brief herein. But they have presented no new questions in addition to those so ably and earnestly presented by counsel for Harrison and the others claiming through him. And as they derived title through Harrison, with notice of plaintiff's rights, they likewise acquired no title to this land; and what has been said to them applies to these defendants also.

We have examined the motion to dismiss the writ of error, and have reached the conclusion that it is without merit.

We, therefore, are of the opinion that the city of St. Louis is the owner in fee of the streets and wharf described in the pleadings; and that the remainder of the land in question belongs to the partnership estate of Murdoch & Dickson, and that one-half of the surplus thereof, if any remains after the payment of the partnership debts, belongs to the estate of Dickson, to be administered according to the provisions of his last will and testament.

We, therefore, are of the opinion that the judgment should be reversed, with directions to enter a decree in conformity to the views above expressed, without attempting to settle or determine the equities, if any there exist between the parties to this suit; that must be done in a separate suit, if the parties so desire.

*Bond, J.,* concurs.